FILED

OO MAY -8 PM 2: 24

CLERK, U.S. DISTRICT COURT
MIDDLE DISTRICT OF FLORIDA
TAMPA, FLORIDA

UNITED STATES DISTRICT COURT
IN THE MIDDLE DISTRICT OF FLORIDA
TAMPA DIVISION

CHARLES E. HARDER,

    Plaintiff,

vs.

                                       Case No. 8:00-CV-270-T-26E
                                       JURY TRIAL DEMANDED

MICHAEL HAGA,

    Defendant.

_____/

### *PLAINTIFF, HARDER'S RESPONSE TO HAGA'S MOTION TO DISMISS FOR LACK OF JURISDICTION AND FAILURE TO STATE A CAUSE OF ACTION, MOTION FOR MORE DEFINITE STATEMENT AND SUPPORTING MEMORANDUM OF LAW*

COMES NOW the Plaintiff, CHARLES E. HARDER (hereinafter "HARDER") by and through his undersigned counsel, and responds to Defendant, MICHAEL HAGA's (hereinafter "HAGA"), Motion to Dismiss for Lack of Jurisdiction and Failure to State a Cause of Action, Motion for More Definite Statement and Supporting Memorandum of Law, and as grounds in support states:

1. On or about February 10, 2000, HARDER filed a two-Count Complaint against HAGA claiming injury as a result of HAGA's alleged defamation and intentional infliction of emotional distress (hereinafter referred to as the "COMPLAINT"). Defendant, HAGA has mischaracterized the intentional infliction of emotional distress Count as being one for extortion. However, any reading of that Count, although mentioning extortionate acts by HAGA, squarely rest upon the tort of intentional infliction of emotional distress, for which Florida law provides a remedy.

9

2.   Although the Defendant, HAGA, is a non-resident of the State of Florida, he not only committed the tortuous acts complained of within the State of Florida, he conducted business within the State of Florida and in fact acted as President of Radio Press International (hereinafter referred to as "RPI"), a Florida corporation with its principal place of business in White Springs, FL, and with its "nerve centers" in White Springs, FL, and in Ruskin, FL.  The defamation and intentional infliction of emotional distress visited by HAGA upon HARDER, occurred within the State of Florida and directly related to HAGA's claims that HARDER had mislead HAGA and other investors into investing in the Florida based corporation, RPI.

As will be shown in the accompanying Memorandum of Law in Support of this Response and in the Affidavits attached hereto, Defendant, HAGA's Affidavit is at best disingenuous and is at worst false.  Note, that Defendant, HAGA, does not explain to this Court that he acted as President of RPI, directed the employees of RPI, raised funds for RPI, sent out letters purporting to be the President of RPI, and eventually resigned as President of RPI.  The Affidavit of HAGA wholly avoids the issue of HAGA's conducting business  within the State of Florida through his radio programs, book sales and through his running the day-to-day affairs of the Florida based corporation, RPI.   Instead, HAGA's Affidavit disingenuously asserts that he was never nominated or appointed as President of RPI.  However, as will be seen in the accompanying Memorandum of Law: 1) RPI was formed by the actions of HARDER and HAGA; 2) the Initial Business Plan named HAGA as President; 3) HAGA wrote a letter stating that he wanted to act as President;  4) HAGA then acted as President; 5) HAGA sent letters indicating that he was the President, and; 6) HAGA eventually sent a letter

confirming that he had resigned as President of RPI.  In short, the carefully worded Affidavit of HAGA does not tell this Court the whole truth about HAGA's actions within the State of Florida in order to foster the false impression that HAGA has little or no contact with this forum state.

Finally, the allegation of both Counts I and Count II are sufficient to state causes of action and are sufficient to meet the jurisdictional requirements of this Court.

WHEREFORE, Plaintiff, CHARLES E. HARDER, respectfully requests that this Court enter an Order denying Defendant, HAGA's Motion to Dismiss and Motion for More Definite Statement and requests such other and further relief as this Court deems just and proper.

## MEMORANDUM OF LAW

### INTRODUCTION

This action arises out of a dispute between HARDER and HAGA with regard to the Florida corporation, RPI.  HARDER and HAGA were the initial proponents of RPI, worked on RPI's Business Plan attached to the Complaint as Exhibit "A," and entered into an oral agreement confirmed in various writings, whereby HAGA: 1) would become the President of RPI, 2) would take his shares of RPI in the name of his other corporate entity, Acclaim Publishing Company, Inc., 3) would solicit shareholders to invest in RPI and, 4) would otherwise run the business of RPI. HAGA agreed to become President of RPI, as will be seen from his own words in correspondence he has sent, ran the Florida-based business as the President, informed everyone that he was the President, directed the employees of RPI, made the business decisions for RPI, issued the stock certificates of RPI to the investors, and in fact, was the person who solicited said investors.  Now,

however, he is claiming that he does not have minimum contacts with the State of Florida despite his running a corporation in the State of Florida and despite the fact that he has committed torts related to RPI within the State of Florida. In short, the claim that this Court lacks in personam jurisdiction over HAGA is ludicrous.

With regard to the allegation that Counts I and II fail to state a cause of action upon which relief can be granted, the main contention is that Count I is an action for recovery for the crime of extortion. That contention is false. Count I is a Count for intentional infliction of emotional distress and merely mentions the extortionate behavior of HAGA. Florida law recognizes the tort of intentional infliction emotional distress and any fair reading of that Count would indicate that is what the Count was intended to constitute.

## ARGUMENT

### I.

### The Complaint should not be dismissed because this Court has personal jurisdiction over Defendant HAGA.

1. This Court has a sufficient basis for the assertion of personal jurisdiction over HAGA under Florida's Long-Arm Statute (Fla. Stat. § 48.193(1)(b)). In this case, HARDER has alleged that the tortuous conduct of HAGA occurred within the State of Florida.

(1) **The harm occurred within the State of Florida.** It is uncontroverted that HARDER is a resident of the State of Florida and the intentional infliction of emotional distress that he suffered was within the State of Florida (see paragraph 2 of the Complaint). As can be seen

by Exhibit "A" to the Complaint, the RPI Business Plan, HAGA was involved in the business of RPI and was even raising additional money in order to "salvage" RPI. Additionally, the Exhibits attached to the Complaint authored by HAGA made numerous references to RPI and to the criminal charges which he intended to bring against HARDER. Paragraph 6 of Count I specifically references HAGA's threat to institute proceedings with the Comptroller's Office of the State of Florida and specifically with the Department of Banking and Finance. Accordingly, under Federal notice pleading, HARDER has certainly plead sufficient facts to indicate that the torts contained in Counts I and II occurred within the State of Florida, especially when read in conjunction with the attached Exhibits. Moreover, the Florida Statute covering the crime of extortion is referenced in paragraph 8 of Count I. It is clear from reading the Complaint as a whole that the threatened act of going to the Florida Comptroller's office to bring charges against HARDER unless HARDER invested approximately $40,000.00 is a crime committed within the State of Florida. HAGA, in response to that issue, states on page 5 of his Motion, footnote 2, that he is unable to find case law in Florida discussing the reach of Florida's Long-Arm Statute to defendants engaging in extortion. However, it is obvious that the crime of extortion occurred within the state. Accordingly, it goes without argument that because HAGA could be prosecuted within the State of Florida for having committed a crime in violation of Florida Statute §836, as identified in paragraph 8 to the Complaint, civil courts would certainly have jurisdiction over him for the related tort of intentional infliction of emotional distress.[1]

---

[1]Moreover, because HAGA has misread Count I as being one for extortion instead of a Count for intentional infliction of emotional distress, HAGA has not provided this Court with any analysis of the jurisdictional aspect of intentional infliction of emotional distress. Certainly, as a starting point, the emotional distress occurred to a Florida resident. Accordingly, the harm occurred in the State of Florida.

2. **HAGA conducted business within the State of Florida**.  The second phase of the two-part jurisdictional analysis, the "due process" phase is easily satisfied in this case.  HARDER agrees with HAGA's statement of the law in that the first  prong requires this Court to consider whether HAGA has purposely established "minimum contacts"  with the State of Florida out of which this action arises.  The second prong requires this Court to consider whether the assertion of personal jurisdiction over HAGA would offend judicial notions of fair play and justice.    Sun Bank, N.A. v. E.F. Hutton & Co., 926 F.2d 1030, 1034 (11th Cir. 1991).

The question, as phrased by HAGA, is whether HAGA purposely availed himself of the privilege  of conducting activity in the forum state thus invoking the benefits and protections of its laws,  Burger King Corp. v. Rudzewicz, 105 S.Ct. 2174, 2183 (1985).  HAGA's brief, at page 7, claims that HAGA's Affidavit supports the notion that he has not availed himself of the privilege of conducting activities in the forum state, and therefore did not invoke the benefits and protections of this State.  However, HAGA's Affidavit carefully never addresses the issue of his having conducted business within the State of Florida and carefully skirts the issue of his acting as President of RPI.  See HARDER's Affidavit attached hereto as Exhibit "1" which clearly establishes, not only through HARDER's sworn statements, but also through HAGA's statements and through HAGA's signed letters attached to HARDER's Affidavit.  HARDER's Affidavit and HAGA's own letters materially and directly contradict HAGA's claims made within his Affidavit.  However, in order to fully advise this Court of the claims made by HAGA in his motion to dismiss and in his Affidavit, in contradiction to his own written words, the following analysis is necessary.

3. **HAGA was the acting President of the corporation RPI**  (see the Affidavit of Charles Harder attached hereto as Exhibit "1"and, in particular, the Exhibits attached thereto). The Complaint

alleges that HAGA was the President of RPI. HAGA's response, in his brief, at page 7, is as follows:

> Indeed, HAGA's only involvement with Florida-resident HARDER is the result of HARDER's solicitation of HAGA, in the State of Colorado, to become involved in an infirm Florida "corporation" (Radio Press International) which never got off the ground (see Exhibit "A"). In fact, although HARDER identifies HAGA as the President this precarious corporation in his Business Plan, no board or shareholder meeting ever took place (see Exhibit "A"). HAGA was never elected or appointed to any officer or director position in the corporation, and was not even a shareholder (see Exhibit "A"). HAGA clearly has not purposely availed himself of the privilege of conducting business activities in the State of Florida to invoke the benefits and protections of its laws.

However, in contradiction to those bold statements made to this Court, we have the following:

(1) Exhibit "A" to HARDER's Affidavit, that being the Radio Press International Business Plan which identifies "Mike Haga, President."

(2) HAGA's letter to HARDER dated December 31, 1999, attached to HARDER'S Affidavit as Exhibit "B", clearly shows HAGA's involvement with RPI, shows his concern and analysis of the financial problems of RPI, discusses the infusion of additional capital in RPI, confirms that "investors now have their stock certificates, P/L and balance sheets in RPI." HAGA goes on to state that "I have spoken with each of them about raising more money-$250,000.00 which is just a number which I feel we must have to insure success in the venture." The letter ends by HAGA saying, "from here I only want positive gains-if we move forward." Accordingly, there can be no question of HAGA's involvement in RPI.

(3) HARDER's letter of October 20, 1999 to HAGA (attached to HARDER's Affidavit as Exhibit "C") confirmed the agreement between the parties: "Pursuant to our agreement,

you [HAGA] are loaning the company [RPI] $250,000.00 which again is just a number, and also buying 250,000 shares at the cost of .0001 per -share, or a total of $25.00."

(4) HAGA's letter to HARDER dated January 18, 2000, (attached to HARDER's Affidavit as Exhibit "D") confirms HAGA's corporation is, Acclaim Publishing Company, Inc.'s, interest in RPI: "Acclaim: 250,000 shares for $25K invested." Accordingly, at a minimum, HAGA took the shares of stock which he had paid for and placed them in Acclaim.

(5) HAGA's letter to HARDER dated October 20, 1999, (attached to HARDER's Affidavit as Exhibit "F") confirms that HAGA is investing through his corporation, Acclaim: "5. Our investment will be made in the name of Acclaim Publishing Company, Inc.." Additionally, in paragraph 6 of HAGA's letter HAGA states: "6. If you still would like me to act as President of RPI, I would be honored." Note too, that the letter discusses the RPI Business Plan, changes within it and a series of complex and insightful suggestions. Moreover, in paragraph 4 HAGA states: "4. I would like to be able to initially purchase an additional 200,000 shares of stock @ 1 cent a share-as incentive to bring the two (or more) initial investors on board." Following that paragraph is the language quoted above that "our investment" will be made in the name of Acclaim Publishing Company, Inc.

(6) Attached to HARDER's Affidavit as <u>Exhibit "G"</u> is HAGA's letter of January 2, 2000, wherein he states, "as President of RPI I have a duty to investors. I don't want to be personally sued in the future by investors claiming I went along with this nonsense." Accordingly, there can be no question that HAGA acted as President of the Florida-based and operated RPI. Note, that there is absolutely no mention by HAGA in his Affidavit that he acted as President of the "start-up" RPI

Florida corporation, but only the disingenuous assertion that he was never "nominated or appointed" as President of RPI. Because the initial board meeting had not yet occurred, HAGA was the acting President of RPI and undertook those duties.

(7) Additional, conclusive evidence on the issue of HAGA's presidency at RPI is his letter of January 13, 2000 to a third party on the letterhead of RPI, indicating its business office in White Springs, FL, followed by text and then signed "Mike Haga, President." A true and correct copy of that letter is attached as Exhibit "H" to HARDER's Affidavit.

(8) If there were any doubt in anyone's mind that HAGA did in fact act as President of RPI, his letter of January 23, 2000, attached to HARDER's Affidavit as Exhibit "I" ends that doubt. In that letter, HAGA confirms that he has resigned as President of RPI.

(9) See the Affidavit of Ed Shiflett attached hereto as Exhibit "2,", wherein Shiflett, a non-party to this action states that: 1) HAGA described himself as the President of RPI (paragraph 3); 2) HAGA oversaw the day-to-day operations of RPI (paragraph 4); 3) HAGA directed his actions as to RPI (paragraph 5); 4) HAGA's instructions to Shiflett, "whether written or oral, were made to [Shiflett] in conjunction with [Shiflett's] work for RPI in the State of Florida (paragraph 6) and; 5) HAGA authorized Shiflett's incurring expenses in the State of Florida (paragraph 7).

4. **The activities of HAGA within the State of Florida are related to the litigation.** HAGA states: "What unsolicited contact he has had with HARDER is completely unrelated to the alleged defamatory statements which form the basis of this litigation." [Motion to Dismiss at p. 8]. However, that assertion is not only unfounded, it is directly contradicted by HAGA's letters attached

to HARDER's Affidavit. [See Exhibit "1"] In this case, the defamation and intentional infliction of emotional distress, arise out of HAGA's contentions that HARDER has misrepresented information within the Business Plan to RPI. [Complaint at paragraph 5]. HAGA was the acting President of RPI and was the individual responsible for raising the money for RPI. Moreover, HAGA did in fact bring investors into the Florida based RPI. [Exhibit "B" and "E" to HARDER's Affidavit] Accordingly, not only is it absurd to claim that HAGA's contact with HARDER was "unsolicited," HAGA's activities in the State of Florida with regard to RPI and his status with RPI constitute the very basis for this litigation.

5. **HAGA did understand that Florida would be the forum state for any litigation regarding any shareholder claims related to RPI.** HAGA's facsimile of January 2, 2000, attached to HARDER's Affidavit as Exhibit "G" states, in pertinent part, as follows: "No one wants to take control of anything, other than spending. As President of RPI, I have a duty to investors. I don't want to be personally sued in the future by investors claiming that I went along with this nonsense." That letter, in addition to confirming that he was the President of RPI, further confirms the fact that he knew he might be sued as President of RPI by the investors.

(1) **The Business Plan for RPI contains a forum selection clause.** The Business Plan attached to the Complaint and attached to HARDER's Affidavit as Exhibit "A" specifically states as follows:

> Any investor must understand that this is an unregistered private placement and is guided by the laws of the State of Florida and no other jurisdiction. Any legal action by an investor must be brought in the State of Florida. By making any investment you subscribe to these terms and conditions. (Emphasis added)

Accordingly, HAGA's having received the Business Plan, having participated in the Business Plan, being named as the President within the Business Plan, being an investor (either directly or through his company, Acclaim Publishing Company, Inc.), his acknowledgment of potential liability to the investors as President of RPI, when combined with the forum selection clause contained with the Business Plan, makes HAGA's assertion that, "thus, it is plainly understandable that HAGA never expected to sue or be sued in the State of Florida" is impossible to comprehend. [Motion to Dismiss at p. 8].

  6. **HAGA's contact with the State of Florida was continuous and deliberate**. HAGA ran a business within the State of Florida: namely, RPI. HAGA acted as President of RPI. HAGA lent money to RPI. HAGA invested in RPI through his company, Acclaim Publishing Company, Inc.. HAGA issued the stock certificates of RPI to the investors. HAGA oversaw the day-to-day operations of RPI. And, HAGA was the person responsible for bringing investors into RPI and in fact brought investors into RPI. Accordingly, the baseless claim that HAGA's activities in the State of Florida were merely limited to unsolicited contact with HARDER is false. HAGA ran a business in the State of Florida and contrary to the allegations in the Brief at the top of page 9 that, "the allegations of the Complaint, at best, merely reveal that HAGA forwarded one electronic message over the Internet to Kay Reetz, an employee of HARDER" which the Defendant concedes for purposes of argument that Ms. Reetz resides in the State of Florida, is contradicted by the dozens of communications between HAGA, HARDER, the employees of RPI, Ed Shiflett and Doug Perreault, the CPA and Treasurer of RPI.[2]

---

  [2] Note that virtually all of HAGA's correspondence attached to HARDER's Affidavit indicates a facsimile destination at (904) 397-4492, a Florida area code and number.

7. **The State of Colorado has absolutely no interest in this matter**. Interestingly, HAGA asserts that the State of Florida has no interest in the matter. How the State of Florida would have no interest in a dispute between officers of a Florida corporation, RPI, over claims that the Business Plan for RPI contained false assertions, where the Business Plan for RPI has a forum selection clause naming the State of Florida as the sole venue for litigation, and where the torts were alleged within the Complaint to have been committed with the State of Florida, is mind boggling. The basis for the unfounded claim that Florida has no connection with the dispute is made within the Motion to Dismiss on pages 10 and 11. Each point made within the Motion to Dismiss on that issue will be addressed here.

(1)   HAGA claims that he has no meaningful ties to the State of Florida. As shown above, that claim is preposterous. Moreover, HAGA has had his radio program aired in Florida [HARDER's Affidavit at paragraph 18], has utilized his 800 telephone number to sell his books and publications in the State of Florida [HARDER's Affidavit at paragraph 19] and has had a continuous relationship with Florida based radio network UBN [HARDER's Affidavit at paragraph 18].   A sub-point to that claim is that HAGA has filed an Affidavit claiming that he suffers from a debilitating, life-threatening disease. Nonetheless, HAGA's assertions are unsupported by anything other than his own personal claims. Secondly, HAGA had no problem running a Florida based corporation from Colorado. And, as to any claim that HAGA can not travel, a careful review of HAGA's Affidavit indicates that he claims that his doctors do not recommend travel, but his Affidavit contains nothing indicating that he does not and can not travel. Nonetheless, HAGA's physical condition is not determinative of the issue of personal jurisdiction.

(2) The second point raised by HAGA is that, "any interest Florida may have in

-12-

adjudicating this personal claim brought by one individual against another for tortuous conduct is heavily outweighed by other relevant considerations." [Motion to Dismiss at p. 10]. After stating that conclusion, those alleged relevant considerations are not listed by HAGA.

(3) The third point made in the Motion to Dismiss is that, "as HARDER had no problem soliciting HAGA in the State of Colorado to get involved with a specious corporation, he will have no problem obtaining effective relief in the Courts of the State of Colorado." First, HAGA's claim that he was solicited by HARDER within the State of Colorado is directly contradicted and refuted by HARDER's Affidavit. HAGA had continuous contact with HARDER and HARDER's organization within the State of Florida because HAGA was broadcasting his radio program within the State of Florida for HARDER and for the Florida based corporation, United Broadcasting Network, Inc. [HARDER's Affidavit at paragraph 19]. It was through that business relationship within the State of Florida, that HAGA and HARDER began to discuss the possibility of creating RPI. [HARDER's Affidavit at paragraph 6]. Accordingly, the initial premise of HARDER's having solicited HAGA in the State of Colorado is false.

(4) The final contention at the bottom of page 10 of the Motion to Dismiss is that the instant lawsuit was filed by HARDER in the State of Florida just shortly after HAGA informed him that he intended to sue HARDER for fraud in the inducement, among other things, in the State of Florida. That Statement is apparently counsel's own and is unsupported by any Affidavit. Moreover, even if the assertion were true, it is meaningless within the context of the jurisdictional issue presented to this Court. This is not a case of forum shopping "which should not be condoned

-13-

by this Court." [ Motion to Dismiss at p. 11]. It is a case of a Florida dispute, regarding a Florida corporation and two officers of that corporation, regarding the claims made in a Business Plan for a Florida based corporation, containing a Florida forum selection clause and related torts perpetrated within the State of Florida.

HAGA's concluding paragraph on the issue of Florida's connections with this dispute claims that, "given the 'utter poverty' of contacts between HAGA and the State of Florida, and the profound offense to traditional notions of fair play and substantial justice that will result if this Court exercises personal jurisdiction over him, HAGA respectfully requests that this Court dismiss the Complaint." The only "utter poverty" in this case is related to the complete lack of candor in HAGA's Affidavit with regard to his contacts with the State and the disingenuous arguments based upon that Affidavit.

8. Count I of the Complaint should not be dismissed for the simple reason that it is a Count for intentional infliction of emotional distress and not a Count for common-law extortion.

There is no dispute between the Plaintiff and the Defendant with regard to the contention that Florida does not recognize common-law extortion as a private cause of action. However, any reading of the Complaint would indicate that the Complaint is for intentional infliction of emotional distress, a cause of action which Florida recognizes. Nothing further need be stated in that regard. As to the final point made within the Motion to Dismiss that HARDER should be required to provide a more definite statement, that suggestion is likewise baseless. The Complaint contains two straightforward Counts; one for intentional infliction of emotional distress and the second for defamation. And, in as much as HAGA fails to identify what is so vague or ambiguous that the Complaint can not be

responded to, HARDER will not belabor the point that HAGA's contention is unfounded.  Simply

put, there is nothing vague or ambiguous about the two simple causes of action plead. (See Fed. R.

Civ. P., 12(e)).

## CONCLUSION

For all of the reasons stated above, the Complaint should not be dismissed, the Motion to

Dismiss should be denied and the Motion for a More Definite Statement should be denied.

Respectfully submitted,

_____
Robert Persante, Esq.
For: Albinson & Persante, P.A.
4625 East Bay Drive, Suite 223
Clearwater, FL 33764
(727) 531-5530
FBN: 376698 SPN: 01080596
Attorneys for Plaintiff

## CERTIFICATE OF SERVICE

I HEREBY CERTIFY that a true and correct copy of the foregoing has been furnished by U.S. Mail
to: Jana Marie Yaw, Esq., Edward Etcheverry, P.A., 250 Weston Road, Suite 313, Fort Lauderdale, FL
33331, this _____ day of May, 2000.

_____
Robert Persante
For: Albinson & Persante, P.A.
4625 East Bay Drive, Suite 223
Clearwater, FL 33764
(727) 531-5530
FBN: 376698 SPN: 01080596
Attorneys for Plaintiff

-15-

UNITED STATES DISTRICT COURT
IN THE MIDDLE DISTRICT OF FLORIDA
TAMPA DIVISION

CHARLES E. HARDER,

     Plaintiff,

vs.                                         Case No. 8:00-CV-270-T-26E
                                               JURY TRIAL DEMANDED

MICHAEL HAGA,

     Defendant.

_____/

## *AFFIDAVIT OF ED SHIFLETT*

STATE OF FLORIDA

COUNTY OF COLUMBIA

     BEFORE ME, the undersigned authority personally appeared, ED SHIFLETT, who upon first being duly sworn, deposes and says as follows:

     1. I, ED SHIFLETT, am a resident of the State of Florida, and am over the age of eighteen years and make this Affidavit based upon my own personal knowledge and belief.

     2. That at all times material, I was an independent contractor with Radio Press International (hereinafter "RPI").

     3. That at all times material, MICHAEL HAGA was, and described himself as, the President of RPI.

     4. That at all times material, Mr. HAGA ran and oversaw the day-to-day operations of RPI.

EXHIBIT "2"

5. That at all times material, Mr. HAGA directed my actions and assured me that I would be paid through RPI. In fact, Mr. HAGA guaranteed the payment of my expenses and charges incurred in completing the tasks which he assigned to me.

6. That at all times material, Mr. HAGA's instructions, whether written or oral, were made to me in conjunction with my work for RPI in the State of Florida.

7. That Mr. HAGA authorized my incurring expenses in the State of Florida and initially purported to pay for those expenses. Thereafter, Mr. HAGA failed to make said payments leaving my expenses outstanding and not reimbursed. After dealing with Mr. HAGA as President of RPI for an extended period of time, I contacted CHARLES E. HARDER to see if he would take over the day-to-day operations of RPI, but Mr. HARDER declined, due to his recent physical injuries.

8. In late January, 2000, I was informed by Mr. HARDER that Mr. HAGA had resigned as President of RPI.

9. FURTHER AFFIANT SAYETH NOT.

_Edward Shiflett_ (SEAL)
ED SHIFLETT

Sworn to and subscribed to before me this _28_ day of _April_, 2000.

_____ personally known
_✓_ produced identification
_____

_Rheba Lee_
NOTARY PUBLIC
Printed Name:
My Commission Expires:
SEAL



RHEBA LEE
MY COMMISSION # CC 692737
EXPIRES: October 29, 2001
Bonded Thru Notary Public Underwriters

UNITED STATES DISTRICT COURT
IN THE MIDDLE DISTRICT OF FLORIDA
TAMPA DIVISION

CHARLES E. HARDER,

     Plaintiff,

vs.

                                        Case No. 8:00-CV-270-T-26E

MICHAEL HAGA,                                JURY TRIAL DEMANDED

     Defendant.

_____/

## *AFFIDAVIT OF ROBERT PERSANTE*

STATE OF FLORIDA

COUNTY OF PINELLAS

     BEFORE ME, the undersigned authority personally appeared, ROBERT PERSANTE, who upon first being duly sworn, deposes and says as follows:

     1. I, ROBERT PERSANTE, am a resident of the State of Florida, am over the age of eighteen years, and make this Affidavit based upon my own personal knowledge.

     2. That I am the attorney for the Plaintiff, CHARLES E. HARDER.

     3. That on or about March 16, 2000, I received a letter attached hereto as Exhibit "A" from the law offices of Edward Etcheverry, P.A., signed by Jana Marie Yaw, an attorney with that firm and counsel for Defendant, HAGA, in this action. Exhibit "A" attached hereto is dated March 14, 2000 and was addressed to Gerald S. Pilger, State Labor Law Representative, Northern Virginia Regional Office, Department of Labor and Industry. Counsel for Defendant, HAGA, copied me on said letter.

4. On page,  paragraph 2, of said letter, attorney Yaw informs the Virginia Department of Labor and Industry that HAGA "had no involvement with the management of RPI."  Ms. Yaw goes on to state that HAGA was "never officially President of RPI, due to RPI's failure to hold its initial meeting of the Board. However, in an abundance of caution and to relieve himself of any perceived Presidential role, Mr. Haga  resigned as "President" of RPI as of January 17, 2000.  Mr. Haga has had no involvement with RPI since his resignation....".

5. The second page of Exhibit "A" acknowledges that the business plan identified "Mike Haga" as President of RPI.

6. FURTHER AFFIANT SAYETH NOT.

_____(SEAL)
ROBERT PERSANTE

Sworn to and subscribed to before me this 4ᵗ day of MAY, 2000.

_____X_____ personally known
_____ produced identification
_____

NOTARY PUBLIC
Printed Name:
My Commission Expires:
SEAL

Loren E. Nuffer
MY COMMISSION # CC784726 EXPIRES
December 4, 2002
BONDED THRU TROY FAIN INSURANCE, INC.



THE LAW OFFICES OF

# EDWARD ETCHEVERRY, P.A.

EDWARD ETCHEVERRY*
NEAL I. SKLAR
KENNETH C. BORDEN

*Licensed in FL only and Of
Counsel To Puerto Rico Firm**

SUITE 313
WESTON CORPORATE CENTER
2500 WESTON ROAD
FORT LAUDERDALE, FLORIDA 33331
TELEPHONE (954) 217-7070
FAX (954) 217-7071
Etchlaw@aol.com

Please Reply To:
Fort Lauderdale Office

March 14, 2000



RECEIVED

MAR 1 6 2000

BY:

Gerald S. Pilger
State Labor Law Representative
Northern Virginia Regional Office
Department of Labor and Industry
Battlefield Business Park
10515 Battleview Parkway
Manassas, Virginia 20109

> Re:   Claims For Unpaid Wages, Bonus And/Or Commissions Filed By Rodney Bower
> and Shirley Ann (O'Bryan) Smith Against Radio Press International, Inc.

Dear Mr. Pilger:

This law firm represents Michael Haga in connection with the above-referenced matter. We have been asked to respond to your letter dated March 3, 2000 regarding allegations of unpaid wages. Please direct all future correspondence to us.

Please be advised that Mr. Haga never owned any stock in Radio Press International, Inc. ("RPI"), did not participate in any employment decisions made by RPI, and had no involvement with the management of RPI. Further, Mr. Haga was never officially president of RPI, due to RPI's failure to hold its initial meeting of the board. However, in an abundance of caution and to relieve himself of any perceived presidential role, Mr. Haga resigned as "president" of RPI as of January 17, 2000. Mr. Haga has had no involvement with RPI since his resignation, and is unaware of the status of the corporation to date. However, this firm ran a corporate search for RPI, which revealed that Charles E. Harder is presently listed as the registered agent of the corporation. Therefore, all requests from your office should be directed to Mr. Harder.

With respect to the specific items you have requested in your March 3, 2000 letter, we have consulted with Mr. Haga, who has confirmed that he does not have possession, custody, or control of any of the following documents: canceled payroll checks, payroll records, wage calculations, tax

---

MIAMI
2151 Le Jeune Road
Suite 204
Coral Gables, Florida 33134
1-888-332-8040

OCALA
108 North Magnolia Avenue
Suite 700
Ocala, Florida 34475
1-888-332-8040

PUERTO RICO
**Vicente & Cuebas
Arterial Hostos, Suite 1201
Hato Rey, Puerto Rico 00918
1-888-332-8040

EXHIBIT "A"

Gerald S. Pilger
March 14, 2000
Page 2

calculations, tax withholding records, tax accounting records, time sheets, employment contracts, written authorizations for deductions from wages, or any other pertinent documentation dealing with this claim. Further, Mr. Haga does not know RPI's tax identification number, and has no idea of the current or past number of employees of the corporation. Mr. Haga knows of no details regarding the alleged employment of Mr. Bower or Ms. Smith. Although he has no personal knowledge of any reason Mr. Bower allegedly was or should not have been paid, Mr. Haga is under the impression that the company closed its doors prior to some of the dates that Mr. Bower claims to be owed wages. Additionally, Mr. Haga was informed that employees took inventory in lieu of wages.

As RPI never had an official meeting of the board of directors, Mr. Haga is not entirely sure who, if anyone, ultimately became the officers and directors of the corporation. According to the Business Plan for RPI created by Mr. Charles E. Harder, the following individuals are identified: Charles E. Harder, Chairman, Route 1, McClurg Lane, White Springs, Flordia 32096; Mike Haga, President; Douglas Perrault, Secretary/Treasurer, P.O. Box 1000, Ruskin, Florida 33510; and Ted Anderson, Member of the Board, 12268 Nicollet Avenue, Burnsville, Minnesota 55337.

We regret that we cannot be of further assistance to you. However, please do not hesitate to contact us if there is any further information you require from Mr. Haga.

Very truly yours,

Jana Marie Yaw
For the Firm

JMY/pc
cc:   Edward Etcheverry, Esq.
      Michael Haga
      Robert Persante, Esq.

\\Server\c drive\MyFiles\86-1000-Haga\86-1001\Correspondence\Pilger.001.wpd

UNITED STATES DISTRICT COURT
IN THE MIDDLE DISTRICT OF FLORIDA
TAMPA DIVISION

CHARLES E. HARDER,

    Plaintiff,

vs.

MICHAEL HAGA,

    Defendant. .

_____/

Case No. 8:00-CV-270-T-26E
JURY TRIAL DEMANDED

### *AFFIDAVIT OF CHARLES E. HARDER*

STATE OF FLORIDA

COUNTY OF COLUMBIA

    BEFORE ME, the undersigned authority personally appeared, CHARLES E. HARDER, who upon first being duly sworn, deposes and says as follows:

    1. I, CHARLES E. HARDER, am a resident of the State of Florida, am over the age of eighteen years, and make this Affidavit based upon my own personal knowledge.

    2. I have read the Affidavit of MICHAEL HAGA signed April 19, 2000 and will respond to certain specific claims made by Mr. HAGA therein as follows:

    3. Mr. HAGA states in paragraph 4, "I have never visited the State of Florida, for business or personal reasons, say one stop-over over twenty years ago at the Miami International Airport." However, Mr. HAGA informed me that he visited the Telford Hotel in White Springs, FL in 1995. The purpose of Mr. HAGA's trip was to promote books that he had written on the

EXHIBIT "1"

subject of financial advice. I, on behalf of Peoples Radio Network, Inc. (PRN), subsequently entered into an agreement with Mr. HAGA and purchased a number of his books and then re-sold them from PRN's main office in White Springs, FL.

4. In paragraph 6 of Mr. HAGA's Affidavit, Mr. HAGA states: "I do not own any assets in the State of Florida." However, Mr. HAGA invested either directly or through his company, "Acclaim Publishing Company, Inc." in Radio Press International (hereinafter "RPI"), a Florida corporation with its principle place of business in White Springs, FL and in Ruskin, FL. Additionally, Mr. HAGA lent money to RPI.

5. In paragraph 7 of Mr. HAGA's Affidavit, Mr. HAGA states: "I do not, and never have had, an office in the State of Florida." If Mr. HAGA is talking in the purely physical sense, I would admit that I know of no physical office which he has ever had in Florida. However, he was, and acted as, the President of RPI, a Florida corporation, with its nerve centers located in Ruskin, FL, and in White Springs, FL.

6. Mr. HAGA states in paragraph 9 of his Affidavit, "My involvement with the Plaintiff in this case is solely the result of his solicitation of me in the State of Colorado." That statement is false. First, I have had a lengthy relationship with Mr. HAGA and his company, Acclaim Publishing Company, Inc., in that they broadcast through my radio network to affiliates in the State of Florida. It was through that relationship, and through numerous conversations with Mr. HAGA, that we jointly came up with the idea of forming RPI. As a matter of fact, it was Mr. HAGA's suggestion that a business plan be drafted. Mr. HAGA had input into the business plan and requested changes to the business plan. A true and correct copy of that business plan is

-2-

attached hereto as Exhibit "A". That business plan provides, in pertinent part, on the last page, that

Florida be the sole venue for any litigation arising out of shareholder lawsuits.

7. Mr. HAGA states in paragraph 10 of his Affidavit, "I am not, and never was, a

shareholder in Radio Press International." However, Radio Press International had only recently

been formed when Mr. HAGA requested, and RPI complied, with forwarding the corporate book

to Mr. HAGA. At all times material, Mr. HAGA has been in possession of the corporate book.

Attached hereto as Exhibit "B" is a true and correct copy of MIKE HAGA's facsimile to my

residence in White Springs, FL, dated December 31, 1999, in which Mr. HAGA states: "1.

Investors now have their stock certificates, P/L and balance sheets in RPI." Accordingly, I

concluded that Mr. HAGA had taken care of the stock transfers as he promised, including the

transfer of its stock which he was going to take ownership of either in his name or in the name of

Acclaim Publishing Company, Inc..

8. As to Mr. HAGA's alleged lack of ownership, attached hereto as Exhibit "C" is a true

and correct copy of my letter to Mr. HAGA dated October 20, 1999, which sets forth the correct

terms of the agreement between the parties as follows: "Pursuant to our agreement, you are

loaning, the company [RPI] $25,000.00 and also buying $250,000.00 shares at the cost of .0001

per-share or a total of $25.00." Thereafter, Mr. HAGA paid the above stated consideration and

was, due to his background as a lawyer, to have issued all of the stock shares to each investor,

including himself or his company, Acclaim Publishing Company, Inc.. Attached hereto as Exhibit

"D" is HAGA's January 18, 2000 letter confirming Acclaim's stock shares in RPI.

9. Mr. HAGA's understanding that he was a stockholder is further evidenced by his

facsimile of Friday, December 24, 1999, in writing to Kay Reetz in which he states: "If anyone

-3-

threatens what you are doing on your end, I will pull out as will the investors I have brought to the table." (attached hereto as Exhibit "E")

10.  Attached hereto as Exhibit "F" is a true and correct copy of Mr. HAGA's facsimile of October 20, 1999 discussing the potential investment in RPI wherein he states: "5. Our investment will be made in the name of Acclaim Publishing Company, Inc.."

11.  In Mr. HAGA's Affidavit, he states, "11. I was never elected or appointed to any officer or director position for Radio Press International." That statement is disingenuous and false.  First, RPI has recently been incorporated with plans to have its initial meeting in January, 2000.  Prior to that time, however, the two incorporators, MIKE HAGA and I, agreed that MIKE HAGA would be the President of RPI.  A true and correct copy of the business plan naming MIKE HAGA as President of RPI is previously attached hereto as Exhibit "A ."

12.  Additionally, at all times material, MIKE HAGA not only assumed the position of President of RPI, and acted as the President of RPI, but he also notified all potential investors and others that he was the President of RPI.  Previously, attached hereto as Exhibit "E " is Mr. HAGA's fax of October 20, 1999, wherein in paragraph 6 he states: "If you still would like me to act as President of RPI, I would be honored."  Attached hereto as Exhibit "G" is Mr. HAGA's facsimile of January 2, 2000, wherein he states, in pertinent part, as follows: "No one wants to take control of anything, other than spending.  As President of RPI, I have a duty to investors.  I don't want to be personally sued in the future by investors claiming I went along with this nonsense."  Attached hereto as Exhibit "H" is a true and correct copy of Mr. HAGA's letter dated January 13, 2000 to Anne Martinez, West Coast Manager, United Stations Radio Network in Los

-4-

Angeles, CA. That letter is signed by MIKE HAGA as "President" and was sent on Radio Press International letterhead listing its office in White Springs, FL.   Attached hereto as Exhibit "I" is a true and correct copy of MIKE HAGA's facsimile dated January 23, 2000, wherein Mr. HAGA states: "From here on, I do not want any more faxes from you and I will take no phone calls from anyone else regarding RPI. Phone calls will be forwarded to you. I resigned as President. End of story" (Emphasis added).

13. At all times material, MIKE HAGA acted as President of RPI and handled the day-to-day affairs of RPI. A true and correct copy of MIKE HAGA's letter of December 31, 1999, is attached hereto as Exhibit "J". In that letter, Mr. HAGA details all of the efforts that he has made with regard to the budget, affiliates relations, stock certificates, corrected financials and expenses, solutions for the future of RPI and projections as to how much money would need to be infused into the company.

14. As to Mr. HAGA's statement in paragraph 12 of his Affidavit that, "I never expected to sue or be sued in the State of Florida." That statement is contradicted by the business plan which Mr. HAGA assisted in creating which provided that all lawsuits be in the State of Florida and is contradicted on Mr. HAGA's later acknowledgment that he might be sued for actions undertaken by RPI since he was RPI's President.

15. On the issue of Mr. HAGA's illnesses, I have no knowledge. However, to the extent that Mr. HAGA is somehow suggesting in paragraph 14 that he is unable to conduct business due to some mental incapacity resulting after his diagnosis in 1997, attached hereto as Exhibit "K" is a true and correct copy of Mr. HAGA's June, 1999, Internet publication on his website, entitled,

"The Economic Outlook, Volume 8, Number 6, Michael W. HAGA, Publisher," in which he analyzes various aspects of the National Ecomony some two years after his alleged diagnosis.

16. Attached hereto as Exhibit "L" is a true and correct copy of Acclaim Publishing's advertisements for books written by Michael HAGA, said advertisements being last revised on December 17, 1999.

17. Attached hereto as Exhibit "M" is a true and correct copy of Mr. HAGA's credentials on his website last revised on June 23, 1999, wherein he details that he received a law degree from Baylor University while working on his MBA in finance; that he is listed on Who's Who in American Colleges and Universities, and; that he is President of Economic Outlook-publishers of "the world renowned The Economic Outlook newsletter." The credentials further go on to list that Mr. HAGA has been a banker and has been very active in law and finance for such notable corporations as Columbia HCA.

18. MIKE HAGA has, at all times material, been a radio talk show host through is corporation, Acclaim Publishing Company, Inc., and has had his programs aired through People's Radio Network, Inc., located in Florida, as well as on the following Florida stations: WNTF-1580 Am, Bithio, FL (Orlando) (owned by the Radio Network); WDCF-1350 AM, Dade City, FL; WZHR-1400 AM, Dade City, FL; WPS-840 AM Mims, FL; and WFSH-1340 AM, Valpraiso, FL. Mr. HAGA also had his radio show broadcast through Peoples Network, Inc.'s successor, United Broadcasting Network, Inc. ("UBN") located in White Springs, FL. True and correct copies of the UBN website advertising Mr. HAGA as a UBN talk show host are attached hereto as Exhibit "N."

19. At all times material, MIKE HAGA has utilized his Florida broadcast and his 800 telephone number to sell his books and publications within the State of Florida.

-6-

20. At all times material, Defendant HAGA personally and directly dealt with Doug Perreault, Certified Public Accountant for Acorn and RPI, giving Perreault continuous directives with regard to RPI.

21. Since on or before October, 1999, until the filing of Complaint in this case, Mr. HAGA had continuous, uninterrupted, and deliberate contact with the State of Florida in sending dozens upon dozens of facsimiles, telephoning contacts within the State of Florida, directing the day-to-day affairs of RPI in White Springs, FL, and in Ruskin, FL, via telephone and via facsimile, and in otherwise publishing and selling his books within Florida, as well as broadcasting a daily program on the affiliate radio stations referenced above within the State of Florida.

22. FURTHER AFFIANT SAYETH NOT.

_____(SEAL)

CHARLES E. HARDER

Sworn to and subscribed to before me this _28_ day of _April_, 2000.

_____ personally known
___✓___ produced identification.

NOTARY PUBLIC
Printed Name:
My Commission Expires:
SEAL

RHEBA LEE
MY COMMISSION # CC 692737
EXPIRES: October 29, 2001
Bonded Thru Notary Public Underwriters

# Radio Press International
## Business Plan

Radio Press International (RPI) is a Florida corporation formed 10/11/99 by Charles E. Harder and located at White Springs, Florida. There are 100 million authorized shares and 10 million shares will be issued. The company will use the CPA services of Douglas Perreault of Ruskin, Florida from day one so that the statements are CPA audited and will be ready when the company files with the SEC to go public if that should occur. Mr. Perreault will also keep the bank accounts and Mr. Harder will monitor same. (Mr. Harder also formed Energy Liberty Unlimited, Inc. December of 1998 and that company just went public SEC OK effective October 08, 1999.)

Mr. Harder also formed Peoples Radio Network (PRN) of which the assets were sold to the United Auto Workers in 1996. Since then he has re-formed under the Florida corporation known as American Community Oriented Radio Network (ACORN Radio.) That company is profitable. See acornradio.com and chuckharder.com

### RADIO MARKET

There are 10,392 commercial radio stations in the USA. Of these stations many strive to provide "full service" to the listener which means whatever type of programming they do plus news on the hour and half-hour. Thus there is a terrific demand for radio news service - but due to the constant mergers and consolidations in the industry we have seen the number of news-providers dwindle. Mutual, NBC, The Source, and several others were bought-up by Westwood One, then merged into only one service. Then, CBS bought Westwood One!

Currently the major players are: ABC, AP, CBS, USA, and Westwood One. Not counting small Christian-based news networks that supply religious stations, there are essentially only four players - counting the recent acquisition of Westwood One by CBS. This presents a problem in radio markets like New York, Chicago, LA, Dallas, Tampa, etc., where there are 50 or more radio stations. Thus a terrific vacuum exists.

Up until a month ago there was another choice: United Press International radio news. That company recently hired Arnaud de Borchgrave as CEO and he made the decision to sell-off the radio news-unit to AP. UPI was serving over 400 radio stations when it went "dark."

### INCOME STREAMS

There are two ways that news services garner income. You can charge for the service and let the local station then sell ads in and around the news. AP does that and has over 1,000 clients. The other method is to provide a completely produced newscast delivered on-the-hour for 5 minutes and the half-hour for 3 minutes. In that news-package you place national radio commercials that provide income and then the station pays nothing for the service - but simply puts the news with the commercials on-the-air. The advantage for the station is they pay nothing and have professional news-anchors voicing the news on their station without paying for the

**EXHIBIT "A"**

gathering of the news or hiring the announcers. This arrangement is called "barter."
At this writing RPI has two national advertising sales reps committed to sell the radio
spots. These commercials are called "units." A unit is typically a 30 second radio
commercial announcement which is pre-recorded. A 60 second spot is 2 units. At a
base rate of 33.3 cents-per-station per-unit this means that for each 100 stations taking
the service RPI would be paid $33.00 per unit. There are 3 units in the 5-minute
newscast at the top of the hour and 2 units at the half-hour for a total of 5 units per-
hour. During a 24-hour period there are 120 units.

It is management's belief that we can "sell" at the above rate at least 12 hours each
day. Thus 100 stations times 60 units bringing in $33.30 each amounts to a daily
revenue of $1,998.00 per-day or $59,940.00 per-month. A target of 300 stations
would mean a monthly income of $179,820.00.

## THE *RPI* ADVANTAGE

Peoples Radio Network has a complete operations center and also a satellite uplink
transmitter at White Springs, Florida. This means that programming fed from the
PRN studios goes directly to the transmitter that beams the audio signal up to the
Galaxy 6 satellite - which in turn provides a signal down to the Northern Hemisphere.
The advantage to satellite-delivery of the signal is that it costs nothing additional for
one or 1,000 stations to get the signal as it's up in the air and all they need is to point
a "dish" at the satellite.

RPI will lease a small-space at the PRN center in White Springs and deliver the
finished newscasts to the PRN master control-room. PRN will uplink the newscasts
at the top of the hour and half-hour at NO CHARGE to RPI. Thus the newscasts will
be carried on PRN satellites which are: Galaxy 6, Transponder 3 at 58.20 wide-band
audio and also Satcom C-1, Transponder 2, at 7.5 audio subcarrier wide-band TVRO.
Radio networks normally pay $12,000.00 or more a month for satellite-distribution
on two channels with the attendant transmission costs. RPI will pay nothing to PRN.
Further, the two satellite channels used by PRN are able to be accessed by hundred
of station now and the equipment to receive either one of the satellite channels is only
$500.00 which is much cheaper than the normal $6,000.00 that is normally spent for
a digital satellite downlink for commercial radio. There are also more than 2 million
backyard dishes that can access the signal on Satcom C-1 also known as F-1.

### Operations

Current technology allows a news operation to monitor the world from any point. With
the Internet, direct-satellite and long-distance phones and fax lines we can literally
cover the globe on a tight budget. A recent breakthrough in transmission of voice over
standard phone lines but providing full high-fidelity was pioneered by the Comrex
corporation. Using their special modem/encoders we can use standard dial-up phone
lines and transmit full-fidelity voice and music from any point across the USA to our
control center. These units plug into a standard phone jack and use the same type of
phone line that is in your bedroom. Thus RPI can have "news bureaus" in the spare
room of anyone's home across the USA or overseas.

The start-up plan is to headquarter operations at The National Press Building at Washington, DC. The cost for a 232 square foot studio space there is $850.00 per month which includes all utilities. We cannot begin to stress what the image is to the radio stations to have their news originate *"From the National Press Building in Washington, DC!"*

Using computers, the Internet, and phone lines - the newscasts will originate in DC most of the day and be fed to the White Springs operation center by standard phone line dial-up twice-hourly. The newscast will be pre-fed at :45 and :15 and then recorded and played back on the hour and half-hour. This will allow time to correct any errors or re-start, etc. At other times the newscasts will originate in Corpus Christi, Texas and Los Angeles, California. There will also be a studio at White Springs that can originate news "just in case."

RPI has contacted several of the former radio-newscasters that were recently fired by United Press International when they sold their division to AP. Our plans are to hire a total of 8 people who will cover the 24-hour 7 day requirements. In actual operations, the newscasts will be "live" from 6 AM to 10 PM Eastern time and then three newscasts will be repeated overnight from 11PM to 5 AM. There will always be one newscaster "on-call" overnight and the control center is staffed and there are five TV monitors in the control center that monitor CNN, MSNBC, FOX, ALL NEWS CHANNEL, plus ABC and CBS. Plus the staffer will watch our wire services and emergency national channels from NOAA. RPI can go "live" within a few moments of a breaking story.

## MARKETING OUR SERVICE

As this is written an 11,000 piece mailing is being prepared to all commercial radio stations in the USA. The mailing consists of a full-color one-side postcard with an additional message on the reverse side. It alerts the station to the RPI website rpinews.com which is being developed and will have full details, contract and sample newscast. We would not be surprised if 300 stations were to come on board in the near future.

Further ongoing promotion will be a direct mailing to all 1,500 "Talk" stations across the USA and also magazine ads plus press-releases to the industry media.

## "Private-Placement"
## STOCK OFFERING

RPI will offer one million shares of stock for $100,000.00 to any one investor. Or for 10 cents a share in smaller lots. We seek to market no more than a total of 4 million shares to no more than a total of 15 investors. To start-up the service we will need a minimum of $150,000.00 in the bank. We believe that the operations will be in the black within 6 months at which time we will endeavor to file with the SEC to go public.

It is understood that this private offering is to sophisticated investors who understand

that there is an element of risk in any start-up.  Further, RPI will not have any significant hard assets other than associated computers, technical equipment and furniture.  The company could fail and your entire investment could be lost.

## PRO-FORMA OPERATIONAL STATEMENT

### START-UP COST:

| | |
|---|---|
| Advertising and mailing to radio stations | $6,000.00 |
| Furniture and equipment | 25,000.00 |
| Plane tickets and travel | 3,000.00 |
| | $34,000.00 |

### Monthly Expenses

| | |
|---|---|
| Washington Office | $850.00 |
| Phones | 500.00 |
| White Springs studio | 400.00 |
| Phones | 300.00 |
| Comrex-Phone Transmission cost | 600.00 |
| Newswires | 1,200.00 |
| Air Talent with benefits | 33,000.00 |
| Miscellaneous | 1,500.00 |
| Total: | $38,350.00 |

### INCOME

| | |
|---|---|
| 100 stations monthly: | $ 59,940.00 |
| 200 stations monthly | 119,880.00 |
| 300 stations monthly | 179,820.00 |
| 400 stations monthly | 239,760.00 |

Assumption:  With a minimum of 100 stations we would anticipate a gross profit of $21,590.00 each month.

Further notes:  Mr. Harder and Mr. Perreault will be stockholders and will not take a salary until RPI is profitable.

It may take 60 days before we see income even if we have more than 100 stations and it there may be a period of time before the accounts receivable are in the operating account.

The anticipated breakdown of stock ownership is as follows:

| | | |
|---|---|---|
| Investors: | 4,000,000 | shares |
| Mr. Harder | 3,000,000 | shares |
| Mr. Perreault | 250,000 | shares |
| Mr. Shifflet | 250,000 | shares |
| Employees | 500,000 | shares |
| | | |
| Reserved to sell to public: | 2,000,000 shares | |

This is pro-forma and may be changed as determined by management.

**Board of Directors and officers:**

Charles E. Harder, Chairman
Mike Haga, President
Douglas Perreault, Secretary-Treasurer

**PLEASE NOTE**: This is a start-up company and like any investment there is an element of risk. *Part or all of the investment may be lost.* If the company does not succeed the hard assets would be worth about 30 percent of book less the cost of removal or shipping.

Any investor must understand that this is an unregistered private placement and is guided by the laws of the state of Florida and no other jurisdiction. Any legal action by an investor must be brought in the state of Florida. By making any investment you subscribe to these terms and conditions. **There is no guarantee of success or return of your investment.**

**We expect operations and service to begin on November 13, 1999.**

Radio Press International, Inc.
Route 1, Box 2002
White Springs, FL 32096
Voice: 904 397-4489   9AM to 2PM weekdays or after 5PM to 8PM
Fax:   904 397-4492

This offer does not constitute a contract to sell stock to any party unless the corporation elects to do so.   The information contained herein is proprietary and not for publication.  This document is to be treated as confidential and will not be duplicated and circulated to more than 20 potential investors.  This offer may be withdrawn or changed without notice.

This is the last page of five pages.

# TELEFAX

Mike Haga
820 23 Road
Grand Junction, CO 81505
Ph: 970-256-7359
Fax: 970-242-5725
E-mail: acclaim@gj.net

December 31, 1999

Dear Chuck:

We have been through a lot in a short time and in going into the new millennium, I
want only positive discussions and progress and therefore, must, before the close of
this year discuss two perhaps outstanding critical negatives that can hopefully be
resolved so that we can move forward and create something terrific.

1. Investors now have their stock certificates, P/L and balance sheets in RPI. I
   have spoken with each of them about raising more money--$250,000 which I feel
   we must have to ensure success of the venture. Without exception, each asked
   me how much you have personally invested in RPI. I have told them that you are
   providing the uplinks, etc., but no actual money. Without exception, everyone
   feels you have to put something into the pot since it was your brainchild--or they
   are not willing to go forward. If they don't go forward, then we will have to pull the
   plug on RPI next week as payroll will exhaust all remaining funds. Question, can
   you personally put in up to $50,000 to prove to everyone that you are willing to
   assume personal risk as well? If not, then we must begin notifying the people
   that the winding down phase will begin. If we have to wind down RPI, then I
   have no reason to fly out, as without RPI, there is nothing in PRN that I can make
   salable on the public side as it currently sits. We have to have all the pieces to
   make this thing fly. Let me know ASAP.
2. If we move forward with RPI, can we get some equipment in White springs for
   the girls to work with for PRN affiliate relations? (RPI will purchase whatever is
   needed here as well--within reason). Without signed affiliate agreements on the
   PRN side as well, there is nothing we can utilize for advertising income which will
   become a critical piece of the income stream equation on the public side going
   forward.

This will be my final "negative" input in all of this. From here I only want positive
gains--if we move forward.
Let me know.
Happy New Year!

Mike

EXHIBIT "B"

** TOTAL PAGE.001 **

**TELEFAX**

*Chuck Harder*

Route 1, Box 2002
McClurg Lane
White Springs, Florida 32096
Voice: 904 397-4489 Fax: 904 397-4492
e-mail: charder@isgroup.net

To: Mike Haga                October 20, 1999

Dear Mike:

Follows is the account info for Radio Press International, Inc. - I would like you to wire the investment as soon as possible.

Pursuant to our agreement, you are loaning the company $25,000.00 and also buying 250,000 shares at the cost of .0001 per-share or a total of $25.00.

Your investment is therefore received with the following understanding:

*1. Profits are distributed pro-rata to the investors until their original loan to the company is repaid. From that point on, all stockholders are then allowed to share in profits on a per-share dividend basis. No stockholder can prevent more stock from being sold to finance the venture up to the limit of available shares. No investor will receive priority other than a first-in basis. In short, only investors of record will get the profits pro-rata.*

*2. You are a sophisticated investor and understand the element of risk.*

Naturally, you and I are working together and therefore we may change various items but the spirit is reflected in this investment letter.

Please accept my heartfelt thanks for your assistance in all regards. Let me know if this letter is correct.

All the best,

Chuck Harder                (faxed and original mailed)

EXHIBIT "C"

# TELEFAX

**Mike Haga**
820 23 Road
Grand Junction, CO 81505
Ph: 970-256-7359
Fax: 970-242-5725
E-mail: acclaim@gj.net

January 18, 2000

To Chuck Harder and Ted Anderson:

Spoke with Ted Anderson moments ago. Ted wants to talk with you prior to confirming with the new investor.

As we discussed, Chuck, if it will mean the difference between life and death for RPI, will you agree to total stock ownership in RPI of 1,000,000 shares personally. (A while back you faxed me a memo to the effect that I could have 1,000,000 of your original 3,000,000 shares. These will be returned to the treasury as unassigned stock for future investors as that is the right thing to do.

Everyone else's stock positions remain the same.
Acclaim:   250,000 shares for $25K invested
Anderson 500,000 shares for $50K invested
Ferris:    250,000 shares for $25,000 invested
Sauer      250,000 shares for $25,000 invested  (we will utilize Sauer's buy out letter to cash him out in the near future and his stock will be returned to the treasury as unassigned treasury stock).

New investors or existing investors injecting more operating capital will receive (through the liquidity crisis only) shares at .10cents for every actual dollar invested.

If Osterhout comes onboard, I will be more than happy to bow out as President of RPI and remain a board member only. Ted feels that any Osterhout ownership in RPI must be in relation to whatever outside dollars Osterhout is successful in injecting into RPI (again—through the liquidity crisis only) at .10 cents a share.

I also left a message for Doug to see if he will continue doing the books. To make certain there are no future problems, I would suggest that (other than payroll) expenses be reviewed by the board prior to payment so everyone is on the same

Mike

EXHIBIT "D"

**Subject: [Fwd: Affiliate Survey]**
   **Date:** Fri, 24 Dec 1999 12:06:53 -0800
   **From:** Mike Haga <acclaim@gj.net>
       **To:** Kay Reetz <kay@forthepeople.org>

Kay
FYI
Mike
And, Kay, don't worry.  If anyone threatens what you are doing on your
end, I will pull out as will the investors I have brought to the table.
I am tired of the games.  Doug did nothing on affiliate relations when
he had it.  Without your efforts with RPI, it would already be dead in
the water.
Don't worry.
Mike

**Subject: Affiliate Survey**
   **Date:** Wed, 22 Dec 1999 14:27:03 -0500
   **From:** "Doug (ACORN)" <doug@acornradio.com>
       **To:** "Ed Shiflett" <wpgs@wpgs.com>, "Chuck Harder" <charder@isgroup.net>,
           "Mike Haga" <acclaim@gj.net>

Chuck and Mike, as we discussed. Ed, this is a surprise to you...

Attached is the survey. The Word format is available for anyone who can read
it. I will fax a copy to Chuck as I know you cannot read Microsoft Word
documents on your computer.

Please let me know if it is OK. If so, I'll have Tina start sending it out
immediately.

Ed, do you want to still send the January newsletter in addition to this, or
should we send this in place of it? We can always send that one in February.

--Doug
----------------------------------------------------------------------------
--------
American Community Oriented Radio Network, Inc. or ACORN(sm) is a
wholly-owned subsidiary of Peoples Network, Inc. (PNI), a 501(c)(3)
not-for-profit organization and producers of the popular For the People®
radio talk show. ACORN provides telephone and mail order support services to
PNI as well as owns radio stations and satellite uplinks to provide
listeners throughout the US with a way to hear the For the People show.

ACORN is also home of Peoples Radio Network, broadcasting 24/7 via
satellite. As a joint venture with Talk America, PRN brings you such
favorites as For the People, Pat Choate, Auto Answers, Michael Haga, Sam
Bushman, and Fishing America with Captain Mel Berman.  For more information
on becoming an affiliate, call 1-888-6-PEOPLE. To receive our catalog or for
more information, call the order center toll free at 1-888-622-2676.

820 23 Road
Grand Junction, CO 81505
Ph:  970-256-7359
Fax: 970-242-5725
E-mail: acclaim@gj.net

October 20, 1999

RE: Radio Press International

Dear Chuck:

Got your fax this morning and have good news—maybe two additional investors @
$25,000 each.  Before we invest, however, I need clarification of several points
addressed in my October 18 correspondence.

1.  Affiliate relations, I understand will be handled by Kay Reetz.  In the
    business plan, (anticipated breakdown of stock ownership) will Kay be
    listed as being given stock in RPI?  Chuck, without Kay in the picture, the
    plan won't work for me.  As I have said on numerous occasions Kay is
    critical—to me—in this venture.  Without a good and dedicated affiliate
    relations person, all is in vain.  Kay works hard.  Shouldn't she be given
    incentive?

2.  I will need in writing (before investing in RPI) an agreement *that if RPI
    fails* that Acclaim Publishing (which pays for my monthly broadcast on
    PRN/ACORN) receive 4 months of free air-time for my broadcast on
    PRN/ACORN for four successive months in the month following the
    failure of RPI ($6,000 x 4 = $24,000).

3.  If in the future, you decide that ELU becomes the umbrella under which
    RPI, ACORN, PRN, etc., are placed, that shares of stock in RPI be
    convertible to ELU stock on a 1 to 1 basis.  The same with ELU stock,
    should ELU ever be absorbed into RPI, etc.

4.  I would like to be able to initially purchase an additional 200,000 shares
    of stock @1 cent a share—as incentive to bring the two (or more) initial
    investors onboard.

5.  Our investment will be made in the name of Acclaim Publishing
    Company, Inc.

6.  If you still would like me to act as president of RPI, I would be honored.

7.  We have to liquidate a CD which matures on Thursday of next week and
    will wire our $25,000 then, if acceptable.

Let me know what you think, Chuck.

Best wishes,

Mike Haga

EXHIBIT "F"

# TELEFAX

**Mike Haga**
820 23 Road
Grand Junction, CO 81505
Ph:  970-256-7359
Fax: 970-242-5725
E-mail: acclaim@gj.net

January 2, 2000

Dear Chuck:

Received your last two faxes.

First:  **Enough** about Sun Radio networks and UBN--that's water under the bridge of which RPI and ELU investors have no connection whatsoever.

Second:  Yes, pursue the bridge loan. You have been talking about this since August when  Alan Ferris and I invested $25,000 in ELU based on your optimistic projections.

Third:  You put together the investment package for RPI with the projected investment requirements and income streams.  You have copies.  I have copies. RPI start-up costs have wildly exceeded your investment projections.  Of course, income is wildly under your expectations due to the affiliate relations mess on your end (which I don't want to discuss anymore either). *The investors won't put anymore money into this venture.  I don't blame them.*  When the RPI bank account is depleted, that's it.  Unless you can raise funds on your end--which you say you are unwilling to do.

I am angry over many issues a few of which are.  1) Ed Shiflett charged  RPI over $9,000 in set up expenses (which Doug paid) --including incredible amounts for mileage--even though Ed flew all around the country.  2) RPI has paid over $1,300 in phone bills ($627.87 of which was long distance charges) yet there is no supporting documentation whatsoever--in fact RPI hasn't even been in business long enough to have received a bill for long distance charges).  3) RPI pays rent.  **Part of a landlord's legal duty in a rental situation is to provide heat and light for its tenants.**  Yet Doug issued RPI checks as follows: $1,700 for propane heaters, in addition to $482.00 in propane--in a  rented office building of which the majority of usage is for ACORN.  4) RPI also paid $1,400 for electrical work in the same building.  I can go on, but you should begin to get the point.

*No one wants to take control of anything, other than spending.  As President of RPI I have a duty to investors.  I don't want to be personally sued in the future by investors claiming I went along with this nonsense.*

EXHIBIT  "G"

# TELEFAX

### Radio Press International
Business Office
1662 Springs Street
White Springs, FL 32096
Ph:  877-844-NEWS
Fax: 904-397-1755

January 13, 2000

Anne Martinez
West Coast manager
United Stations Radio Network
1400 West Olympic Blvd. #200
Los Angeles, CA 90064

RE: Radio Press International

Dear Anne:

The following is the confirmed current affiliate list for RPI. *We have included only affiliates with whom RPI has signed affiliate contracts in hand.*  Bear in mind, there is double this list of affiliates in the process of signing the RPI contract, but we chose not to list them until the signed contracts are in hand.
The affiliate relations staff is totally overloaded with fielding phone calls from prospective affiliates picking up the information off the web site
(**www.rpinews.com**) which we have been advertising.  Therefore the DMA information has yet to be completed, but it is forthcoming.  Bear with us.  Better yet, link up with us as we grow this into something huge!

Sincerely,

**Mike Haga**
**President**

EXHIBIT "H"

# TELEFAX

Mike Haga
820 23 Road
Grand Junction, CO 81505
Ph: 970-256-7359
Fax: 970-242-5725
E-mail: acclaim@gj.net

January 23, 2000

Dear Chuck:

From here on, I do not want anymore faxes from you and I will take no phone calls from anyone else regarding RPI. Phone calls will be forwarded to you. I resigned as President. End of story.

For the record, though, there was a lot that could have been done with RPI--IF IT HAD BEEN AS IT WAS REPRESENTED BY YOU IN THE PRIVATE PLACEMENT INVESTOR AGREEMENT and business plan. It was not--and you know it and, unfortunately, neither I nor the other investors learned the truth until well after the fact and then I set about to make it into what you originally represented. Had I known the truth from the beginning, I would never have become involved in any of this. I have said this in countless faxes to you.

Every dime you wanted earmarked for advertising in the business plan was spent by you as detailed in the business plan. End of story.

As to the two national ad reps onboard. Jose Peno pre-sold one $3,000 ad. Doug took the money, put it in the ACORN account and said nothing and no ad ever ran. I learned about this from Jose and then had to fight with Doug to get the money to the RPI account. In fact, I have not spoken with Jose for over a month. My three previous contacts with him however were always positive. In fact, a month ago, I even offered in writing to him, 5,000 shares of the stock owned on this end for every $25,000 in sales he brought to RPI. I have heard nothing from Jose until last week when Kay told me Jose had a second ad which Jose proposed would have had money going to RPI ($1,500 per week) and ($1,500 per week to Talk America) if PRN would set up an 800 number at PRN's expense for people to call in to order the potential advertiser's vitamin products. According to KAY, You told Kay to nix this, as PRN would have lost money. Kay has the facts on this, as it was she who talked with both you and Jose--not me. If there is turmoil with Jose, I have had nothing to do with any of it.

In desperation to obtain advertising income, I called David Reeder of the RAB (after you finally faxed me the information 2 weeks ago). The day I called David to see how to link up. He asked how many affiliates RPI had and when I said 56, he said,

EXHIBIT "I"

In your 31 Dec 99 fax you say *"My source is connected to an investment firm that can come in with bridge financing and then do the deal...."* I hope you can do it, but quite frankly I'm sure they will be asking for the same financial information I have been asking for and at this juncture I doubt they will ever receive it either.

It's a new year, Chuck. I'm not going to continue rehashing these issues. My hands have been tied by the nonsense on your end. If RPI (like ELU) fails due to that nonsense, so be it. We can argue liability later in a court of law.

Mike Haga

# TELEFAX

**Mike Haga**
820 23 Road
Grand Junction, CO 81505
Ph:  970-256-7359
Fax: 970-242-5725
E-mail: acclaim@gj.net

December 31, 1999

Dear Chuck:

I didn't mean to throw a bomb at you while you were on the air.  I have family coming in and am just trying to get out of the office to spend time with them--like I used to.

I will be at least Tuesday before I can give you answers to your last fax.

All I know at this point is that others are telling me they are not willing to go forward unless you are also willing to put some actual cash in the pot as well, since you are a major stockholder as well in RPI and came up with the budget, which to date has been woefully off as well as the income projections which have also been far off the mark because of the lack of affiliates to date.  In fact, Chuck, it took me a month of fighting tooth and nail to get the affiliate relations staff up and running, and if I hadn't this entire thing would now be dead in the water.  You know it and I know it.

The immediate problem is that we need more money now.  I have been frantic, Chuck, on the issue of additional investor money.  We would have had it but for the fact stock certificates were delayed as well as correct financial information.  These are problems I did not create.  Look back through my faxes to you and to Doug on the issue of corrected financials, expenses, etc., on the RPI side.  Even with ACORN, it has been over three weeks and counting since I have asked for financial information to help on the public side--to date no response.

I remain willing to put an additional $50,000 in RPI, but that's it.  We need more than that.  As I told you in the beginning, I am not willing to "bet the farm on any of it."

Stockholders currently have $150,000 invested in RPI, and the checking account is down to $20,000, which is not enough to meet Jan 8 payroll unless we get the $8,000 credit for the returned Vector Units.  RPI needs (I believe) an additional $250,000 to ensure the success of the venture as the affiliates (hopefully) come onboard along with the income stream to repay investors.

See if your source wants to invest in RPI on the same level as everyone else in the start-up group.  This is the simplest solution.  If your source won't do it, I have to see what everyone demands on their end--which eats up valuable time that we don't have.  If we are forced to bankrupt it and then you start it back up through your

EXHIBIT "J"

network (even if you sell to someone else) I guarantee everyone will end up in court
on the issue of fraud because that's what it will look like to the other investors.

I did not mean to throw a bomb at you this morning. In re-reading my fax to you, if
anything, it is a simple statement of the facts, nothing more, nothing less.

Let's work together to find additional investors, Chuck. That's what we need. That
will solve everything. If you invest, that solves everything on this end with the
current investors. Whether you believe it or not, I am on your side. I always have
been. I have grown tired, however, with the ridiculous war games while I fought to
set up the affiliate relations staff, which, by the way, RPI would be dead in the water
if we had not done so.

The RPI books arrived this morning and the checkbook is a mess. That is as far as I
have gotten.

I have family here and am out for the rest of the weekend. Let me know on your
potential investor, I will discuss what the others will want if they accept a buy-out.

Mike

**Volume 8, Number 6**

**June 1999**

# The Economic Outlook



Michael W. Haga, Publisher

**Domestic And International Markets - The Long Wave Economic Cycles - Socio/Political Trends**

### Socio/Political

## What is happening to America?

For many years I have been warning readers to prepare for the events we are now experiencing in America.

In spite of all the difficulties facing our nation, there is still no other place I would rather live. However, our nation is at a crossroads, not unlike the difficulties faced by our forefathers. Many of the same conditions that prompted the Declaration of Independence prevail in America today. Of the indictments against the King of Great Britain, our Founders declared:

*"He has erected a Multitude of new offices, and sent hither Swarms of Officers Officers to harass our people and eat out their Substance."*

Today there are literally hundreds of thousands of government employees (federal, state and local) administering various regulatory agencies with annual budgets in the billions of dollars. Regulatory compliance alone exceeds $780 billion annually.

Our founding fathers opposed "taxation without representation," and declared that the King was: "..imposing Taxes on us without our Consent."

---

**The U.S. treasury has just announced that it will sell three new types of bonds:**
**1. The Al Gore bond, which has no interest.**
**2. The Monica Lewinsky bond, which has no maturity. AND...**
**3. The Bill Clinton bond, which has no principle.**

---

Today, taxation now sees the average American working through the first week of July to meet his or her yearly local, state, federal and sales tax obligations.

Despite the fact most Americans believe they are financially better off than their parents and grandparents, they are literally drowning in a sea of debt that threatens the very existence of this nation.

Despite the fact the stock market has been hovering near an all-time high, most Americans find that 96 percent of their disposable income (what's left after taxes) is already committed to meeting *existing* monthly expenses like rent, mortgage, electricity, insurance, auto loans, health insurance, food and clothing.

That leaves a mere 4 percent for savings. However, since most Americans are now working longer and harder than ever before, (mainly to pay taxes) they want to take time

See What's happening, page 3

### U.S. Economy

## Farm Crisis Deepens!

EXHIBIT "K"

**O**n Wednesday, May 19, Federal Reserve Chief Alan Greenspan, speaking to a convention of independent bankers in San Francisco, said *the battere U.S. farm sector coul experience a deep an prolonged economic crisis, a technological advances an cost cuts accelerate*. (This is exactly what I said would happen, in my book, AFTER THE CRASH—first comes the farm crisis, followed by rising interest rates and collapsing stock and bond markets, which set the stage for the economic collapse and subsequent Great Depression).

Greenspan said that, farmers, despite their solid efforts, haven't participated in the nation's current economic boom, struggling as ailing world economies have led to parched demand for U.S. agricultural goods.

*"Until you know who has lent what to whom, you know nothing whatever of politics...or history."*

*—Ezra Pound*

Greenspan offered the checklist of farmers woes — such as ailing world economies and currencies — that have siphoned off demand. Greenspan also said that farmers may be forced to seek more ways of trimming costs. *"In the interim, farmers will likely be turning even more intensely to what has been, in the past, the one tried-and-true*

*formula for maintainin profitability—reducing th costs of production to th bare bone,"* he said. Behin the problems for the U.S farm sector has been th Asian economic tailspin Still he said, there is optimis that farmers are weatherin the storm. To which I say hogwash!!!

On Tuesday, May 18 NIGHTLINE aired a segmen detailing the farm crisis According to NIGHTLIN 200,000 American farmer will be forced to quit thi year. THERE WILL B FOOD SHORTAGES THI FALL, during the Y2K an the general economi collapse. Don't believe it wil happen? You will!

Page 1 - 2 - 3 - 4 - 5 - 6 - 7 - 8 







**Welcome to the online ordering site for best selling books by Michael Haga**

Best Sellers

Radio Broadcasts

Online copy of newsletter





### Order Online
### or Call 1-800-323-3523

### acclaim@gj.net

Acclaim Publishing - About Michael Haga - Is the American Dream
Dying? - After the Crash - On the Brink - Taking back America - Order
Online - Radio Schedule and Affiliates - Guest List - Important News -
Links - Economic Outlook

Last revision Friday, December 17, 1999
Contact Webmaster



EXHIBIT "L"

4/24/00

Chuck Harder

Apr 24 00 04:32P

904 397-4492

P.2

















## About the Author





Michael Haga is an economic historian. He began the study of long-term economic trends while attending Baylor University. There, he received his law degree, while working on his MBA in finance. Mr. Haga is listed in Who's Who in American Colleges and Universities.

He is president of Economic Outlook - publishers of the world renowned The Economic Outlook Newsletter. Mr. Haga has been a banker and has been very active in law and finance for such notable Corporations as Columbia HCA.

Acclaim Publishing - About Michael Haga - Is the American Dream Dying? - After the Crash - On the Brink - Taking back America - Order Online - Radio Schedule and Affiliates - Guest List - Important News - Links - Economic Outlook

Last revision Wednesday, June 23, 1999
Contact Webmaster



EXHIBIT "M"

## UBN HOSTS *Your Economic Future's*

# Mike Haga
# ...on the path to real wealth

by ROGER KERSON
*National News Reporter*

"We are on the brink of major economic change, the crest of a tidal wave," says Michael Haga, the United Broadcasting Network's newest talk radio host. "But it's not necessarily a negative thing. Our show is going to prepare people for the new economy, so that they can be part of a new generation of millionaires."








Haga's show, *"Your Economic Future,"* premiered on April 5 and is broadcast live from the UBN satellite Sundays from 7pm to 9pm, Eastern time. With weekly guests and audience call-ins, Michael will examine the dark underbelly of our current economic boom.

"There is an irrational belief that everything will be fine forever," he says, referring to a stock market that recently cracked 9000 for the first time. "Alan Greenspan calls it 'exuberance,' but it's really a mania."

Haga ticks off the signals that all is not right in America: the gulf between rich and poor, NAFTA's effect on the middle class, rising personal debt, and a record trade deficit. Haga is also very concerned about computer glitches as our high-tech society rolls into the next century: "The millennium bug' could adversely affect our banking structure, our very way of banking."

## A CATCH-22

The underlying truth, he says, is that the globe is simply not ready for the global

EXHIBIT "N"
http://www.uaw.org/breaktime/news_to_you/news2u5_08/haga.html

It's News to You: Mike Haga: The path to real wealth                    Page 2 of 2

economy. "Globalization is based on the ability of the American consumer to fuel the bandwagon," Michael told the *News Reporter* "NAFTA and GATT were good for earnings initially, but they've now overproduced ; the American marketplace is being flooded with cheap products.

"The Catch-22 is that they are dependent on having consumers to buy those products. They thought that the Asian economy would create demand there, but now that's failed. Now they're looking to Africa, to stimulate those economies. That's what Clinton's trip to Africa was all about," adds Haga, "trying to expand NAFTA."

But Africa, like Asia, is not ready, he says. As a result, "The wave of euphoria will be pierced. The paper economy will implode. We'll be going away from paper wealth and back to real wealth."

It may sound apocalyptic, but for Haga "a window of opportunity is opening that has not been open in 60 years. In five years we will be talking about the elimination of NAFTA, GATT, and the WTO. Labor unions will gain strength. Jobs will come back. Already," he says, "Compaq Computer is thinking of bringing manufacturing back to America."

## HOW YOU CAN GET AHEAD

His listeners, says Haga, will be prepared for the change. "We advocate paying off your debts. Put yourself in a position where you can take charge of your own life. When the paper economy does break down, you can pick up assets cheaply from the high-rolling, highly-leveraged speculators of today."

If you do, he says, "your economic future" will be a bright one.

Haga himself worked his way through college, has law and business degrees, and has been a financial consultant to many major companies. He is the author of *"On the Brink: How to Survive the Coming Great Depression"* and other books, and he has appeared as a commentator on CNN and CNBC. Radio, however, is a medium he especially enjoys. "It's tremendous to talk directly to people," he says. "I just like to listen -- people who call in give me plenty of ideas for future books."

"Your Economic Future" *replaces* "Natural Alternatives" *and* "American Montage" *in the UBN line-up. It airs 7-9pm, Sundays. Click here to listen to UBN on the net.*

Hightower tapped as one of "Top 100" 

*Copyright 1998, United Broadcasting Network*

-- Feature taken from the National News Reporter. *To get your copy, click here.*