UNITED STATES DISTRICT COURT
IN THE MIDDLE DISTRICT OF FLORIDA
TAMPA DIVISION

FILED

01 AUG 16 AM 11: 35

U.S. DISTRICT COURT
MIDDLE DISTRICT OF FLORIDA

Case No. 8:00-CV-270-T-26EA

CHARLES E. HARDER,
Plaintiff,

vs.

**DEFENDANT'S MOTION TO
STRIKE and MEMORANDUM OF
LAW IN SUPPORT THEREOF**

MICHAEL HAGA,
Defendant.

THE DEFENDANT, MICHAEL HAGA, pursuant to local Rule 301 (g) and Rules 12(f) and

56(e) of the Fed. R. Civ.P. moves this Court to strike the affidavit of Charles E. Harder dated April

28, 2000 and the affidavit of Ed Shiflett dated April 28, 2000 and as grounds for the instant motion

state:

Pursuant to local Rule 301(g) of the Rules of the United States District Court for the Middle

District of Florida, the Defendant has made a good faith effort to resolve these issues with opposing

counsel, calling counsel's office on 8-14 and 8-15, 2001 to be told by counsel's secretary that

counsel is in the office and in meetings and will return Defendant's phone calls yet opposing counsel

has to date refused to return any telephone calls.

1.  Plaintiff filed the above referenced affidavits purportedly for the sole purpose
    of obtaining jurisdiction in this matter.

2.  The above referenced Affidavits contain many untruths and outright falsities
    and should be stricken.

1

3.     This motion is more fully supported by the attached Memorandum of Law.

WHEREFORE, Defendant Haga respectfully requests that the affidavit of Charles

E. Harder dated April 28, 2000 and the Affidavit of Ed Shiflett dated April 28, 2000

be stricken and that Plaintiff be admonished with respect to filing documents similar

to these in the future and that Defendant be awarded costs, including attorney fees for

being required to file the instant motion.

## MEMORANDUM OF LAW

Federal Rule of Civil Procedure 12(f) provided that upon motion by a party or upon the

Court's initiative, the court may order stricken from any pleading any "redundant, immaterial,

impertinent or scandalous or false matter." The purpose of Rule 12(f) is to conserve time and

resources by avoiding litigation of issues which will not affect the outcome of a case. *United States*

*v. Smuggler-Durant Mining Corp.* 823 F. Supp 873, 875.

In the instant case, the affidavit of Ed Shiflett, dated April 28, 2000 and the Affidavit of

Charles E. Harder contain outright untruths.

With respect to the Ed Shiflett Affidavit:

Paragraph 2 states that: "At all times Material I was an independent contractor with Radio

Press International."

This paragraph is an outright lie. **Mr. Shiflett is a named major shareholde**r in RPI on

page 4 of Mr. Harder's RPI Business Plan which is attached hereto as **Exhibit A**.

Paragraph 3 states that at all times material, Michael Haga was, and described himself as the

President of RPI.

Again, this is an outright lie. Page 6 of Mr. Harder's RPI Business Plan contains a statement

2

"Charles Harder, Chairman and acting President of RPI." **See Exhibit A**.

Mr. Harder signed all contracts, hired all personnel, opened all bank accounts, etc., for RPI., and is the sole incorporator of RPI.

Paragraph 4 of Ed Shiflett's affidavit states: "That at all times material, Mr. Haga ran and oversaw the day-to-day operations of RPI."

This is an outright lie. The Defendant suffers from a progressive and delibitating neurological condition which renders him incompetent and this fact has been noted by this Court in relation to physician letters filed with this Court. Most of the time when RPI was operational—2 months—the Defendant was delibitated and unable to function, again this fact has been made clear to this court through the letter of Dr. Robert Sammons and this Court has ruled that though the Court currently finds the Defendant competent, **the Court made such ruling on 2-16-2001 yet ruled without prejudice**. In addition, this statement of Mr. Shiflett stands in direct contrast to the affidavits of David L. Brothers, Alan Ferris and Michael Haga dated May 24, 2001 and attached hereto as **exhibits B,C, & D.**

In Paragraph 5 of Mr. Shiflett's affidavit, Mr. Shiflett states: "That al times material, Mr. Haga directed my actions and assured me I would be paid through RPI. In fact, Mr. Haga guaranteed the payment of my expenses........"

Again, this is an outright lie. Numerous letters are on file with this Court where Harder stated that he and his other company ACORN was paying Mr. Shiflett's expenses. (SEE EXHIBITS B,C,E) This statement also stands in direct contravention of the affidavits of Ferris, Brothers and Haga attached hereto as exhibits D,E,&F). No where does Mr. Shiflett offer any proof of the Fact Haga guaranteed his expenses because there is none.

In Paragraph 6 of Mr. Shiflett's affidavit is an outright lie and is totally contradicted by the aforementioned affidavits of Brothers, Ferris and Haga.

In Paragraph 7 of Mr. Shiflett's Affidavit is also an outright lie and is totally contradicted by numerous letters on file with this Court and again stands in direct contravention of the aforementioned affidavits of Brothers, Ferris and Haga.

With respect to the Harder affidavit:

Paragraph 3 of the Harder affidavit states: "Mr Haga informed me that he visited the Telford Hotel in 1995......

This is an outright lie as in 1995, Haga was medically incapacated and this statement stands in direct contradiction to the aforementioned Affidavits of Brothers, Ferris and Haga.

Paragraph 4 of Harder's affidavit states: "Mr. Haga invested either directly or through his company Acclaim Publishing Company, Inc., in Radio Press International.......Additionally, Mr. Haga lent money to RPI.

This is an outright lie.  See the aforementioned affidavit of Brothers and Haga.  In the Brothers affidavit he states that he is the sole owner of Acclaim Publishing and that Haga has never had any ownership in or interest of any kind in Acclaim Publishing.

Paragraph 5 of the Harder affidavit states: "....he was and acted as the President of RPI...."

Haga maintains this statement is at best self-serving and at worst an outright untruth.  With the exception of one letter to Ann Martinez of United Stations (written at the bequest of Mr. Harder) Haga never signed anything as President of RPI and his contacts with RPI were so minimal as to be laughable as he was medically incapacated most of the time.

Paragraph 6 of the Harder Affidavit states, among other untruths: "...I have had a lengthy

4

relationship with Mr. Haga and his company, Acclaim Publishing company, Inc.,

This is an outright lie and again, stands in direct contradiction to the aforementioned Brothers affidavit which states that Brothers is and has always been the sole owner of Acclaim Publishing, Inc and that Haga does not have and has never had any legal or equitible interest in Acclaim Publishing.

In Paragraph 6 of the Harder affidavit he goes on to state that "we jointly came up with the idea of forming RPI and that it was Mr. Haga's suggestion the business plan be drafted......

Again, this is an outright lie and stands in direct contravention of the affidavits of the aforementioned affidavits of Brothers and Haga.

Paragraphs 7 through 21 of Harder's affidavit contain nothing more than outright lies to this Court and stand in direct contravention to the affidavits of Brothers, Feris and Haga.

**In fact, this Court based its ruling of jurisdiction on these fradulent affidavits and yet the Plaintiff has offered no "proof" to substantiate any of his SWORN statements because there is none.**

Based upon this lengthy review of the Harder and Shiflett affidavits, Defendant respectfully requests that the Affidavits of Charles Harder and Ed. Shiflett be stricken, that Plaintiff and Mr. Shiflett be admonished about wasting judicial resources with numerous outright untruthful assertions and that Defendant be granted an award of attorney fees in this matter as this case has been butressed on nothing more than outright untruths.

Respectfully submitted,

Michael Haga, Defendant
820 23 Road

5

Grand Junction, CO 81505
970-256-7359

## <u>CERTIFICATE OF SERVICE</u>

IT IS HEREBY CERTIFIED that a true and correct copy of the foregoing was furnished via UPS on this ___15___ day of August, 2001 to **Robert Persante, Esq.,** PERSANTE & McCORMACK, 2555 Enterprise Road, Suite 15, Clearwater, FL 33763

Michael Haga

6

# Radio Press International
## Business Plan

Radio Press International (RPI) is a Florida corporation formed 10/11/99 by Charles E. Harder and located at White Springs, Florida. There are 100 million authorized shares and 10 million shares will be issued. The company will use the CPA services of Douglas Perreault of Ruskin, Florida from day one so that the statements are CPA audited and will be ready when the company files with the SEC to go public if that should occur. Mr. Perreault will also keep the bank accounts and Mr. Harder will monitor same. (Mr. Harder also formed Energy Liberty Unlimited, Inc. December of 1998 and that company just went the SEC OK effective October 08, 1999.)

Mr. Harder also formed People's Radio Network (PRN which the assets were sold to the United Auto Workers in . Since then he has formed under the Florida corporation known as America. Community Oriented Radio Network (ACORN Radio.) That company is profitable.  See acornradio.com and chuckherder.com

### RADIO MARKET

There are 10,392 commercial radio stations in the USA. Of these stations many strive to provide "full service" to the listener which means whatever type of programming they do plus news on the hour and half-hour. Thus there is a terrific demand for radio news service - but due to the constant mergers and consolidations in the industry we have seen the number of news-providers dwindle. Mutual, NBC, The Source, and several others were bought-up by Westwood One, then merged into only one service. Then, CBS bought Westwood One!

Currently the major players are: ABC, AP, CBS, USA, and Westwood One. Not counting small Christian-based news networks that supply religious stations, there are essentially only four players - counting the recent acquisition of Westwood One by CBS. This presents a problem in radio markets like New York, Chicago, LA, Dallas, Tampa, etc., where there are 50 or more radio stations. Thus a terrific vacuum exists.

Up until a month ago there was another choice: United Press International radio news. That company recently hired Arnaud de Borchgrave as CEO and he made the decision to sell-off the radio news-unit to AP. UPI was serving over 400 radio stations when it went "dark."

### INCOME STREAMS

There are two ways that news services garner income. You can charge for the service and let the local station then sell ads in and around the news. AP does that and has over 1,000 clients. The other method is to provide a completely produced newscast delivered on-the-hour for 5 minutes and the half-hour for 3 minutes. In that news-package you place national radio commercials that provide income and then the station pays nothing for the service - but simply puts the news with the commercials on-the-air. The advantage for the station is they pay nothing and have professional news-anchors voicing the news on their station without paying for the

Exhibit A



gathering of the news or hiring the announcers.  This arrangement is called "barter."  At this writing RPI has two national advertising sales reps committed to sell the radio spots.  These commercials are called "units."  A unit is typically a 30 second radio commercial announcement which is pre-recorded. A 60 second spot is 2 units. At a base rate of 33.3 cents-per-station per-unit this means that for each 100 stations taking the service RPI would be paid $33.00 per unit. There are 3 units in the 5-minute newscast at the top of the hour and 2 units at the half-hour for a total of 5 units per-hour.  During a 24-hour period there are 120 units.

It is management's belief that we can "sell" at the above rate at least 12 hours each day.  Thus 100 stations times 60 units bringing in $33.30 each amounts to a daily revenue of $1,998.00 per-day or $59,940.00 per-month.  A target of 300 stations would mean a monthly income of $179,820.00.

## THE *RPI* ADVANTAGE

Peoples Radio Network has a complete operations center and also a satellite uplink transmitter at White Springs, Florida.  This means that programming fed from the PRN studios goes directly to the transmitter that beams the audio signal up to the Galaxy 6 satellite - which in turn provides a signal down to the Northern Hemisphere. The advantage to satellite-delivery of the signal is that it costs nothing additional for one or 1,000 stations to get the signal as it's up in the air and all they need is to point a "dish" at the satellite.



RPI will lease a small-space at the PRN center in White Springs and deliver the finished newscasts to the PRN master control-room.  PRN will uplink the newscasts at the top of the hour and half-hour at NO CHARGE to RPI.  Thus the newscasts will be carried on PRN satellites which are:  Galaxy 6, Transponder 3 at 58.20 wide-band audio and also Satcom C-1, Transponder 2, at 7.5 audio subcarrier wide-band TVRO. Radio networks normally pay $12,000.00 or more a month for satellite-distribution on two channels with the attendant transmission costs.  RPI will pay nothing to PRN. Further, the two satellite channels used by PRN are able to be accessed by hundred of station now and the equipment to receive either one of the satellite channels is only $500.00 which is much cheaper than the normal $6,000.00 that is normally spent for a digital satellite downlink for commercial radio.  There are also more than 2 million backyard dishes that can access the signal on Satcom C-1 also known as F-1.

## Operations

Current technology allows a news operation to monitor the world from any point.  With the Internet, direct-satellite and long-distance phones and fax lines we can literally cover the globe on a tight budget.  A recent breakthrough in transmission of voice over standard phone lines but providing full high-fidelity was pioneered by the Comrex corporation. Using their special modem/encoders we can use standard dial-up phone lines and transmit full-fidelity voice and music from any point across the USA to our control center. These units plug into a standard phone jack and use the same type of phone line that is in your bedroom.  Thus RPI can have "news bureaus" in the spare room of anyone's home across the USA or overseas.

Exhibit i

The start-up plan is to headquarter operations at The National Press Building at Washington, DC. The cost for a 232 square foot studio space there is $850.00 per month which includes all utilities. We cannot begin to stress what the image is to the radio stations to have their news originate *"From the National Press Building in Washington, DC!"*

Using computers, the Internet, and phone lines - the newscasts will originate in DC most of the day and be fed to the White Springs operation center by standard phone line dial-up twice-hourly. The newscast will be pre-fed at :45 and :15 and then recorded and played back on the hour and half-hour. This will allow time to correct any errors or re-start, etc. At other times the newscasts will originate in Corpus Christi, Texas and Los Angeles, California. There will also be a studio at White Springs that can originate news "just in case."

RPI has contacted several of the former radio-newscasters that were recently fired by United Press International when they sold their division to AP. Our plans are to hire a total of 8 people who will cover the 24-hour 7 day requirements. In actual operations, the newscasts will be "live" from 6 AM to 10 PM Eastern time and then three newscasts will be repeated overnight from 11PM to 5 AM. There will always be one newscaster "on-call" overnight and the control center is staffed and there are five TV monitors in the control center that monitor CNN, MSNBC, FOX, ALL NEWS CHANNEL, plus ABC and CBS. Plus the staffer will watch our wire services and emergency national channels from NOAA. RPI can go "live" within a few moments of a breaking story.

## MARKETING OUR SERVICE

As this is written an 11,000 piece mailing is being prepared to all commercial radio stations in the USA. The mailing consists of a full-color one-side postcard with an additional message on the reverse side. It alerts the station to the RPI website rpinews.com which is being developed and will have full details, contract and sample newscast. We would not be surprised if 300 stations were to come on board in the near future.

Further ongoing promotion will be a direct mailing to all 1,500 "Talk" stations across the USA and also magazine ads plus press-releases to the industry media.

## "Private-Placement"
## STOCK OFFERING

RPI will offer one million shares of stock for $100,000.00 to any one investor Or for 10 cents a share in smaller lots. We seek to market no more than a total of 4 million shares to no more than a total of 15 investors. To start-up the service we will need a minimum of $150,000.00 in the bank. We believe that the operations will be in the black within 6 months at which time we will endeavor to file with the SEC to go public.



It is understood that this private offering is to sophisticated investors who understand

Exhibit 1

that there is an element of risk in any start-up. Further, RPI will not have any significant hard assets other than associated computers, technical equipment and furniture. The company could fail and your entire investment could be lost.

## PRO-FORMA OPERATIONAL STATEMENT

### START-UP COST:

| | |
|---|---|
| Advertising and mailing to radio stations | $6,000.00 |
| Furniture and equipment | 25,000.00 |
| Plane tickets and travel | 3,000.00 |
| | $34,000.00 |

### Monthly Expenses

| | | |
|---|---|---|
| Washington Office | $850.00 | |
| Phones | 500.00 | |
| White Springs studio | 400.00 | |
| Phones | 300.00 | |
| Comrex-Phone Transmission cost | 600.00 | |
| Newswires | 1,200.00 | |
| Air Talent with benefits | 33,000.00 | |
| Miscellaneous | 1,500.00 | |
| | Total: $38,350.00 | |

### INCOME

| | |
|---|---|
| 100 stations monthly: | $ 59,940.00 |
| 200 stations monthly | 119,880.00 |
| 300 stations monthly | 179,820.00 |
| 400 stations monthly | 239,760.00 |

Assumption: With a minimum of 100 stations we would anticipate a gross profit of $21,590.00 each month.

*Chuck: Question: Abbreviate? Chuck says there are 170 PRO Applied already Onboard!*

Further notes: Mr. Harder and Mr. Perreault will be stockholders and will not take a salary until RPI is profitable.

It may take 60 days before we see income even if we have more than 100 stations and it there may be a period of time before the accounts receivable are in the operating account.

*Chuck Says There are 100 Now —*

EXHIBIT 1

The anticipated breakdown of stock ownership is as follows.

*Chuck Question —*

| | |
|---|---|
| Investors: | 4,000,000  shares |
| Mr. Harder | 3,000,000  shares | *? Is this fair ?* |
| Mr. Perreault | 250,000  shares |
| Mr. Shifflet | 250,000  shares |
| Employees | 500,000  shares |
| | |
| Reserved to sell to public: | 2,000,000  shares |

This is pro-forma and may be changed as determined by management.

**Board of Directors and officers:**

Charles E. Harder, Chairman
Mike Haga, President
Douglas Perreault, Secretary-Treasurer
*Ted Anderson*

**PLEASE NOTE**: This is a start-up company and like any investment there is an element of risk **Part or all of the investment may be lost.** If the company does not succeed the hard   sets would be worth about 30 percent of book less the    of removal or shipping.

Any investor must understand that this is an unregistered private placement and is guided by the laws of the state of Florida and no other jurisdiction. Any legal action by an investor must be brought in the state of Florida. By ma   ng any investment you subscribe to these terms and conditions. There is no guarantee of success or return of your investment.

We expe    operations and service to begin on November 13, 1999

Radio Press International, Inc.
Route 1, Box 2002
White Springs, FL 32096
Voice: 904 397-4489   9AM to 2PM weekdays or after 5PM to 8PM
Fax     904 397-4492

This offer does not constitute a contract to sell stock to any party unless the corporation elects to do so.  The information contained herein is proprietary and not for publication.  This document is to be treated as confidential and will not be duplicated and circulated to more than 20 potential investors.  This offer may be withdrawn or changed without notice.

This is the last page of five pages.

## Radio Press International
## Private Placement Investor Agreement

Radio Press International, Inc. (A Florida for-profit corporation) hereby offers stock to the following person(s) to be classed as a sophisticated investor who is purchasing from an unregistered private placement.

_____ shares of stock @ 00.10 per share total:_____

to be issued to: _____ _____

_____

_____

Signed: _____ _____
      Investor  .

with the understanding that there is a risk of losing the entire investment. This investment is guided by the laws of the State of Florida. Further the above investor warrants that he or she has read the business plan and has been cautioned of all risks of making this investment and there is no guarantee success or return of the investment.

Signed by:

Charles E. Harder
Chairman and acting President

Exhibit 1

United States District Court
for the
District of Colorado

---

Civil Action File No.___01-S-356_____
JURY TRIAL DEMANDED

ACCLAIM PUBLISHING COMPANY, INC.
ALAN FERRIS,
MICHAEL HAGA

      Plaintiffs,

v.

CHARLES E. HARDER,
PEOPLES NETWORK, INC., a Florida Corporation,
AMERICAN COMMUNITY ORIENTED RADIO NETWORK, INC.,
a Florida Corporation,
ENERGY LIBERTY UNLIMITED, INC., a Florida Corporation,
RADIO PRESS INTERNATIONAL, INC., a Florida Corporation,
PEOPLES RADIO NETWORK, a subsidiary of Peoples Network, Inc., and/or American Community Oriented Radio Network,

      Defendants.

---

### AFFIDAVIT OF DAVID L. BROTHERS

STATE OF COLORADO
COUNTY OF MESA

      Before me the undersigned authority, personally appeared DAVID L. BROTHERS, and after first being duly sworn, did depose and state as follows.

      1.     I am a life-long resident of the State of Colorado, over the age of 18 years and have personal knowledge of the facts contained herein.

      2.     I have read the affidavit of CHARLES E. HARDER, dated May 14, 2001 in this Case, DEFENDANT HARDER'S REPLY TO PLAINTIFF HAGA'S RESPONSE TO HARDER'S MOTION TO DISMISS, dated May 17, 2001; DEFENDANT'S MOTION TO DISMISS FOR IMPROPER VENUE AND

1

Exhibit B

FORUM NON-CONVENIENS, dated May 17, 2001; DEFENDANT'S MEMORANDUM OF LAW IN SUPPORT OF MOTION TO DISMISS, dated May 17, 2001; and DEFENDANT'S MOTION TO DISMISS COUNTS XII, XV, XVI OF PLAINTIFF'S AMENDED COMPLAINT, dated May 17, 2001, and feel that I must respond to the many false statements contained therein.

3.    I am the President and sole owner of Acclaim Publishing Company, Inc., a Colorado corporation which I incorporated in Colorado in 1992. *Tom Lacroix, Esq., 700 Rood Avenue, Grand Junction, CO, is in the process of entering an appearance for Acclaim Publishing Co., Inc., thus reinstating the claims of my company in this case.*

4.    From 1992, to date I have had, **in Colorado,** an ongoing *substantial* and ongoing business relationship with Mr. Charles E. Harder, and his Florida corporations American Community Oriented Radio Network, Inc, Peoples Network, Inc., Peoples Radio Network.

5.    Since 1992, Mr. Harder through PRN/PNI/ACORN has purchased, wholesale, from me in Colorado, through my Colorado Corporation, Acclaim Publishing, CO., Inc. over $30,000 in books published by Acclaim in the State of Colorado for resale through his Peoples Radio Network, and Peoples Network, Inc., and American Community Oriented Radio Network.

From 1992 to 1996, Mr. Harder periodically called Mike Haga in Colorado to appear as a guest on Mr. Harder's daily nationwide talk show (carried on well over 100 radio stations) where Mr. Haga and Mr. Harder would discuss four books Mr. Haga had written from 1992 to 1995 as the guest interviews would result in orders for Mr. Haga's books through Mr. Harder's order center for PRN/PNI/ACORN.

It should be noted here that Mr. Haga, who had been a financial Administrator for Columbia HCA (the nations largest hospital organization) for a decade, became disabled in 1995 as a result of Sarcoidosis/Neurosarcoidosis, first diagnosed in 1987--a rare and slowly debilitating disease akin to MS.

I have been friends with Mike Haga for a very long time as I have been in health care all of my adult life am an RN,BSN and ran the operating room at Presbyterian St. Lukes in Denver, Co, during the

2

time Mike was a Financial Administrator for Columbia HCA.  P/SL is owned by Columbia HCA.  My publishing Company also published Mike's four books which sold very well from 1992 to 1995.

In 1995, I became Mike Haga's caretaker as the result of his chronic progressive disease process.

It should be noted that Mike continues to try to write books, but to date has not been able to complete a new book--though he continues to try and believes one day he will.

6.      In March 1999, *Mr. Harder, due to his successful relationship with my company, Acclaim Publishing, Co., Inc. personally solicited Mike Haga and myself in Colorado* to purchase $6,000 per month air-time on his American Community Oriented Radio Network, Inc. (ACORN), Peoples Radio Network (PRN) Peoples Network, Inc.(PNI), which is carried live via the Internet in Colorado, through Satellite in Colorado and on several radio stations in Colorado as well as shortwave in Colorado.

Mr. Harder went on to state that because of having interviewed Mike on his own program, he knew Mike had the voice to become a great talk show host and Harder sweetened the pot by telling me the ACORN/PNI/PRN order center would continue to order Mikes books at wholesale from me, stock them in the order center and promote them heavily on other ACORN/PRN/PRN programs as well.

7.      Chuck Harder, Mike Haga and I discussed whether Mike physically felt he could host a radio program and Mike, who desperately wants to be what he feels is productive again and still believes he will one day wake up and be completely well said he knew he could.  After several discussions with Mr. Harder, I agreed, to purchase the air-time and Mr. Harder then sent to me a list of 35 ACORN/PRN/PNI radio stations nationwide that were to carry the one hour per day radio talk show Mike would host.  Mr. Harder also maintained this same list on his websites www.chuckharder.com and www.forthepeople.org.

7.      From April 1, 1999 to December, 1999 I purchased over $48,000 of Air-time on American Community Oriented Radio Network, Inc, (ACORN), PNI/PRN by writing checks on my Colorado bank account for Acclaim Publishing Company, Inc, which Mr. Harder subsequently cashed in Florida..

3

8.     In late July, 1999, Mr. Charles E. Harder called and proceeded to *personally solicited Mike Haga, myself and Alan Ferris*, a good friend and neighbor who was visiting Mike when Harder called, to invest in to invest in Harder's public corporation known as Energy Liberty Unlimited, Inc. (ELU).

9.     Mr. Charles E. Harder told the three of us the SEC was in the final process of registering ELU stock for public trading and that Mr. Harder had a financial consultant, Ross Secunda of Hanevan Financial, who would be working with Capstone a market-maker for ELU, stock, and that Mr. Harder would be transferring the assets of PNI/PRN/ACORN to ELU to make it very attractive to future stockholders.

Ferris, who was fascinated with Haga's daily radio program told Harder he was personally interested in investing as well, as it sounded like a gold mine, which Harder totally agreed with.  It is interesting that Mr. Harder has the ability to make one feel as if Harder is doing you a favor by letting you in become a part of his radio empire, and he certainly has the track record, 14 years of nationwide broadcasting, etc.

10.     By the end of the phone conversation, both Ferris and myself agreed that once we saw the prospectus we would each be interested in purchasing 12,500 shares each at a pre-offering price of $1.00 per share.  Mr. Harder agreed to mail to me and to Mr. Ferris, the ELU prospectus. Harder also sent to me the appraised valuation of the assets of PNI/PRN/ACORN showing a then current valuation of $4,350,000 that would increase to $6,000,000.

11.     By the end of the phone call, Mr. Harder thanked Alan and myself and said Mark Warner, then President of ELU would after we had the prospectus contact each of us with instructions on where to wire transfer our investments in ELU.

12.     On August 3, 1999, pursuant to written instructions from Mr. Harder and Mark

4

Warner, I wired $12,500 from my Colorado bank account for Acclaim Publishing to First Federal Savings Bank of Florida for my investment in ELU.

13.     On or about August 15, 1999, I received, through the mail in Colorado, a stock certificate for 12,500 shares of ELU stock in the name of Acclaim Publishing, Inc.

14.     Mr. Harder signed the certificate as Chairman.

15.     On or about October 3, 1999, Mr. Charles E. Harder, called Mike to discuss his radio program and during that call Harder asked if Alan Ferris could join us (which he did) as Harder had some really important news to share. When Alan arrived, Harder personally solicited us to loan money to and to invest in Radio Press International, Inc, (RPI) which he said was to be a nationwide radio news service he was creating to replace UPI news and that RPI News would become a part of ELU thus tremendously enhancing the value of our ELU stock.

16.     Mr. Harder told us he was personally investing in RPI, had already raised capital to fund RPI for at least one year of operation, that he had already hired the top anchors for the former UPI news, was finishing the RPI Business Plan, and the articles of incorporation for RPI, and that all 125 PNI/PRN/ACORN nationwide radio stations would immediately carry RPI news when it commenced operation in November, 1999 thus assuring that RPI would operate in the black from day one. Ferris and I told Harder that once we had seen his Business Plan (which he said he was completing), we would consider it.

17.     Mr. Harder faxed copy of his Articles of Incorporation for RPI, dated October 8, 1999.

18.     On October 16, 1999, Mr. Harder faxed to me in Colorado a copy of his RPI Business Plan which stated he has 2 national sales reps for RPI, will not commence operations until there is

5

$150,000 IN THE BANK, that ACORN is profitable, that MR. Perreault, Mr. Harder's Florida CPA will maintain the RPI books and that Harder will monitor the RPI bank account.

19.     There are SIX pages to the RPI Business Plan, not five as Mr. Harder maintains. The SIXTH page is the RADIO PRESS INTERNATIONAL PRIVATE PLACEMENT INVESTOR AGREEMENT (a true and correct copy is attached hereto and incorporated herein).

20.     Though there is a forum selection clause on page 5 of the RPI Business Plan, naming Florida as the place of jurisdiction, I told Mr. Harder I would not invest in RPI if this were the case and he said don't worry about it, it's just a formality.  He said, "just don't sign the Investor Agreement." That's what we agreed to.  And I did not sign the Investor agreement which would have formed the contract to be bound by the laws of Florida.  In any event, since the whole Business Plan was, in my opinion, fraudulent, the law is clear that the Investor agreement would not be binding even if I had signed it because of the fraud.  (A true and correct copy of the RPI Investor Agreement--which I did not sign--is attached hereto and incorporated herein).  At the bottom of the Investor Agreement it says "**Charles E. Harder, Chairman and acting President**."

21.     As a result of Mr. Charles E. Harder's personal solicitation, phone calls to me in Colorado, faxing and subsequently mailing to me in Colorado his Radio Press International, Inc., Business Plan accompanied by his "global plan to put ACORN/PRN/PNI/RPI into ELU" I loaned $25,000 to Radio Press International, Inc. and agreed to purchase 250,000 shares of stock in RPI for an additional $25.00.

22.     Pursuant to written instructions from Mr. Harder,  On October 21, 1999, I personally wired $5,000 to Mr. Harder from my bank in Colorado and authorized Mr. Harder to charge my Acclaim Publishing Company, Inc., American Express Corporate card  $20,799.00.

6

23.     Mr. Harder faxed to me a copy of the RPI Corporate resolution for deposit accounts showing Mr. Harder and his CPA Doug Perreault as being the only signers on the RPI Business account at First Federal Savings Bank of Florida.

24.     Mr. Harder had also personally asked Mike Haga, who Mr. Harder knew was permanently disabled,  as each of them discussed it during phone calls when I was present, if he would like to be the President of RPI.

25.     I was present with Mike Haga on the day he called Mr. Harder and said he would be honored to be the president, but could not travel to Florida or actually assume any duties as President until his health permitted.  Mr. Harder said that was fine and that Mr. Harder would continue in his role of acting President as well as remaining chairman of RPI, until such time as Mr. Haga's health permitted him to actually assume the role of President of RPI.

26.     By late December 1999, I began having many concerns about ACORN/PRN/PNI as I was receiving only minimal response from approximately 6 radio stations from the air-time I was purchasing on ACORN despite the fact I was offering free items to listeners.  At about this same time I learned from Kay Reetz, a long-time HARDER employee that Harder was using RPI funds to pay ACORN bills and to pay ACORN employees, among other things.

27.     Mike Haga called Mr. Harder and said, "Hey Chuck, if I am going to be the President of this thing, I need to see the books.  Mr. Harder was hesitant, but finally agreed.

28.     On December 29, 1999, Mr. Harder, in writing had Mr. Perreault send the RPI books to HAGA at 820 23 Road, Grand Junction, CO 81505.

29.     In early January 2000, I also (inadvertently?) received a copy of an e-mail Harder had sent 12-6-1999 to his wife Dianne and Perreault where Harder states that he knew he was bankrupt

7

when he thought of and then created RPI. This was material misrepresentation of fact which Harder knowingly suppressed from me.

30.     In early January Mike Haga received the RPI books and together we verified from cancelled checks signed by Mr. Perreault that Mr. Harder was indeed using RPI funds to pay ACORN bills and employees and to make improvements to the ACORN studio housed in a building owned by Harder's daughter Darlene Stewart (who is also the registered agent of ACORN). That Mr. Harder had never invested in RPI and did not at any time ever have the required $150,000 IN THE bank to commence operations for RPI as required in his RPI Business Plan. And that there were no national ad reps onboard for RPI and that the PNI/PRN/ACORN radio stations were not carrying the RPI news.

31. Copies of the bills and checks were made, the books were bundled up and returned to Harder who admitted, in writing that he received them and returned them to Perreault.

32.     Mr. Harder then began making written promises on 1-2-2000, 1-13-2000, 1-23-2000, to repay, with a profit, RPI and ELU investors from the sale of the assets of ACORN/PNI/PRN/ELU.

33.     On January 21, 2000, Mr. Harder sent a fax asking Mike Haga to contact Mr. Bob Persante, legal counsel for PNI/PRN/ACORN/ELU stating that harder's plan was"to recover your investment, etc."

34.     On January 22 or 23, 2000 Mike Haga called Mr. Persante and while I was present, listening on the speakerphone, Mr. Persante laughed and said: "I thought it had been too quiet down there." (Referring to Harder). Mr. Persante then went on to talk with Mr. Haga telling him that he (Persante) would make sure the "situation" was resolved correctly as he had represented Harder and his various companies for years and that Harder "often put the cart ahead of the horse leaving me

8

(Persante) to clean up the mess afterwards."

35.    Mr. Haga had a couple of other telephone conversations with Persante, while i was present and began opening up to Persante who continually assured Haga everything would be taken care of.

36.    In one conversation, Haga stated to Persante that he was permanently disabled with Sarcoidosis a progressive disease affecting his heart and lungs and also in his central nervous system and then faxed to Persante a letter which Haga said he planned to file civil and criminal charges against Harder if the matter was not resolved as Persante promised.

37.    On January 31, 2000 Mr. Persante sent a letter to Haga telling Haga that Persante was not comfortable working directly with Haga due to his neurologic problems with Sarcoidosis and told Haga to get a local attorney to work with Persante to "resolve" the issues.

38.    Haga went to Tom Lacroix, Esq. and made an appointment for 2-8-2000.

39.    I told Haga to let Lacroix know Haga had the authority to speak for me as well as I could not make the meeting.

40.    Haga met Lacroix on 2-8-2000 and left documentation with Lacroix.

41.    On February 15, Lacroix drafted a 3 day demand letter to Persante.

42.    On February 15, 2000, Haga was served with papers naming him as a defendant in a lawsuit Persante filed in Florida against Haga, alleging Haga defamed Harder when Haga sent (to Persante) a letter stating Haga planned to file civil and criminal charges against Harder for fraud.

43.    When he was served with Harder's lawsuit, Haga called Persante asking him why he did this and Persante said (over the speakerphone) "we knew you were going to do something so we thought we would head you off and make sure it would be almost impossible for anyone to sue

9

Harder outside the State of Florida."

44.    I was appalled and continue to be appalled at the misstatements, and outright lies made by not only Harder but Mr. Persante and refuse to discuss anything with Mr. Persante as I don't want to find myself being a target as well. An example of the deceptive statements by Mr. Harder and Mr. Persante can be seen in the fact in the Florida case for Defamation of character Harder filed against Haga, in Harder's affidavit to the Court Harder states that Haga was the co-incorporator of RPI, in Harder's affidavit to this Court, along with Mr. Persante's DEFENDANT'S MEMORANDUM OF LAW IN SUPPORT OF MOTION TO DISMISS, both state that Mike Haga was the President of RPI, immediately assumed his duties as President and ran the day to day operations of RPI. As I have stated in this affidavit, I am Mike Haga's caretaker, he lives in my home and from 1995 until July 2000 I was with him virtually 24 hours per day and I can state, for a fact, Haga was never the co-incorporator of RPI and certainly never ran the day-to-day operations of RPI as he was physically and much of the time mentally unable to do so. This nonsense has to stop. Attorneys are officers of the Court and are sworn to uphold professional standards and to represent the truth.

45.    It has been decades since I have been in Florida and it is outrageous that Mr. Harder now challenges the jurisdiction of the Colorado Court in this matter as Harder approached me in Colorado, I wired all loans and investments from Colorado, have filed complaints with the FBI in Colorado, the Colorado Department of Securities, the SEC, etc.

46.    I also personally know that Mike Haga never controlled the day-to-day operations of RPI as Mr. Harder alleges in his affidavit to this Court, as I am not only a Registered Nurse, since 1995 I have been Mike Haga's caretaker as well. I know for a fact, Haga never signed any contract

10

for RPI, hired anyone for RPI, never visited the RPI operations center in Florida--though Harder diligently tried to get him to, as his health would not permit it at any time. I also know for a fact Haga never controlled or handled the RPI books other than examining and returning them immediately to Mr. Harder. I know for a fact only Harder and Perreault were ever the signers on the RPI bank account. I also can attest to the fact that after Haga examined the RPI books he told Harder he would have nothing to do with RPI and followed it up with a resignation letter on January 17, 2000 to Harder stating that although he was the named President in the Business Plan he had done nothing and wanted to go on record "out of an abundance of caution" to make it clear he resigned. Thank God He did! I also never received and stock certificate of any type for RPI stock.

47.    It has been even more appalling that *__in March 2000__*, Haga began receiving bills for RPI, *__at my post office box for Acclaim Publishing__*, addressed to: Mr. Mike Haga, President, Radio Press International, Inc., P.O. Box 3918, Grand Junction, CO 81505 (wrong zip code as well). In some of these bills were postcards and letters from Mr. Harder telling creditors to send the bills to Haga as President, to this post office box because "RPI had moved." This has not only been an outright lie, it has had a very serious impact on Haga's health as stress enhances the negative effects of Sarcoidosis--and Harder is well aware of this. The only way I can figure out how Harder got ahold of my Post Office box for Acclaim Publishing is that he took it off one of the $6,000.00 monthly checks I was sending to ACORN for air-time.

48.    This whole matter belongs in Colorado.

49.    I want nothing to do with Mr. Persante and will not talk with him and feel the only way to have a truthful examination of the facts is for there to be unbiased and truthful counsel as well.

11

50.     Mr. Persante told this Court of having my deposition taken if the Florida matter and has represented to this Court that is the only reason he sent me a notice of Cross Deposition in this case, which he later withdrew.

51.     For the record, I was never given notice of having my deposition taken in the Florida case and never gave a deposition in that case and am appalled that Mr. Persante continually represents the contrary.

52.     For the record, on April 2, 2001, I received a letter from Mr. Harder dated March 28, 2001 regarding being bought out of ELU. (A true and correct copy is attached hereto).

53.     Both myself and Alan Ferris responded to Mr. Harder, sending him a letter on April 2, 2001 requesting full disclosure on the buy-out of ELU. (A true and correct copy is attached hereto).

54.     On April 7, 2001, Both myself and Alan Ferris received a response from Mr. Harder (dated April 3, 2001) regarding ELU, with a demand to either sell our ELU shares or buy-out Mr. Harder. (A true and correct copy of this letter is attached hereto and incorporated herein).

55.     On May 5, 2001 I received a letter from Mr. Harder regarding ELU whit the threat of legal action against me. (A true and correct copy is attached hereto).

56.     Mr. Persante has made it clear that once he is successful in dismissing the Colorado action, he will file suit against me in Florida regarding ELU to obtain a settlement against me. This is nonsense indicative of why I want nothing to do with Mr. Persante.

57.     I feel badly that Mr. Harder finds his physical condition such that it makes it hard for him to travel.  However, being "morbidly obese" is a choice, the same as I believe his physical problems are as all one has to do is go out to Mr. Harder's website (www.chuckharder.com) and read,

12

in Harder's own words how he became wheelchair bound.  In his own words, he states that he fell, broke dislocated a knee and possibly broke a leg.  Instead of going to the emergency room, Harder chose to blame his insurance carrier for not giving him a referral to a specialist, but instead went to bed and stayed there until his injuries healed wrong and then personally paid for his body brace, wheelchair, etc.  Now Harder claims to be the voice for the 54 million disabled Americans.  One wonders how his actions against Haga (a truly disabled man) could be helping a disabled American.

58.    Finally, in having research done with the Florida Department of State, Department of Corporations, I have learned that Mr. Harder has, over the years, incorporated 11 Corporations in the State of Florida and that almost all of them have been involuntarily dissolved by the State--the same as RPI and ELU and that there have been numerous lawsuits filed by Mr. Harder against former investors.  (True and correct copies of the Florida Department of State, Division of Corporations, Coporations Online) are attached hereto and incorporated herein.

It is also outrageous that on Harder's website he continues to do business under ELU despite the fact Florida Dissolved the corporation on 9-22-2000.  Harder even has the nerve to have a customer counter for ELU which has gone from 0 to almost 5,000 since 9-22-2000 as he refers to it on his daily radio broadcast.  On several occasions, I have spoken with Mr. Barry Williams of the Florida State Department of Banking and Finance about this (as well as filing a formal written complaint which is under investigation) and Mr. Williams assures me they know all about this and though it may take several years, action will be taken.

59.    Mr. Persante states, in documents filed with this Court, that he has never had any knowledge of the financial aspects of any of Harder's companies, and I find this hard to believe as Mr. Persante was the registered agent for Sun Broadcasting, Inc/Sun Radio Network Corporation,

13

another corporation the state of Florida involuntariarly dissolved on 11-09-1990.  Yet on Harder's

website he proudly states he was the founder of Sun Radio Network.

FURTHER, THE AFFIANT SAYETH NAUGHT

_____
DAVID L. BROTHERS

Sworn to and subscribed before me this 24th day of May, 2001 by DAVID L. BROTHERS.

_____
Maurine Schumann
printed, stamped or typed name of notary

✓ personally known to me

__produced_____as identification

14

## Radio Press International
## Private Placement Investor Agreement

Radio Press International, Inc. (A Florida for-profit corporation) hereby offers stock to the following person(s) to be classed as a sophisticated investor who is purchasing from an unregistered private placement.

_____ shares of stock @ 00.10 per share total:_____ -

to be issued to: _____

_____

_____

Signed: _____

      Investor   .

with the understanding that there is a risk of losing the entire investment. This investment is guided by the laws of the State of Florida. Further the above investor warrants that he or she has read the business plan and has been cautioned of all risks of making this investment and there is no guarantee success or return of the investment.

Signed by:

Charles E. Harder
Chairman and acting President

United States District Court
for the
District of Colorado

_____

Civil Action File No.___01-S-356_____
JURY TRIAL DEMANDED

ACCLAIM PUBLISHING COMPANY, INC.
ALAN FERRIS,
MICHAEL HAGA

      Plaintiffs,

v.

CHARLES E. HARDER,
PEOPLES NETWORK, INC., a Florida Corporation,
AMERICAN COMMUNITY ORIENTED RADIO NETWORK, INC.,
a Florida Corporation,
ENERGY LIBERTY UNLIMITED, INC., a Florida Corporation,
RADIO PRESS INTERNATIONAL, INC., a Florida Corporation,
PEOPLES RADIO NETWORK, a subsidiary of Peoples Network, Inc., and/or American
Community Oriented Radio Network,

      Defendants.

_____

## AFFIDAVIT OF ALAN FERRIS

STATE OF COLORADO
COUNTY OF MESA

      Before me the undersigned authority, personally appeared Alan Ferris, and after first being

duly sworn, did depose and state as follows.

      1.      I am a life-long resident of the State of Colorado, over the age of 18 years and have

personal knowledge of the facts contained herein.

      2.      I have read the affidavit of CHARLES E. HARDER, dated May 14, 2001 in this Case,

and feel that I must respond to the many mistatements contained therein.

1

Exhibit C

3.      In July, 1999, I was visiting Mike Haga and David Brothers at David's home at 820 23 Road, Grand Junction, CO.  While I was visiting Mr. Charles E. Harder called and began discussing his public company Energy Liberty Unlimited (ELU).  During the conversation, which Mr. Brothers had on speakerphone, Mr. Harder solicited Brothers and Haga to invest in ELU.  I said I was also interested in investing as well, as I had been fascinated by Mike Haga's radio program carried on Harder's nationwide radio network.  I gave Mr. Harder my phone number and address for him to send an ELU prospectus to.  Mr. Harder then sent to me the ELU through the US Mail.

4.      During the original phone call, Mr. Charles E. Harder assured me the SEC was in the final process of registering ELU stock for public trading and that Mr. Harder had a financial consultant, Ross Secunda of Hanevan Financial, who would be working with Capstone a market-maker for ELU, stock, and that Mr. Harder would be transferring the assets of PNI/PRN/ACORN to ELU to make it very attractive to future stockholders.

10.      Mr. Harder sent to me the appraised valuation of the assets of PNI/PRN/ACORN showing a current valuation of $4,350,000.

11.      I agreed with Mr. Harder to purchase 12,500 shares of ELU stock for $1.00 per share. Mr. Harder thanked me and said Mark Warner, then President of ELU would contact me with instructions on where to wire transfer my investment in ELU.

12.      On August 12, 1999, pursuant to written instructions from Mr. Harder and Mark Warner, I wired $12,500 from my A.G. Edwards Investment Account in Grand Junction, CO, to First Federal Savings Bank of Florida for my investment in ELU.

13.      On or about August 15, 1999, I received, through the mail in Colorado, a stock certificate for 12,500 shares of ELU stock in the name of Alan Ferris.

2

14.    Mr. Harder signed the certificate as Chairman.

15.    On or about October 4, 1999, Mr. Brothers walked over to my house and told me Harder was on the phone and wanted to speak to both of us. I went to Brothers home where Mr. Charles E. Harder, *personally solicited,* me in Colorado to loan money to and to invest in Radio Press International, Inc, (RPI) which he said was to be a radio news service he was creating to replace UPI news and that RPI News would become a part of ELU thus tremendously enhancing the value of my ELU stock.

16.    Mr. Harder told me he was personally investing in RPI, had already raised capital to fund RPI for at least one year of operation, that he had already hired the top anchors for the former UPI news, was finishing the RPI Business Plan, and the articles of incorporation for RPI, and that all 125 PNI/PRN/ACORN nationwide radio stations would immediately carry RPI news when it commenced operation in November, 1999 thus assuring that RPI would operate in the black from day one.

17.    Mr. Harder faxed a copy of his Articles of Incorporation for RPI, dated October 8, 1999.

18.    On October 16, 1999, Mr. Harder faxed to me in Colorado a copy of his RPI Business Plan which stated he has 2 national sales reps, will not commence operations until there is $150,000 IN THE BANK, that ACORN is profitable, that MR. Perreault, Mr. Harder's Florida CPA will maintain the RPI books and that Harder will monitor the RPI bank account.

19.    There are SIX pages to the RPI Business Plan, not five as Mr. Harder maintains. The SIXTH page is the RADIO PRESS INTERNATIONAL PRIVATE PLACEMENT INVESTOR AGREEMENT (a true and correct copy is attached hereto and incorporated herein).

3

20.     Though there is a forum selection clause on page 5 of the RPI Business Plan, naming

Florida as the place of jurisdiction, both Brothers and I, in another phone call, told Mr. Harder we

would not invest in RPI if this were the case and he said don't worry about it, it's just a formality.

Just don't sign the Investor Agreement, he said.  That's what we agreed to.  And I did not sign the

Investor agreement which would have formed the contract to be bound by the laws of Florida.  In

any event, since the whole Business Plan was, in my opinion, fraudulent, the law is clear that the

Investor agreement would not be binding even if I had signed it because of the fraud.  (A true and

correct copy of the RPI Investor Agreement--which I did not sign--is attached hereto and

incorporated herein).   On the Investor Agreement form it states CHARLES E. HARDER,

CHAIRMAN AND ACTING PRESIDENT.

21.     As a result of Mr. Charles E. Harder's personal solicitation, as well as his sending

the RPI Business Plan to me via fax to me in Colorado, mailing to me in Colorado his Radio Press

International, Inc., Business Plan accompanied by his "global plan to put RPI into ELU" I loaned

$25,000 to Radio Press International, Inc. and agreed to purchase 250,000 shares of stock in RPI for

an additional $25.00.

22.     Pursuant to written instructions from Mr. Harder,  On December 20, 1999, I

personally wired $25,025 to Mr. Harder from my A.G. Edwards Investment Account in Grand

Junction, Colorado to First Federal Savings Bank in Florida, for RPI, as designated by Mr. Harder.

23.     Mr. Harder faxed to me a copy of the RPI Corporate resolution for deposit accounts

showing Mr. Harder and his CPA Doug Perreault as being the only signers on the RPI Business

account at First Federal Savings Bank of Florida.

24.     In the original phone call where Harder solicited me to invest in RPI, Mr. Harder

4

personally asked Mike Haga, who Mr. Harder knew was permanently disabled, if he would like to be the President of RPI.

25.     During that phone call, Mr. Haga said he would be honored to be the president, but could not travel to Florida or actually assume any duties as President until his health permitted. Mr. Harder said that was fine and that Mr. Harder would assume the role of acting President as well as remaining chairman of RPI, until such time as Mr. Haga's health permitted him to actually assume the role of President of RPI.

26.     In early January, 2000 Mike Haga told me that he had learned that Harder, among other things, was using RPI funds to pay ACORN bills and to pay ACORN employees, etc.

27.     Mike Haga demanded that Mr. Harder send the RPI books so we could verify the truthfulness of the information.

28.     On December 29, 1999, Mr. Harder had Mr. Perreault send the RPI books to HAGA.

29.     In early January 2000, David Brothers gave me a copy of an e-mail he and Mike Haga somehow received that Harder had sent on 12-6-1999 to his wife Dianne and Perreault where Harder states that he knew he was bankrupt when he created RPI. This was a material misrepresentation of fact which Harder knowingly suppressed from me.

30.     In early January Mike Haga received the RPI books and together we verified from cancelled checks signed by Mr. Perreault that Mr. Harder was indeed using RPI funds to pay ACORN bills and employees and to make improvements to the ACORN studio housed in a building owned by Harder's daughter Darlene Stewart (who is also the registered agent of ACORN). That Mr. Harder had never invested in RPI and did not at any time ever have the required $150,000 IN THE bank to commence operations for RPI as required in his RPI Business Plan. And that there were no

5

national ad reps onboard for RPI and that the PNI/PRN/ACORN radio stations were not carrying the RPI news.

31. Copies of the bills and checks were made, the books were bundled up and returned to Harder who admitted, in writing that he received them and returned them to Perreault.

32.   Mr. Harder then began making written promises on 1-2-2000, 1-13-2000, 1-23-2000, to repay RPI and ELU investors from the sale of the assets of ACORN/PNI/PRN/ELU.

33.   On January 21, 2000, Mr. Harder sent a fax asking Mike Haga to contact Mr. Bob Persante, legal counsel for PNI/PRN/ACORN/ELU stating that harder's plan was "to recover your investment, etc."

34.   On January 22, 2000 Mike Haga called Mr. Persante and while David Brothers and I were present (because we wanted to know what was going on), listening on the speakerphone, Mr. Persante said: "I thought it had been too quiet down there." Mr. Persante then went on to talk with Mr. Haga telling him that he (Persante) would make sure the "situation" was resolved correctly as he had known Harder for years and that Harder "often put the cart ahead of the horse leaving me (Persante) to clean up the mess afterwards."

35.   Mr. Haga began opening up to Persante and had several subsequent telephone discussions which I was present at and listened to on the speakerphone, with Persante who continually assured Haga everything would be taken care of. I believed Haga had an attorney client relationship with Persante, at this juncture.

36.   In one conversation, Haga stated to Persante that he was permanently disabled with Sarcoidosis a progressive disease affecting his heart and lungs and also in his central nervous system and then faxed to Persante a letter which Haga said he planned to file civil and criminal charges

against Harder if the matter was not resolved as Persante promised.

37.     On January 31, 2000 Mr. Persante sent a letter to Haga telling Haga that Persante was not comfortable working directly with Haga due to his neurologic problems with Sarcoidosis and told Haga to get a local attorney to work with Persante to "resolve" the issues.

38.     Haga went to Tom Lacroix, esq. and made an appointment for 2-8-2000.

39.     I told Haga to let Lacroix know Haga had the authority to speak for me as well as I could not make the meeting.

40.     Haga met Lacroix on 2-8-2000 and left documentation with Lacroix.

41.     On February 15, Lacroix drafted a 3 day demand letter to Persante.

42.     On February 15, 2000, Haga was served with papers naming him as a defendant in a lawsuit Persante filed in Florida against Haga, alleging defamation of Harder's character by Haga.

43.     I was present when Haga called Persante asking him why he did this and Persante said (over the speakerphone) "we knew you were going to do something so we thought we would head you off and make sure it would be almost impossible for anyone to sue Harder outside the State of Florida." In a subsequent telephone conversation between Haga and Persante, which I was present at and listened to on the speakerphone, Haga told Persante he was upset that Harder used the donation Haga sent to PNI (after receiving in Colorado via the US mail a PNI fund-raising solicitation to help purchase the Telford Hotel in White Springs, FL--to fund operations of ACORN instead--which Harder discusses in his 12-9-99 e-mail to his wife and CPA Doug Perreault) saying "However, I'm getting calls on the air from folks who are getting the package and they are responsive.  They have hope that we will get the Telford [Hotel] back.  In their mind it is THEIR clubhouse.  I figured processing all those checks could keep the order center going after December

15 and it looks like I'm right....." Persante responded to Haga saying: "So What!"  "So what!" Persante is counsel for PNI.

44.    I was appalled and continue to be appalled at the mistatements, and outright lies made by not only Harder but Mr. Persante and refuse to discuss anything with Mr. Persante as I don't want to find myself being a target as well.

45.    It is outrageous that Mr. Harder now challenges the jurisdiction of the Colorado Court in this matter as Harder personally approached me in Colorado, I wired all loans and investments from Colorado, have filed complaints with the FBI in Colorado, the Colorado Department of Securities, the SEC, etc.

46.    I also personally know that Mike Haga never controlled the day-to-day operations of RPI as Mr. Harder alleges in his affidavit to this Court.  I know for a fact, Haga never signed any contract for RPI, hired anyone for RPI, never visited the RPI operations center in Florida--though Harder diligently tried to get him to, as his health would not permit it at any time.  I also know for a fact Haga never controlled or handled the RPI books other than examining and returning them immediately to Mr. Harder.  I know for a fact only Harder and Perreault were ever the signers on the RPI bank account.  I also can attest to the fact that after Haga examined the RPI books he told Harder he would have nothing to do with RPI and followed it up with a resignation letter on January 17, 2000 to Harder stating that although he was the named President in the Business Plan he had done nothing and wanted to go on record "out of an abundance of caution" to make it clear he resigned. I also have never received a stock certificate for the shares in RPI I purchased.

47.    I have witnessed the detrimental health effects Mr. Haga has suffered when, in March 2000, Haga began receiving bills, at David Brothers post office box for Acclaim Publishing, for RPI

addressed Mr. Mike Haga, President, Radio Press International, Inc., P.O. Box 3918, Grand Junction, CO 81505 (wrong zip code as well). In some of these bills were postcards and letters from Mr. Harder telling creditors to send the bills this post office box because "RPI had moved." This has not only been an outright lie, I have watched as Haga's health has gone downhill--with him ending up in the hospital in May last year as stress enhances the negative effects of Sarcoidosis--and Harder is well aware of this.

48.     This whole matter belongs in Colorado.

49.     I also want nothing to do with Mr. Persante and will not talk with him and feel the only way to have a truthful examination of the facts is for there to be unbiased and truthful counsel as well.

50.     Mr. Persante continually writes of having my deposition taken if the Florida matter and has represented to this Court that is the only reason he sent me a notice of Cross Deposition in this case, which he later withdrew.

51.     For the record, I was never given notice of having my deposition taken in the Florida case and never gave a deposition in that case and am appalled that Mr. Persante continually represents the contrary.

52.     For the record, on April 2, 2001, I received a letter from Mr. Harder dated March 28, 2001 regarding being bought out of ELU. (A true and correct copy is attached hereto).

53.     Both myself and David Brothers responded to Mr. Harder, sending him a letter on April 2, 2001 requesting full disclosure on the buy-out of ELU. (A true and correct copy is attached hereto).

54.     On April 7, 2001, Both myself and David Brothers received a response from Mr.

9

Harder (dated April 3, 2001) regarding ELU, with a demand to either sell our ELU shares or buy-out Mr. Harder. (A true and correct copy of this letter is attached hereto and incorporated herein).

55.     On May 5, 2001 I received a letter from Mr. Harder regarding ELU whit the threat of legal action against me. (A true and correct copy is attached hereto).

56.     Mr. Persante has made it clear that once he is successful in dismissing the Colorado action, he will file suit against me in Florida to obtain a settlement against me. This is nonsense indicative of why I want nothing to do with Mr. Persante and feel he should be disqualified as counsel in this Case so we can get at the truth instead of this continual paper chase which is costing time and money.

57.     I have tried on two occasions to talk with Mr. Persante to let him know that I planned to file a motion to have him disqualified in this case and each time he was unavailable am in the middle of planting season and don't have the time to continue try to talk with him and will not talk with him without either Haga or Brothers being present as I don't want my words to be twisted into what I believe Persante will use as grounds for a lawsuit against me as it seems there is a pattern here.

58.     David Brothers and I have done a lot of research on the Internet through the Florida Department of State, Division of Corporations, Corporations online and have learned that Mr. Harder has incorporated at least 11 corporations over the years and it seems that most of these companies have been involuntarily dissolved by the State. Brothers has attached true and correct Copies to his affidavit and it is most troubling.

59.     I am appalled that Mr. Harder continues, to date, to do business through ELU, even though Florida dissolved it on 9-22-2000 and that he promotes it on his website:

www.chuckharder.com where there is a customer visit counter which one year ago stood at zero and today is near 5,000. Products and services are offered. Amazing.

60.     I filed a formal complaint with the State of Florida, Department of Banking and Finance regarding this and I know that Mr. Brothers has spoken several times with Mr. Barry Williams at this office and was told a formal investigation is underway and that it will take a long time but that action will be taken.

FURTHER, THE AFFIANT SAYETH NAUGHT

ALAN FERRIS

Sworn to and subscribed before me this _28th_ day of May, 2001 by ALAN FERRIS.

Aubrey J. Carlos

printed, stamped or typed name of notary

___ personally known to me

Ⓧ produced _drivers license_ as identification



My Commission Expires 3/11/2002

11

United States District Court
for the
District of Colorado

_____

Civil Action File No.___01-S-356_____
JURY TRIAL DEMANDED

ACCLAIM PUBLISHING COMPANY, INC.
ALAN FERRIS,
MICHAEL HAGA

   Plaintiffs,

v.

CHARLES E. HARDER,
PEOPLES NETWORK, INC., a Florida Corporation,
AMERICAN COMMUNITY ORIENTED RADIO NETWORK, INC.,
a Florida Corporation,
ENERGY LIBERTY UNLIMITED, INC., a Florida Corporation,
RADIO PRESS INTERNATIONAL, INC., a Florida Corporation,
PEOPLES RADIO NETWORK, a subsidiary of Peoples Network, Inc., and/or American
Community Oriented Radio Network,

   Defendants.

_____

## AFFIDAVIT OF MICHAEL HAGA

STATE OF COLORADO
COUNTY OF MESA

   Before me the undersigned authority, personally appeared DAVID L. BROTHERS, and after first

being duly sworn, did depose and state as follows.

   1.  I am a life-long resident of the State of Colorado, over the age of 18 years and have personal

knowledge of the facts contained herein.

   2.  I have read the affidavit of CHARLES E. HARDER, dated May 14, 2001 in this Case,

DEFENDANT HARDER'S REPLY TO PLAINTIFF HAGA'S RESPONSE TO HARDER'S MOTION TO

DISMISS, dated May 17, 2001; DEFENDANT'S MOTION TO DISMISS FOR IMPROPER VENUE AND

1

*Exh: B: + D*

FORUM NON-CONVENIENS, dated May 17, 2001; DEFENDANT'S MEMORANDUM OF LAW IN

SUPPORT OF MOTION TO DISMISS, dated May 17, 2001; and DEFENDANT'S MOTION TO DISMISS

COUNTS XII, XV, XVI OF PLAINTIFF'S AMENDED COMPLAINT, dated May 17, 2001, and feel that

I must respond to the many false statements contained therein.

  3.  Mr. Harder personally solicited me in Colorado to be the President of RPI at the same time

he personally solicited Colorado Investors in RPI (See affidavits of David Brothers and Alan Ferris).

  4.  I was named as the President of RPI in Mr. Harder's RPI Business Plan only.

  5.  There was never an election of officers nor a meeting of shareholders for RPI.

  6.  Mr. Harder was aware, from day one, of my chronic and progressive physical and neurological

disability--Sarcoidosis/Neurosarcoidosis and agreed to be the acting President of RPI until I could assume the

duties of President--which never occurred.

  7.  I never ran the day-to-day operations of Radio Press International, Inc. (RPI).

  8.  I don't even know the names of the employees Mr. Harder hired to work for RPI.

  9.  I was never on the RPI bank account, never signed a contract committing RPI funds for

anything.

  10.  I did demand to see the RPI books in late December, 1999, after Kay Reetz called me to tell

me Harder was using RPI funds to pay for ACORN bills, etc.

  11.  Mr. Harder told Mr. Perreault, in writing, on December 29, 1999 to Send the RPI Books to

the house where I reside at 820 23 Road, Grand Junction, CO 81505.

  12.  Together with David Brothers and Alan Ferris (investors in RPI) we examined the books and

made copies of ACORN bills paid for with RPI funds via checks signed by Mr. Perreault.

  13.  The books were returned to Mr. Harder who acknowledged receipt in writing on January 25,

2000 also stating that Harder returned them to Mr. Perreault.

  14.  I did have several telephone discussions with Mr. Persante and felt he was representing me

2

and that we had an attorney client relationship, after Mr. Harder had me call him on January 22, 2000.

15.     I had forgotten that Mr. Brothers and Mr. Ferris were present when I called Mr. Persante and that the call was on a speakerphone. See affidavits of Mr. Brothers and Alan Ferris.

16.     During that first phone call, Mr. Persante told me that he would "resolve" the situation and not to worry as Persante had worked for and represented Harder and his companies for years and that Harder often put the cart ahead of the horse leaving Persante to clean up the mess afterwards.

17.     When I told Mr. Persante of my chronic medical condition, he followed up with a letter on January 31, 2000 telling me he was not comfortable working with me with my medical condition and that he would work only with an attorney and told me to get one.

18.     I scheduled a meeting with Tom Lacroix and on 2-8-2000 took all the documentation to Mr. Lacroix, along with the written promises of Mr. Harder to repay the investors. Mr. Brothers and Mr. Ferris were unable to attend the meeting but gave Lacroix authorization for me to speak for them--although the documentation says it all.

19.     On 2-15-2000, Mr. Lacroix sent a 3 day demand letter to Mr. Persante asking Persante to contact Lacroix.

20.     On 2-15-2000 I was served with a lawsuit Harder and Persante filed in Florida on 2-10-2000 against me in which Harder alleges I defamed his character when I threatened to file criminal and civil actions against Harder for a fraudulent business plan in RPI.

I feel it was nothing more than bad faith on Mr. Persante's part to file a lawsuit against me in Florida during the very time I felt he was working with me to resolve a situation which Mr. Harder, in writing promised to do--repay the investors.

21.     After reading the affidavits of Mr. Brothers and Mr. Ferris, I remember Mr. Persante telling me why he filed the Florida lawsuit against me--to get jurisdiction in Florida and to prevent

3

the investors from pursuing Harder in Colorado.

22.     Jamie Fired, the Florida attorney I had to borrow money to hire to represent me in the Florida matter, also told me that Persante told her "We knew that Haga was going to do something, so we thought we better head him off."

23.     I have requested an affidavit from Mrs. Fried who will not give one, but will so testify to this if called to do so.

24.     I have never done any business in the State of Florida (see affidavit of David Brothers)

25.     I did voluntarily host a daily radio program on Mr. Harders Peoples Radio Network, American Community Oriented Radio Network, Peoples Network, Inc. However, the network called me in Colorado for each program.

26.     There were days when I could not host the program due to health reasons.

27.     I have never received any income from Acclaim Publishing.  I own no stock or any other interest in Acclaim Publishing.  Acclaim Publishing did publish 4 books of mine from 1992 to 1995 when I became disabled.  I have never received any royalties from Acclaim Publishing-- though I had always hoped to and would have had Acclaim not paid out excessive costs, like the $6,000 per month Mr. Harder charged a\Acclaim for my broadcast.

28.     I am totally disabled and have been since 1995, when Social Security found me to be so disabled, though I long to be productive again.

29.     Mr. Brothers and Mr. Ferris have filed suit in Colorado, alleging fraud on the part of Mr. Harder who personally solicited them, in Colorado to invest in two of his Florida corporations, Energy Liberty Unlimited, and Radio Press International. (See affidavits of Mr. Brothers and Mr.

4

Ferris).

30.     I also filed suit in Colorado against Mr. Harder who began a systematic mail fraud campaign against me by sending postcards and letters to RPI creditors telling them to send all the bills to me in Colorado at a post office box belonging to Acclaim Publishing (See affidavit of David Brothers).

31.     Mr. Harder commenced his postcard and letter campaign in March, 2000--even though Harder admits in his Florida lawsuit against me that I resigned as President of RPI in January, 2000.

32.     In the Florida lawsuit, Mr. Harder states (in his affidavit) that I was the co-incorporator of RPI which is an absolute lie.

33.     In Mr. Harder's response to the Colorado lawsuit both Mr. Harder and his attorney Mr. Persante now claim I ran the day to day operations of RPI which is an outright lie. Nowhere does Mr. Persante nor Mr. Harder now claim I was the co-incorporator of RPI. It is amazing how their stories have changed.

34.     Mr. Persante now claims that my claims in Colorado were compulsory counterclaims in the Florida proceeding as they arose out of the same occurrence or transaction. This is nonsense. Again, Mr. Harder admits in his Florida pleadings, I resigned as President in January, 2000. That severed whatever legal connection I would have had to RPI and Harder's mail fraud campaign is a totally separate occurrence, transaction which Mr Harder commenced much later, when I had no legal relationship whatsoever to RPI.

35.     Mr. Persante and Mr. Harder now claim that I controlled the books for RPI. More nonsense. The only connection whatsoever I had with the RPI books was when I demanded to see

5

them and Mr. Harder and Mr. Perreault sent them to me at my residence on December 29, 1999. After documenting (for investors) Mr. Harder's and Mr. Perreault's improper use of RPI funds to pay ACORN bills, etc., they were returned to Mr. Harder who admitted receipt in writing and returned them to Mr.Perreault.

36.     I am unable to travel for more than short distances.  On Friday, May 18, 2001, I met with my primary care physician, Dr. Horowitz who, after a complete examination (though I see him very frequently) wrote the attached letter stating that air travel is out of the question and that even short trips are medically risky.  (see a true and correct copy--the Florida Court has the original of Dr. Horowitz's letter of May 18, 2001 which is attached hereto and incorporated herein.

37.     I do admit that I have memory problems which are severe at times is there is swelling of the brain which MRI's document as needed.  However, in the Florida case, I filed a motion for the appointment of a Guardian ad Litem which the Florida court rejected finding I was competent enough to draft the motion so I am competent.

38.     Mr. Persante had no problem with the ruling of the Florida Court but now raises the question of my competency with the Colorado Court.  More nonsense.  I am drafting this affidavit and feel perfectly competent to do so.  If, at any point I feel I cannot represent myself, I will have a guardian appointed to so represent me.

39.     It appears that Mr. Harder is no stranger to creating corporations and then leaving them and investors, and Mr. Persante to clean up the mess.  (See affidavit of David Brothers with attachments).

40.     I believe Mr. Persante cleans up the messes by first endearing himself (as he did to me) to people Mr. Harder has gotten involved in his corporations, getting them to open up to him

6

and then finding a reason to file suit against them to place them on the defensive, creating so much legal mumbo-jumbo in the process that they give up and Harder wins. It will not happen this time, not if my health will hold together long enough to get the truth out.

41.     I hold no ill will toward Mr. Harder, though I am upset that there is this whole other side to him that radio listeners of his FOR THE PEOPLE nationwide daily broadcast never see. I am upset that Mr. Harder would take money from people for donations to specific causes, like the purchase of the Telford Hotel (which was to become the headquarters of RPI/PRN/PNI/ACORN/ELU) and then in writing, as he did on 12-9-99 tell his wife and his CPA (who was also handling the books for RPI and wrote RPI checks to pay ACORN bills) that he knew that processing all those (donations) checks would keep the order center operating.

42.     I sent a $100.00 donation to help purchase the Telford Hotel pursuant to the PNI non-profit fundraiser solicitation I received in Colorado only to learn it was used to keep the for-profit ACORN order center operating. That's not right.

43.     Mr. Persante's response when I told him of this was: "So What! So What!" (See affidavit of Alan Ferris).

44.     I feel badly that Mr. Harder now claims to be disabled because he is morbidly obese and wheelchair bound due to leg injuries he suffered in a fall. However, Harder freely admits on his website that the injuries healed wrong because he did not get proper medical attention. Being overweight and not seeking medical attention--were and are choices. Many of us who are truly disabled do not have the luxury of that CHOICE.

45.     By the time trial rolls around, Mr. Harder could lose weight and have his leg fixed--again, it is CHOICE. I don't have the luxury of that choice, nor do most of the 54 million disabled

7

Americans Harder now claims to be the voice for on his daily nationwide radio broadcast and his websites. I have also asked Mr. Persante, in discovery, to provide documentation showing that someone other than Mr. Harder has declared him to be disabled. I have yet to receive a response. I also find it ironic that Mr. Harder, personally decided to have his leather body brace built at, he said to me, his own expense along with purchasing his wheelchair, etc. Insurance companies ordinarily pay for these things, if there is a need.

46.     It is also critically important that on May 1, 2001, the Florida Court, in Harder's action against me for defamation, issued an ORDER REFERRING CASE TO MEDIATION stating: "Because of limited judicial resources available to try civil cases and given the nature of this proceeding which suggests that mediation........." The court then ordered the case to mediation. (A true and correct copy of the ORDER is attached hereto and incorporated herein).

47.     Interestingly enough, Mr. Persante never references this order in his paper barrage in the Colorado Court. On the contrary Persante continually tries to get the Colorado case dismissed or transferred to Florida despite the fact the Colorado investors have nothing to do with the Florida litigation.

48.     Mr Persante also harps to the Colorado Court about trying to cross-depose the Colorado investors when he was to allegedly depose them in the Florida matter. But when you read the affidavits of Brothers and Ferris, they never received notice of having their depositions taken in the Florida matter and have never been deposed. More nonsense.

49.     I am filing a Motion to Dismiss or Transfer venue to the Colorado Court where the investor claims reside. This is where it belongs, especially in light of the Florida Court ordering mediation. I have no choice. My doctor prohibits travel as it could possibly take my life, not to

8

mention the fact that I am at one Dr's office or another almost 2 days of every week.  Again, Mr. Harder has a choice.

50.     I am also, like Brothers and Ferris asking that Mr. Persante be disqualified as Colorado counsel for Mr. Harder so the truth in this matter can be achieved without the ongoing mistatements and continual paper barrage.

51.     Now that I have read the affidavits of Brothers and Ferris, I am also going to be asking the Florida Court to award me attorney fees as Mr. Persante admitted to them he filed the matter in bad faith and Jamie Fried will, if needed, corrobborate this fact.

FURTHER, THE AFFIANT SAYETH NAUGHT

_Michael W. Haga_
MICHAEL W. HAGA

Sworn to and subscribed before me this 24th day of May, 2001 by MICHAEL W. HAGA.

_Aubrey J. Carlos_

_Aubrey J. Carlos_
printed, stamped or typed name of notary

__personally known to me

X produced _drivers license_ as identification



My Commission Expires 3/11/2002

9

**_CORRECTED_**                                    **TELEFAX**

*Chuck Harder*

Merry Christmas:                                    24 Dec 99

Doug is taking a few days off and the order center is closed.  I can call him at home but don't want to disturb his holiday as he has family in from out of town.  He will do as you ask next week upon his return as I will order him to do so.  But for now please, it's Christmas.

I will be sending you the corporate kit and seal Monday by express mail so that you can make out whatever certificates you deem appropriate as new investors come on-line.  *I do not own a typewriter, cannot find one, and I don't want to hand-write them.*

Mr. Sauer's checks were lost in transit to the bank and he then replaced them and they just recently cleared.  *Sorry, but that's the fact and he needs to be thanked and also reminded of that.*

As you will have the kit and the stock certificates, please double check and ask John Sauer how he wants them made out in case he has had further thoughts.

On the website:  This is total news to me.  However, we're happy to add a banner but cannot understand why we as a dealer would want to refer our customers elsewhere?  Would you?

On RPI and Lear.  I have tried but cannot get in touch with Jose the day you asked me and also yesterday.  He's out for the holiday I'm told -- will try next week.  All I need from him is a fax and I will advise to make the change.  Sorry for the mix-up but we never got proper documentation and did not ever get a commercial.  You can't run anything without a script or spot and Jose knows that.

From your faxes I can see that you are focusing on "what's wrong."  You may want to consider some very positive plus items.  ACORN has paid the salary of Ed Shifflet and RPI only has paid for the net cost of the gear needed for setup.  Any other operation would see another 100 to 400K for start-up that did not have to be spent due to ACORN and our assets used and shared by RPI.  Plus, RPI is getting FREE uplinking and FREE access to a very expensive uplink and NO MAINTENANCE COST.  Unheard of.

29

(EXHIBIT E)

*Exhibit E*

**TELEFAX**

*Chuck Harder*

Route 1, Box 2002
McClurg Lane
White Springs, Florida 32096
Voice: 904 397-4489 Fax: 904 397-4492
e-mail: charder@isgroup.net

(94)

To: Mike Haga            Supplemental  Jan 02/00

Information for the investors:

RPI is using thousands of dollars of my equipment that was not charged including the master control horseshoe desk.

RPI pays nothing for uplinking on two satellites. The going rate is 3.5 K per month per satellite or 7K per month plus transmission cost.

By being in the same building as ACORN RPI gets other things for free. Acorn should bill RPI for this but did not.

You either have, or will have all the expense reports. When you get them and look at the hundreds of hours worked and **NONE of that time charged to RPI, I will then accept an apology.** Please call any engineering firm of your choice and tell them what was done and they would have to fly around and buy the equipment. You won't get an estimate for less than $100K — I know, I have been in the business and paid for work to be done. We pulled off a miracle. Sadly, neither you nor the investors have the background to appreciate what has been done.

Your angry, I'm brokenhearted. I'll work tirelessly to get us out of this.

I wish you well.

Chuck

exhibit 42
Exhibit F