UNITED STATES DISTRICT COURT
IN THE MIDDLE DISTRICT OF FLORIDA
TAMPA DIVISION

FILED

01 AUG 16 AM 11: 33

CLERK U.S. DISTRICT COURT
MIDDLE DISTRICT OF FLORIDA
TAMPA, FLORIDA

Case No. 8:00-CV-270-T-26-E

CHARLES E. HARDER,
　　　Plaintiff,

vs.

MICHAEL HAGA,
　　　Defendant.

**DEFENDANT'S MOTION FOR SUMMARY JUDGMENT ON THE PLEADINGS AND MEMORANDUM OF LAW  IN SUPPORT THEREOF**

THE DEFENDANT, MICHAEL HAGA, pursuant to Rule 12(c) of the Federal Rules of Civil Procedure and Rule 3.10(g) of the Rules of The United States District Court for the Middle District of Florida, seeks the entry of an order from this Court granting entry **of Summary Judgment on the pleadings** in favor of Defendant, MICHAEL HAGA, on the grounds there is no genuine issue of law or fact and and as grounds in supports states:

　　　1.　　　The Plaintiff, a public figure, is a national radio talk show host whose daily radio program is carried on over 100 radio stations coast to coast, has pending before this Court a complaint containing one single remaining count alleging that the Defendant embarked upon a systematic campaign of defamation against the Plaintiff, accusing the Plaintiff of defrauding investors in the Plaintiff's corporation known as Radio Press International, Inc. through the use of a false and/or fradulent Business Plan.

　　　2.　　　The Defendant, who continues to maintain this Court is without either Personal Jurisdiction over the defendant, and/or subject matter Jurisdiction over the issue(s), to prevent a default judgment from being entered against him, was forced to answer the Plaintiff's complaint setting forth six

1



affirmative defenses including (1.) absolute privilege of "truth", pursuant to Section 581A of the Restatement Second of the Law of Torts; (2) absolute priveledge pursuant to Section 586 of the Restatement of the Law of Tort granted to parties and witnesses to planned Judicial Proceedings—which were undertaken and are underway; (3) in addition to several conditional privleges. (**See Exhibit A**).

3.        On February 28, 2001, Colorado investors in Radio Press International, Inc., (RPI), a 34 page Complaint in United States District Court For the District of Colorado, Denver, Colorado, against RPI, Mr. Harder personally, and several other companies of Mr. Harder's, including Radio Press International, Inc., alleging among other things, that the Plaintiff in this case (HARDER) defrauded the Colorado Investors of tens of thousands of dollars through the use of a false and/or fradulent Business Plan in RPI. That case number is 01-S-356. (**See Exhibit B**).

5.        On April 18, 2001, the **Plaintiff** in this case filed with this Court a NOTICE OF RELATED CASE filed in the UNITED STATES DISTRICT COURT OFR THE DISTRICT OF COLORADO, Civil Action # 01-S-356, which is now titled, **David Brothers, Alan Ferris, John Sauer and Michael Haga, Plaintiffs v. Charles E. Harder, Radio Press International, Energy Liberty Unlimited, American Community Oriented Radio Network, Peoples Network, Inc., and Peoples Radio Network, Defendants.**    (See Exhibit C).

4.        Original copies of sworn Affidavits by Mr. David L. Brothers and Mr. Alan Ferris, and Michael Haga filed in the Colorado case 01-S-356, were filed with this Court on May 26, 2001, attached to Defendants Motion for Change of Venue and are labeled Dkts. 40, 41, & 42.  In these affidavits, Brothers and Ferris state that Mr. Harder is a nationally recognized radio Talk show host appearing on over 120 radio stations daily and that Mr. Harder personally approached them in Colorado to loan money to and to invest in Radio Press International, Inc., they did, in fact loan money to and invest in Radio Press International, and subsequently learned they were, in fact, defrauded by Mr. Harder through Mr.

Harder's use of his false Business Plan in Radio Press International.  **(See Exhibits D,E,F).**

5.      In these aforementioned affidavits, Brothers and Ferris state that after they learned they had been defrauded by Mr. Harder, Mr. Harder, on numerous times, in writing, promised to repay the Brothers and Ferris loans and investments made to/in Radio Press International—but has not done so to date.

6.      Brothers and Ferris have filed formal complaints against Mr. Harder  with the Colorado Department of Securities, the FBI in Grand Junction, CO, Florida State Department of Banking and Finance.  The Defendant in this matter has filed mail fraud complaints with the US Postal Inspector. Copies of those complaints are attached to Defendants Initial Motion for Summary Judgment filed with this Court.

7.      The Testimony of both Brothers and Ferris is not only necessary but critical for Defendant's defense in this case to prevent the possibility of an injustice in this case.

8.      Plaintiff in this matter maintains that there is a venue selection clause in the RPI business Plan which states that "This investment is guided by the laws of the State of Florida," and thus Florida is the proper venue for this action.

10.      The Defendant in this case continues to assert that the so called venue selection clause is irrelevent in that there is a sixth page to Plaintiff's RPI Business Plan which contains signature lines for investors in RPI agreeing to be bound by the venue selection clause.  **(See Exhibit G).**

11.      In the aforementioned affidavits of Brothers, Ferris and Haga (Dkt's 40, 41, 42, each state under oath that they objected to the venue clause, would not sign the agreement to be bound by the venue selection clause and were told by the Plaintiff Harder that it was irrelevent, a mere formality and that they did not have to sign the agreement.

12.      Neither Brothers, Ferris nor Haga signed the agreement agreeing to be bound by the laws

3

of Florida.

13.     In addition, Brothers and Ferris each loaned $25,000 to RPI and merely invested $25.00

and said loans fall totally outside the venue selection clause as they were not investments.

14.     Neither Brothers nor Ferris will agree to travel to Florida to testify for the Defendant in

this matter (and even if they would, Defendant cannot afford to pay their costs) in this case since they

have filed the Colorado case and will not subject themselves to the Jurisdiction of this Court, and this

Court is without Jurisdiction to require the presence of Brothers and/or Ferris in this trial.

15.     Their testimony is crucial for a just resolution of this matter and Pursuant to Rule 19 of

the Fed. R. Civ.P., this case cannot proceed without them.

16.     In addition, Defendant has been informed by Mr. Barry Williams of the Florida State

Department of Banking and Finance that a formal investigation (pursuant to complaints filed by Brothers,

Ferris and Haga will be initiated commencing on August 17, 2001 into the allegations by Brothers, Ferris

and Haga of fraud by the Plaintiff in the RPI Business Plan, among other issues.

WHEREFORE, Defendant respectfully requests that this Court Grant Summary Judgment

on the pleadings in favor of the Defendant and against the Plaintiff and for such other and further relief

as the Court deems proper and/or transfer claims remain in the instant case to the United States District

Court for the District of Colorado.

### Memorandum of law

Summary Judgment on the Pleadings should be granted in favor of the Defendant on the

following grounds: Summary Judgment is proper when there is no genuine issue of material fact and

the moving party is entitled to judgment as a matter of law. Fed.R.Civ.P. 56(c).  In opposing a

motion for Summary Judgment, "a party may not rely on his pleadings to avoid judgment against

him." *Ryan v. Int'l Union of Operating Eng'rs, Local* 675, 794 F.2d. 641, 643 (11th Cir.1986).  The

purpose of summary Judgment "is to pierce the pleadings and to assess the proof in order to see whether there is a genuine need for trial." *Wouters v. Martin County*, 9F. 3d 924, 928 (11th Cir.) (quoting *Matsushita Elec. Indus. Co. V. Zenith Radio Corp.*, 475 U.S. 574, 587, 106 S.Ct. 1348, 1356, 89 L.Ed.2d 538 (1986)), cert. denied,--U.S.---,115 S.Ct. 65, 130 L.Ed.2d 21 (1994). Thus, "mere general allegations which do not reveal detailed and precise facts "will not prevent the award of summary judgment upon a court's determination that no genuine issue for trial exists." *Franz Chem. Corp v. Phila. Quartz Co.*, 594 F.2d 146, 150 (5th Cir. 1979).

As to the issue of Defamation of Character which is the basis of the Plaintiff's complaint against the Defendant, the Plaintiff is a public figure in that he hosts a national radio talk show on a daily basis, broadcast on over 100 radio stations nationwide. In the Eleventh circuit, the Courts have consistently ruled that **public figures** "must prove that the defendant acted with actual malice to establish liability" when the "defamatory material involves issues of legitimate public concern." *Silvester V. American Broadcasting Co.*, Inc. 839 F.2d 1491, 1493 (11th Cir. 1988). "To show actual malice by publishing defamatory material, the **Plaintiff must show that the Defendant acted "with knowledge that it was false or with reckless disregard of whether it was false or not."** *New York Times Co. V. Sullivan*, 376 U.S. 254, 84 S.Ct. 710, 11 L.Ed.2d 686 (1964). (emphasis added).

In this case before this Court, the Defendant did not act with actual malice, the Defendant merely stated the truth in that the Defendant planned to contact the FBI, etc., regarding a fradulent business plan, etc. Complaints were filed with the FBI, The Florida Department of Banking and Finance, The Colorado Department of Securities, the IRS, and the SEC, only after the Plaintiff failed to honor his written promises to fund RPI until it was sold and to repay investors, which Plaintiff has refused to do. In addition, Colorado Investors in RPI filed  suit on Federal Court in Denver

Colorado on February 28, 2001 (CV 01-S-356)  alleging, among other things, that the Plaintiff

defrauded them by inducing them to invest in RPI through the use of a false business plan.

      The United States Court of Appeals for the Eleventh Circuit has consistently ruled

that "Summary Judgment is to be granted when the evidence shows 'that there is no genuine issue

of any material fact and that the moving party is entitled to a judgment as a matter of law.'" *BECK*

*v. PRUPIS* Nos. 95-4844, 95-5586, 1995.

      Summary Judgment is appropriate where the moving party shows an absence of

evidence to support an essential element of the non-moving party's case.  Weiss v. School Bd. Of

Hillsborough County, 141 F.3d. 990, 1994 (11 Cir.1998).

      Plaintiff's in defamation cases can be characterized as either: 1) public officials or

public figures, 2) limited purpose public figures, or 3) private individuals.  The Supreme Court has

struck a "balance between the needs of the press and an individual's claim for wrongful injury' by

establishing different tests for different defamation plaintiffs.  *Gertz v. Robert Welch, Inc.,* 418 U.S.

323, 343.  A limited purpose public figure is 'an individual [who] voluntarily injects himself or is

drawn into a particular public controversy and thereby becomes a public figure for a limited range

of issues." *Id.* At 351, 94 S. Ct. at 3013.  "Public Figures "must prove that the defendant acted with

actual malice to establish liability" when the "defamatory material involves issues of legitimate

public concern." *Silvesterc. American Broadcasting Co., Inc.* 839 F.2d.1491, 1493 (11 Cir.1988).

To show that they acted with actual malice by publishing defamatory material the plaintiff must

show that the defendant acted "with knowledge that it was false or with reckless disregard of whether

it was false or not." *New York Times Co. v. Sullivan* 376 U.S. 254, 84 S.Ct. 710, 726 (1964)**.**

      **In the matter pending beforre this Court, there is no material issue of either law or fact.**

This Court is on Judicial notice that Colorado investors have filed suit alleging that Mr. Harder (the plaintiff in this case) defrauded them through the use of a fradulent Business plan in RPI, among other issues.  This Court has originals of the affidavits of Brothers and Ferris, plaintiffs in the Colorado action against Harder wherein they allege that Harder defrauded them through the use of a fradulent business plan.

As such, there is no material issue of either law or fact before this court, as the only remaining issue before this Court is whether the Defendant defamed the Plaintiff when the Defendant accused the Plaintiff defrauding investors through the use of a fraudulent business plan.

Nowhere in the pleadings before this Court is there any statement, allegation or proof that the Defendant acted with "Actual Malice" because there is none.

IN ADDITION: **Absolute immunity** extends to "the witnesses, the judge, ***parties***, etc., in the due course of judicial proceedings *or as necessairly preliminary thereto.*" (Emphasis supplied). *Ange v. State, 98 Fla 538,* 123 So., 916, 917.  The Defendant published truthful remarks in preparation for judicial proceedings which were commenced with the filing of formal complaints with the FBI, The Colorado Department of Securities, The Florida State Department of Banking and Finance and Mail Fraud Complaints and now Civil Proceedings in Colorado which are underway.

WHEREFORE, Defendant seeks an order of this Court, pursuant to Fed.R.Civ.P. 56© and Rule 3.10(g) of the Rules of The United States District Court for the Middle District of Florida, seeks the entry of an order granting Summary Judgment in favor of Defendant, MICHAEL HAGA, on the grounds that there is no genuine issue of law or fact.

Further, Defendant asks for such further and proper relief as this Court deems proper.

Respectfully, submitted,

_Michael Haga_

Michael Haga, Defendant
820 23 Road
Grand Junction, CO 81505
970-256-7359

## CERTIFICATE OF SERVICE

IT IS HEREBY CERTIFIED that a true and correct copy of the foregoing was furnished via UPS on this _15_ day of August, 2001 to **Robert Persante, Esq.**, PERSANTE & McCORMACK, 2555 Enterprise Road, Suite 15, Clearwater, FL 33763

_Michael Haga_

Michael Haga

UNITED STATES DISTRICT COURT
MIDDLE DISTRICT OF FLORIDA
TAMPA DIVISION

CHARLES E. HARDER                    Case No.: 8:00-CV-270-T-26E

      Plaintiff,

                           **HAGA'S ANSWER AND AFFIRMATIVE**
vs.                                                    **DEFENSES**

MICHAEL HAGA

      Defendant.

_____

Defendant, MICHAEL HAGA ("HAGA"), by and through his undersigned counsel hereby files his Answer and Affirmative Defenses to Count II of Plaintiff, CHARLES E. HARDER'S ("HARDER") Complaint as follows:

1.    HAGA admits that this action is predicated upon federal diversity jurisdiction and that HAGA is a resident of the State of Colorado and HARDER is a resident the State of Florida. HAGA denies the remaining allegations of paragraph 1 of Plaintiff's Complaint and demands strict proof thereof.

2.    HAGA denies the allegations contained in paragraph 2 of Plaintiff's Complaint and demands strict proof thereof.

3.    HAGA denies the allegations contained in paragraph 3 of Plaintiff's Complaint and demands strict proof thereof.

Exhibit A

Case No.. 8:00-    t  I-2(1

4.     HAGA does not respond to the allegations of Count I of Plaintiff    Complaint contained in paragraphs 4 through 11 pursuant to this Court's Order dated  . . . , 200. dismissing Count I of Plaintiff's Complaint.

5.     HAGA responds to the allegations contained in paragraph 12 of Plaintiff's Complaint as stated above.

6.     HAGA denies the allegations contained in paragraph 13 of Plaintiff's Complaint and demands strict proof thereof.

7.     HAGA denies the allegations contained in paragraph 14 of Plaintiff's Complaint and demands strict proof thereof.

8.     HAGA admits the allegations contained in paragraph 15 of Plaintiff's Complaint.

9.     HAGA denies the allegations contained in paragraph 16 of Plaintiff's Complaint and demands strict proof thereof.

10.    HAGA denies the allegations contained in paragraph 17 of Plaintiff's Complaint and demands strict proof thereof.

11.    HAGA denies the allegations contained in paragraph 18 of Plaintiff's Complaint and demands strict proof thereof.

12.    HAGA denies the allegations contained in paragraph 19 of Plaintiff's Complaint and demands strict proof thereof.

Case No : 8.00-1    7  T-20F

## AFFIRMATIVE DEFENSES

**First Affirmative Defense:** Plaintiff is not entitled to recovery in a    matter, in whole or in part, as the statements complained of by Plaintiff and allegedly made by HAGA are not defamatory as a matter of law.

**Second Affirmative Defense:** Plaintiff is not entitled to recovery in this matter, in whole or in part, as the statements complained of by Plaintiff and allegedly made by HAGA are true, were made in good faith, and are of such character to properly serve the rights, duties, and interests of all parties by and to whom they were made. Specifically, all statements of which Plaintiff complains and allegedly made by HAGA were made to investors and/or employees and/or persons otherwise interested in RPI in an effort to protect their investments and interests in RPI.

**Third Affirmative Defense:** Plaintiff is not entitled to recovery in this matter, in whole or in part, as the statements complained of by Plaintiff and allegedly made by HAGA are qualifiedly privileged: HAGA made the statements, if at all, in good faith, HAGA had an interest in the subject of the statements made as he was identified in RPI's business plan as the President of the organization, the individuals to whom the statements were made were investors and/or employees and/or persons otherwise interested in the business of RPI. HAGA made the statements with the belief that by doing so he was discharging a duty to be performed by him, the statements were made when RPI began to fail in order to protect the investments and interests of HAGA and the investors and/or employees and/or individuals

3

Case No.: 8:00-C...   ...  ...

otherwise interested in RPI's interests, the statements were made in a proper manner and the statements were made in the absence of malice.

**Fourth Affirmative Defense:** Plaintiff is not entitled to recovery in this matter, in whole or in part, as the statements complained of by Plaintiff and allegedly made by HAGA, do not constitute libel per se, and Plaintiff has not suffered any actual damage.

**Fifth Affirmative Defense:** To the extent that Plaintiff is entitled to any recovery in this matter, such recovery should be reduced as HAGA had a reasonable belief that the statements allegedly made by him were true.

**Sixth Affirmative Defense:** Plaintiff is barred from recovery in this matter based upon the equitable doctrine of estoppel. Specifically, Plaintiff made numerous false statements regarding RPI, all of which are contained in RPI's business plan attached to Plaintiff's Complaint as Exhibit "A." Plaintiff knowingly made said false statements to HAGA, with the intent that HAGA rely upon said statements so that he would become involved in the business of RPI. HAGA reasonably relied upon said false statements, became involved in the business of RPI, and has suffered damage as a result.

WHEREFORE, Defendant, MICHAEL HAGA, respectfully requests that this Court enter judgment in his favor and against Plaintiff, CHARLES E. HARDER, and for such other and further relief as this Court deems just and proper.

4

Case No.: 8:00-C    1-26?

Respectfully submitted,

Jana Marie Yaw
Florida Bar No. 0060267
The Law Offices of Edward Etcheverry, P.A.
Counsel for Defendant
2500 Weston Road
Suite 313
Weston, Florida 33331
Tel. (954) 217-7070
Fax (954) 217-7071
E-mail: etchlaw@aol.com

## CERTIFICATE OF SERVICE

IT IS HEREBY CERTIFIED that a true and correct copy of the foregoing was furnished via **facsimile** and U.S. mail on this 25th day of July, 2000 to **Robert Persante**, **Esq.**, **ALBINSON & PERSANTE, P.A.**, 4625 East Bay Drive, Suite 223, Clearwater, FL 33764.

JANA MARIE YAW

**FILED**
**UNITED STATES DISTRICT COURT**
GRAND JUNCTION, COLO.

**APR - 6 2001**

**JAMES R. MANSPEAKER**
**CLERK**

United States District Court
for the
District of Colorado

Civil Action File No.__01-S-356__

JURY TRIAL DEMANDED

ACCLAIM PUBLISHING COMPANY, INC., a Colorado Corporation.
ALAN FERRIS,
MICHAEL HAGA

     Plaintiffs,

v.

CHARLES E. HARDER,
PEOPLES NETWORK, INC., a Florida Corporation,
ASSOCIATED COMMUNITY ORIENTED RADIO NETWORK, INC.,
a Florida Corporation,
ENERGY LIBERTY UNLIMITED, INC., a Florida Corporation,
RADIO PRESS INTERNATIONAL, INC., a Florida Corporation,
PEOPLES RADIO NETWORK, a subsidiary of Peoples Network, Inc., and/or American
Community Oriented Radio Network,

     Defendants.

## AMENDED COMPLAINT

     COMES NOW the plaintiffs, DAVID L. BROTHERS, dba, ACCLAIM PUBLISHING
COMPANY, INC., a Colorado Corporation, (hereinafter referred to as "ACCLAIM"), ALAN
FERRIS (hereinafter referred to as "FERRIS") and MICHAEL HAGA (hereinafter referred to as
"HAGA") and state, pursuant to Fed.R.Civ.P. 15(a):

     1.    The original complaint in this matter, MICHAEL HAGA v. CHARLES E. HARDER,
was filed with this Court on February 28, 2001.

     2.    No responsive pleading has, as yet, been served, allowing the plaintiff(s) to amend
this complaint to add additional plaintiffs and defendants.

## JURISDICTION AND VENUE

     3.    This Amended Complaint is predicated upon 1. Diversity, pursuant to 28, USC 1332,

1

Exhibit B

in that Defendant CHARLES E. HARDER, (hereinafter "HARDER"), a resident of the state of Florida, PEOPLES RADIO NETWORK, (hereinafter "PRN"), ASSOCIATED COMMUNITY ORIENTED RADIO NETWORK, INC. (hereinafter "ACORN"), PEOPLES NETWORK, INC. (hereinafter "PNI"), ENERGY LIBERTY UNLIMITED, INC. (hereinafter "ELU") are Florida Corporations and individuals pursuant to 28 USC 1332

The Plaintiff, ACCLAIM PUBLISHING COMPANY, INC, is a Colorado Corporation, and FERRIS and HAGA, are residents of the State of Colorado.

The amount in controversy exceeds $100,000.00.

4.      Certain of the acts and occurrences giving rise to the causes of action herein were committed by the Defendants, as individuals, within the State of Colorado.

5.      All conditions precedent to this action have been met, waived or have been satisfied.

## GENERAL ALLEGATIONS

6.      Plaintiffs repeat and reallege the allegations contained in paragraphs 1 to 5 as if fully set forth here.

7.      ACCLAIM is a Colorado book publishing company, incorporated in 1992 by David L. Brothers who has always been the sole owner/stockholder.

8.      HARDER is a veteran, national radio talk show host of over fourteen years currently hosting a live daily 3 hour radio broadcast, "For The People," which originates through a satellite uplink in White Springs, Florida owned by either PNI and/or ACORN, as well as Talk America Radio Network, and is carried on over 100 radio stations coast to coast and live on the Internet at www.chuckharder.com and www.forthepeople.org, as well as satellite and shortwave.

9.      From 1992 to 1995, ACCLAIM had very profitable business relationship with HARDER, wherein HARDER utilized PRN (a then subsidiary of the Telford Resort Hotel, Inc., HARDER'S for-profit Florida corporation) to promote four books written by HAGA, which were published by ACCLAIM and all rights owned by ACCLAIM.

10.      From 1992 to 1995, HARDER interviewed HAGA, live, dozens of times, on PRN, which resulted in very profitable book sales for ACCLAIM.

11.      From 1992 to 1995, ACCLAIM wholesaled HAGA's books to HARDER's PRN Florida order center where HARDER then sold HAGA's books for retail.

2

12.     In 1996, HARDER sold PRN to United Broadcasting Network (UBN).

13.     From 1997 to March 31, 1999, HAGA volunteered his time to host a two hour per-week radio program "Your Economic Future" on UBN, building a solid affiliate list of 43 stations nationwide to carry his program.  (See exhibit A).

14.     On June 9, 1997,  HARDER, through a name change amendment filed with the Florida Department of State, Department of Corporations, changed the name of the Telford Resort Hotel, Inc, to the American Community Oriented Radio Network, Inc. (ACORN). (See Exhibit B).

15.     At all times material, ACORN was a wholly-owned subsidiary of Peoples Network, Inc. (PNI), a 501(c)(3) not-for-profit organization and producers of HARDER'S For the People radio talk show. (See exhibits B1 and C).

16.     At all times material, ACORN provided telephone and mail order support services to PNI as well as owned radio stations and satellite uplinks to provide listeners throughout the US with a way to hear the For the People show. (See exhibits B1 and C).

17     At All times material, ACORN was also home of Peoples Radio Network, broadcasting 24/7 via satellite.  As a joint venture with TALK AMERICA.....(See exhibits B1 and C).

18.     On or about March 29, 1999, HARDER, from Florida, telephonically contacted HAGA and ACCLAIM in Colorado to tell them that UBN was going to shut down, without notice to hosts, etc., and that all UBN radio stations/affiliates would once again become PRN radio affiliates under HARDER'S for-profit ACORN.

19.     HARDER then telephonically solicited HAGA to host a  broadcast on the new PRN telling HAGA he could keep his current 43 UBN affiliates, "and add to them like topsy." (See exhibit D).

20.     ACCLAIM based on its previous and very successful business relationship with HARDER, and based upon HARDER's March 29, 1999 written offer to HAGA (attached hereto as Exhibit D), accepted HARDER'S offer to purchase PNI/ACORN/PRN/Talk America air-time, commencing in April 1999, for $6,000 per month, which guaranteed ACCLAIM (or its designee--HAGA) one hour of air time per day from 9am to 10am Eastern time, Monday through Friday, and also 7 PM Sunday night Eastern time.

3

21.   In addition, ACCLAIM (or its designee) was to receive 5 one minute commercial spots plus mention every 24 hours.  These commercial were to be "must carry" network spots on all PNI/ACORN/PRN/Talk America radio affiliates nationwide.

22.   At all times material HARDER, ACORN/PNI/PRN, through phone calls, faxes and websites at: www.acornradio.com and www.pm1.com continually represented to HAGA and ACCLAIM, the PRN radio stations **allegedly** carrying HAGA'S program.  (See exhibit E).

23.   In mid-July, 1999, HARDER began, through a series of telephone discussions, talking about ELU with HAGA, ACCLAIM and FERRIS. (See Exhibit F).

24.   HARDER stated ELU was about go public, and would become the umbrella corporation under which PNI/ACORN/PRN would be placed and that once ELU was "public" HARDER could raise $51,000,000 which he would utilize to create one of the largest media company's in the US.

25.   HARDER then stated to HAGA, ACCLAIM and FERRIS that HARDER had already sent, through the US mail, an ELU prospectus to ACCLAIM and FERRIS.  (See Exhibit G).

26.   At all times material, HARDER, maintained all information regarding ELU, including public solicitation of investments in ELU on PNI/ACORN/PRN websites, www.pm1.com; www.forthepeople.org; www.acornradio.com; www.chuckharder.com.

27.   On or about July 20, 1999, after HAGA, ACCLAIM and FERRIS had received the ELU prospectus, and reviewed the ELU information maintained on  the websites referenced in paragraph 26, HARDER then asked HAGA, ACCLAIM and FERRIS, if they would like to invest in ELU, as given HARDER'S media experience, the fact PRN was a $5 million per year entity before HARDER sold it to UBN and the current assets of PNI/ACORN/PRN were over $4,000,000, and that HARDER was in discussion with several potential market-makers for ELU stock, and that within a year, ELU would prove to be the investment opportunity of a lifetime.

28.   HARDER also stated to HAGA, ACCLAIM and FERRIS, that he would be promoting ELU stock on his daily radio nationwide broadcast.

29.   On July 23, HARDER then sent to HAGA a fax which HARDER discusses arranging with Mark Warner (HARDER's agent for ELU) to wire transferring investments to ELU.   (See Exhibit H).    .

4

30.     On July 26, 1999, HARDER then faxed to HAGA a note regarding changing the time of HAGA'S program while at the same time encouraging investments in ELU through Mark WARNER. (See exhibit I).

31.     As the result of said solicitations and representations by HARDER, ACCLAIM, and FERRIS, in August 1999, each invested $12,500.00 in ELU for a total of $25,000.00.

32     ACCLAIM and FERRIS investments in ELU were made pursuant to Regulation D, Rules Governing the Limited Offer and Sale of Securities Without Registration Under The Securities Act of 1933, in that ACCLAIM and FERRIS are each "accredited investors." (See Exhibits J and K).

33.     ACCLAIM AND FERRIS each signed all ELU agreements in Colorado and wired all investment moneys from Colorado to HARDER'S designated bank in Florida. (See Exhibits L-O)

34.     ACCLAIM AND FERRIS each received through the mail (from HARDER in Florida) in Colorado a stock certificate for 12,500 shares each of ELU stock.  (See Exhibits P and Q).

35.     On October 2, 1999, HARDER faxed to ACCLAIM and FERRIS a letter which states that he had located a market maker for ELU who will interface with Warner and that HARDER's CPA, Douglas Perreault would be working on interim funding for ELU, utilizing the ACORN order center, etc. (See Exhibit R).

36.     HARDER then approached HAGA, ACCLAIM and FERRIS (among others) regarding his planned radio news network to replace UPI radio news which had been terminated due to mergers, etc.

37.     HARDER stated that the closing of UPI created a void in the radio industry for a viable news service which presented another opportunity of a lifetime for PNI/ACORN/ELU, etc., as, HARDER could start a news service, utilizing the former UPI anchors and have it up and running overnight which would tremendously enhance the value of PNI/ACORN/ELU.

38.     On October 4, HARDER faxed to HAGA a letter which states in part that HARDER already had an Internet site under construction (www.rpinews.com) *and that HARDER was personally investing in RPI and would raise all other funds for RPI.*  (See exhibit S).

39.     On October 5, 1999, HARDER sends a fax regarding RPI, that the project is starting to jell and his pro-forma appears viable, etc. (See Exhibit S1)

40.     On October 6, HARDER sent a fax that he has 2 national advertising representatives

5

onboard for RPI.  (See Exhibit S2).

41.    On October 7, 1999, the SEC issued an order declaring the registration statement of ELU to be effective.  (See Exhibit T).

42.    On October 9, 1999, HARDER faxed a letter to HAGA stating that he had already raised the necessary funding for RPI and had incorporated RPI in the State of Florida.  (See Exhibits U-Z).

43.    In October, 1999, the HARDER told RPI anchors (as a material incentive to get the anchors to come onboard RPI) that HARDER had raised sufficient capital to fund RPI for at least one year of operation. (See exhibit Z1)

44.    On October 16, 1999, Harder then faxed the RPI business Plan to HAGA, ACCLAIM, FERRIS, and others. (See Exhibit 1).

In the RPI Business Plan, HARDER states, among other things:

*Mr. Harder also formed People's Radio Network (PRN) of which the assets were sold to the United Auto Workers in 1996.  Since then he has re-formed under the Florida corporation known as American Community Oriented Radio Network (ACORN Radio.) That company is profitable.  See acornradio.com and chuckharder.com.*"

a.    The company will use the services of Douglas Perreault of Ruskin, Florida from day one so that the statements are CPA audited and will be ready when the company files with the SEC..."

b.    Mr. Perreault (who is also a named major shareholder in the RPI Business Plan) will also keep the bank accounts and Mr. Harder will monitor same.

c.    That, "At this writing RPI has two national advertising sales reps committed to sell the radio spots."

d.    "RPI will lease a small-space at the PRN center in White Springs...."

e.    "Our plans are to hire a total of 8 people who will cover the 24-hour 7 day requirements..."

f.    "To start-up the service we will need a minimum of $150,000 in the bank."

45.    On October 20, 1999, HARDER faxed and mailed to Haga a letter stating that HAGA was going to *loan* RPI $25,000 and *purchase* 250,000 shares of RPI stock for an additional $25.00

along with instructions as to where to wire the money.  (See exhibits 2 and 3).

46.     On October 20, Haga faxed to HARDER a letter which states that ACCLAIM, not HAGA will be making the loan and investment in RPI and that FERRIS was planning to loan money to and invest in RPI as well.  (See Exhibit 4).

47.     In this same letter, HAGA says he will be honored to act as President of RPI.

48.     In this same letter, there is a clause which states that if RPI fails, ACCLAIM will receive 4 months free air-time on PRN.

49.     On October 20, 1999, HARDER faxes to HAGA a letter of agreement.  (See Exhibit 5).

50.     On October 20, 1999, HARDER sends a fax to HAGA, ANDERSON, SAUER, discussing RPI.  (See exhibit 6).

51.     On October 22, 1999, HARDER and PERREAULT open the RPI bank account at First Savings Bank of Florida.  (See exhibit 7).

52.     On October 21, 1999, ACCLAIM wired $5,000 to RPI and on October 28, 1999, PERREAULT charged ACCLAIM's AMEX card for $20,795.00 for the loan/investment to and in RPI.  (See exhibits 8 and 9).

53.     On October 22, 1999 Harder sends a fax to HAGA and Anderson regarding RPI.  (See Exhibit 10)

54.     On October 21, Anderson sends to ACCLAIM a copy of his agreement with HARDER to loan money to and to invest in RPI.  (See exhibit 11).

55.     HARDER commenced RPI operations on or around November 20, 1999.

56.     There was never a meeting of shareholders nor an election of officers for RPI..

57.     On December 20, 1999, Perreault acknowledged FERRIS' $25,025 loan/investment in RPI "Per the agreement sent to you by Chuck HARDER." (See exhibit 12).

58.     On November 24, 1999, HAGA received in the mail, in Colorado, a copy of CHUCK HARDER'S UPDATE, FALL/WINTER - 1999 / 2000 (paid for by PNI) soliciting funds to help HARDER purchase the Telford Hotel in White Springs FL which will become the nerve center for PNI/ACORN/PRN/RPI/ELU.  (See Exhibit 13.)

59.     Haga donates $100.00 to help purchase the Telford and mails the donation to

7

HARDER in the SASE.  (See Exhibit 14).

60.     At some point in late November, 1999, the HAGA learned from Mr. Stanley Fields, an advertising representative and radio time broker, that of the over 100 PRN radio affiliates which Plaintiff stated in the RPI business plan would carry RPI and which HARDER, PERREAULT and SHIFLETT stated were carrying RPI that in reality, perhaps only 5 were carrying RPI.

61.     Fields also told HAGA that the majority of the PRN radio affiliates HARDER, REETZ, PERREAULT and SHIFLETT stated were carrying HAGA's program on PRN, most had never heard of HAGA or PRN.

62.     On November 24, 1999, HARDER faxed to HAGA a letter stating: "While the Peoples list is being cleaned up, remember that MOST PRN affiliates take RPI and will be added to the RPI list....." (See exhibit 15)

63.     On December 1, 1999, HAGA faxed to HARDER a letter stating in part: "I am a customer of PRN.  When I first started with PRN, I agreed to pay $6,000 based on the fact I had a strong affiliate list......"  (See exhibit 16).

64.     On December 5, 1999, Warner, who at some point resigned as president of ELU, accuses HARDER of fraud, etc. (See exhibit 16a).

65.     On December 9, 1999, HARDER e-mailed his wife Dianne and Perreault (and perhaps inadvertently to ACCLAIM) a lengthy e-mail which states in part: **"In early fall I awakened a bit to realize we were bankrupt...." "Then one day I thought of RPI. I worked my fingers to the bone to do the paperwork and get the deal started.  I burned the midnight oil and worked literally around the clock......"** "During this time Mike Haga got outsiders involved such as an ad agency and time broker.  They obtained the affiliate list from Ruskin.  According to them it was bogus.  Haga talked suit and said he would not pay us.... "I scrambled and spent hours on the phone to repair the damage...." "Last, during my confinement to the house I also worked on fund-raising ideas for PNI.  I spent months re-writing one with Mike (Galuska) at DMD...." "Although you and Dianne don't believe me, the proof is in the pudding.  People constantly call me on the air and tell me they miss the Telford....." However, I'm getting calls on the air from folks who are getting the package and they are responsive.  They hope we will get the Telford back.  In their mind it is THEIR clubhouse.  *I figured processing all those checks would keep the (ACORN) order center going after December 15 and it looks like I'm right..... "* (PNI is HARDER'S non-profit Florida corp.  ACORN is HARDER'S for-

8

profit Florida corp).  In essence, HARDER was using non-profit funds to operate his for profit company. (See exhibit 17).

66.     On December 13, 1999, HARDER faxed to ACCLAIM, HAGA and FERRIS an appraisal of the assets of ACORN/PRN.  (See exhibit 18).

67.     On December 16, 1999, HARDER faxed to ACCLAIM, HAGA a letter which states, in part: "I'm mailing you an interim sales report from Doug (Perault) and he just finished an interim report on RPI...."  (See exhibit 19).

68.     On December 19, 1999, HARDER faxed to HAGA a letter which says, in part: "In that regard I suggest we buy the RAB fax that David Reeder has and that will also help bring him onboard..." (See exhibit 20).

69.     On December 24, 1999,  HARDER faxed to HAGA a letter which says, in part, "From your faxes I can see that you are focusing on "what's wrong." You may want to consider some very positive items.  ACORN has paid the salary of Ed Shiflett and RPI has only paid the net cost of the gear needed for setup...."  (See exhibit 21)

70.  Despite this statement by HARDER, HAGA and ACCLAIM have documented the fact HARDER utilized over $13,000 in RPI funds to pay the expenses of Ed Shiflett--many of which date back to August 1999--long before HARDER incorporated RPI. (See exhibit 22 as one example).

71.     On December 28, 1999, PERREAULT sent to HAGA a fax and a P&L on RPI which showed that only $125,000 had been invested in RPI, well below the $150,000 required in HARDER's RPI Business Plan *to start up RPI*.  (See exhibits23 and 24).

72.     At this juncture, HAGA demanded to see RPI's books.

73.     On December 29, the HARDER faxed to HAGA a letter which states, in part, "Doug: For now, send all corporate RPI stuff to Mike Haga by express mail." (See exhibit 25).

74.     On December 30, HARDER faxed to HAGA a letter which states, in part, "Doug is sending you all financial documents today....." (See exhibit 26).

75.     On December 31, 1999, HARDER faxed to HAGA a letter which states:  *"RE; RPI and ELU.  Please send me details of who needs to be paid back and the amounts.  Then under what conditions they will sign a release.  I have contacted another source who wants the whole deal."* (See exhibit 27).

9

76.    On December 31, the HAGA sent a fax to HARDER with details of who needed to be paid back with amounts.  (See exhibit 28).

77.    on December 31, HARDER faxed to HAGA a letter which says, in part: "My source is connected to an investment firm that can come up with bridge financing and then do the deal...." (See exhibit 29).

78.    On December 31, 1999, HARDER faxed to HAGA a letter which states, in part: *"When I came up with the idea of RPI it was honestly presented."*  (See exhibit 30).

79.    This totally contradicts paragraph 55 above and Paragraph #2 of HARDER'S RPI Business Plan.

80.    On January 2, 2000, HARDER faxed to HAGA a letter which states, in part: "You either have, or will have all the expense reports.  When you get them and look at the hundreds of hours worked and **NONE of that time charged to RPI, I will then accept an apology.**  Please call any engineering firm of your choice and tell them what was done and they would have to fly around and buy the equipment.  You won't get an estimate for less than $100K....." (See exhibit 31).  Despite this statement, HARDER paid over $13,000 to Ed Shiflett from RPI investor funds.

81.    On January 2, 2000, HARDER faxed to HAGA a letter which states in part: **"Last, I'm working on raising money to keep RPI going until such time as we have a buyer.  I plan to get it done.**  I have been told tonight that we will need "**Cut-Off Letters.**" "in short, you, Ted Anderson, Alan Ferris, John Sauer or any other investor in ELU, RPI will have to write a letter that says: *In return for a cashiers check or wire transfer in the amount of_____ dollars, I will turn over all my stock and relinquish and quit any claim that I have or might have had in or against: ELU, RPI, ACORN, PRN, etc.....* **"I want to get you and the other investors paid back fairly with a profit and end this and move on."** (Exhibit 32).

82.    The HAGA again faxed to HARDER a letter of the RPI investors HAGA knew of.

83.    On January 6, 2000, the corporate books  HARDER had PERREAULT send to HAGA were received by the HAGA. *In examining the books, the HAGA learned HARDER had never invested in RPI nor raised any other funds for RPI as HARDER stated he had done prior to the HAGA agreeing to be RPI's President.*

84.    On January 7, 2000, the HARDER faxed to HAGA a letter the HARDER had written

to Doug Perault which states in part: "I was not able to furnish financial information to lenders." (See exhibit 34.)

85.    On January 10, 2000, HARDER faxed to HAGA a letter which states in part: *"Pursuant to our conversation I am endeavoring to get new financing and "take out" all present parties at face of investment plus 10 percent.  This will be done ASAP."*  (See exhibit 35).

86.    On January 10, 2000, the HAGA faxed to HARDER a letter in which HAGA states in part: "You asked me to summarize where I stand with the RPI issues.  It is the same as I said in my January 9 memo to you.  **I don't want to be a part of management."**  (See exhibit 36).

87.    On January 11, 2000, the HARDER faxed a letter to HAGA which states, in part: "The cut-off letter from Sauer is helpful.  Now we need them from all other investors telling us what they want including you.  Do they want the money back plus 10 percent or keep the stock?" (See exhibit 37).

88.    On January 13, 2000, the HARDER faxed to HAGA a letter which states in part: **"Once the investors are repaid as agreed,** I then have these questions to ask..."   (See exhibit 38).

89.    On January 13, 2000, the HAGA faxed to HARDER a letter which states in part: "I am bundling up the RPI books and returning them to you...." (See exhibit 39).

90.    On January 14, 2000, the HARDER faxed to HAGA a letter which states in part: "We have located an investment group in Miami that wants it all." (See exhibit 40).

91.    On January 14, 2000, the HAGA faxed to HARDER a letter which states in part: "Got your Jan 11 fax on the latest buy out of investors I know of in RPI.  Thanks for the GOOD NEWS. I just hope it happens this time." (See exhibit 41).

92.    On January 14, 2000, the HAGA returned the RPI books to HARDER in two boxes with a letter in each box detailing the RPI investors HAGA knew of and the amounts owed to the investors.  The HAGA also said: "Please let me know when these people can expect a return of their investments....."  (See exhibits 42 and 43).

93.    On January 16, 2000, HAGA faxed to HARDER a letter which states, in part: "I too am tired, Chuck.  I want this to end as well.  Thankfully you have confirmed that investors will receive their money back and thus we won't have to find ourselves sitting in a court for a year while the investors make us spend another huge sum of money in defense of your written promises to entice us to invest in both ELU and RPI." (See exhibit 44.)

11

94.     On January 16, 2000, the HAGA faxed to HARDER a letter which states in part: "I pray you live up to your statement in your 1-17-2000 fax: 'The investors will get their money back....'" (See exhibit 45).

95.     On January 17, 2000, the HAGA sent to HARDER his letter of resignation as President of RPI stating among other things, "I have no input on anything else either--thank God!"  (See exhibit 46).

96.     *On January 17, 2000, HARDER faxed to HAGA a letter which states in part: "The investors got free ads, free shows with me, and will get their money back."* (See exhibit 47).

97.     On January 21, 2000, the HARDER faxed to HAGA a letter which states, in part: "The non-profit assets presently for sale would be enhanced by keeping RPI alive.  I am going to contact counsel for PNI to see if PNI can make an investment in RPI on the same basis as you and Mr. Ferris. If so, I am sure the board will approve that transaction.  To that end, Mr. Bob Persante will call you as soon as he returns to his office from a bout of the flu.  He has a copy of this fax.  I anticipate he will call you Monday.  His number is 727-531-5530."  "The plan is to recover your investment, Alan Ferris and mine.  I cannot personally afford to lose 54K."  "I is my hope and prayer that 90 days from now all this is done and you and I will be made whole and gan go on with life down our separate paths as if we had never met."  (See exhibit 48).

98.     On January 21, 2000, HARDER sent an e-mail to ACCLAIM and others, stating, in part: "Over the last few days, our management teams have been meeting with consultants regarding the possible restructuring of ACORN, RPI, ELU and PNI...."  "We feel very positive that this will go forward with everything intact, minus the administrative overhead we now have."  (See exhibit 49).

99.     On January 23, 2000, the HAGA faxed to HARDER a letter which states, in part: "You keep talking about just walking away and I want to assure you it will not be that easy for you. Investors are not at all happy.  In fact, like me, they feel there are many issues of fraud involved through written representations you made in the PRIVATE INVESTOR AGREEMENT which you drafted, to entice investment in RPI....."  (See exhibit 50).

100.     On January 25, 2000, HARDER faxed a letter to HAGA where he states, in part: "The box you sent me was unopened and sent to Doug.  It contains the checkbook, payroll data and some unpaid bills."  (See exhibit 51).

101.     *On January 26, HARDER employee, Kay Reetz faxed to HAGA a copy of a fund raising*

*scheme HARDER was sending to investors and brokerage firms all over the nation, attempting to raise funds for ELU which the HARDER was now calling Media Liberty Unlimited (MLU).*

102.    *In this fax, HARDER lists all assets of ELU/MLU as RPI, PRN, ELU, ACORN, etc. (See exhibit 52).*

103.    **What is critical here is that HARDER was now violating SEC rules in simply deciding to change the name of ELU to MLU without going through the SEC.  It also shows that HARDER has no problem with soliciting funds through fraudulent schemes and that HARDER was controlling RPI (See exhibit 53).**

104.    On January 27, 2000, HAGA faxed to Mr Persante (whom HAGA believed he had an attorney client relationship with) a letter wherein HAGA states, in part: "My position is this.  The RPI Business plan which Chuck Harder put together and sold to us unwitting victims was fradulent from day one and Chuck Harder knew it....." (See exhibit 54)  The HAGA then told Mr. Persante that he planned to pursue criminal charges against the HARDER.

105.    On January 28, 2000, HARDER employee Ed. Shiflett faxed a letter to HAGA which in part says: "Due to critical financial concerns, it has become necessary for us to sell the program slot from 12PM to 2PM to another entity.  The new show will start on Monday.  Today, we will run a tape of a previously recorder "On The Brink Program." (See exhibit 55).

106.    In paragraph 42 above, HARDER had agreed, as an incentive for ACCLAIM to invest in RPI, that if RPI failed ACCLAIM would receive 4 months of free air time worth $24,000 on PRN.

107.    On January 30, 2000, Andrew McGee e-mailed to HAGA an e-mail wherein McGee states that he had always been paid with RPI funds even though he had been hired as an ACORN employee. (See exhibit 56).

108.    On February 9, 2000, Dennis Daily, head RPI anchor faxed his letter of resignation to HARDER. (See exhibit 57).

109.    HARDER then told RPI investors that he found another buyer for RPI.

110.    On 2-14-2000, the alleged purchaser of RPI, declined to purchase RPI after reviewing P&L, Balance sheets, etc, which HARDER and PERREAULT prepared.

111.    On February 17, 2000, HAGA received from Frank Boyle a fax which states, in part: "Chuck has persuaded me to keep pitching RPI,"  (See exhibit 84)

112.    On April 14, 2000, HARDER sent to HAGA a copy of a letter he wrote to Mr. John

Sauer, an investor in RPI, threatening Mr. Sauer with legal action saying. in part: "I was told that to threaten me or our organization saying that we should/would sell assets owned by a non-profit unrelated to RPI in order to pay you back in order not to be prosecuted is illegal in this state." (See Exhibit 85).

113.   To date, HARDER continues to utilize his web sites, www.forthepeople.org and www.chuckharder.com to advertise RPI, despite the fact it is defunct. (see exhibit 86).

114.   To date, HARDER continues to utilize his web sites, www.forthepeople.org and www.chuckharder.com continues to solicit investors in ELU and to do business under ELU nationwide, despite the fact ELU has been administratively dissolved by the State of Florida. (see exhibit 87)

115.   On June 1, 2000, Friends at Truth Radio on California faxed ACCLAIM a copy of a flyer that they had received in the mail from HARDER, through PNI, advertising PNI/ACORN radio assets for sale. (see exhibit 88)

116.   When examining RPI's books, HAGA and ACCLAIM documented the fact that HARDER was paying ACORN bills with RPI funds and having extensive work done on the ACORN studio which is located in a building owned by the HARDER's daughter Darlene Stewart in which HARDER (verbally?) leased a small space for RPI and then paid for the electrical work using RPI funds. (See exhibits 89-93).

117.   Though HAGA had never been elected President of RPI, never received any payment or income in any form from RPI, never visited the offices of RPI, never hired nor met any RPI employees, never handled payroll, was never on the RPI bank account, etc., never signed any type of lease or contract committing RPI funds for any purpose, never opened any governmental tax account, etc., out of an abundance of caution, HAGA tendered to HARDER his letter of resignation as President of RPI January 17, 2000. (See exhibit 94)

118.   In   March, 2000, HAGA learned (when HAGA, in Colorado, began personally

14

receiving mail addressed to RPI) that HARDER had begun a systematic campaign of sending postcards and letters to governmental agencies and RPI creditors stating that RPI had moved and that all mail should be directed to, Mr. Mike Haga, President, Radio Press International, Inc. Post Office 3918, Grand Junction, CO 81505.  (See exhibits 95-97 for a few samples of HARDER's postcard campaign).

119.    Some of the mail HAGA began receiving for RPI was certified mail demanding that HAGA personally pay RPI's debts, including money owed for leases the Defendant had personally signed, etc.

120.    Some of these debts had been turned over for collection in HAGA'S name, despite the fact HAGA had never had incurred the debts.

121.    HAGA has been forced to spend thousands of dollars on attorney fees to protect himself, his credit, and his reputation, as a result of HARDER'S fradulent postcard/letter campaign directing RPI mail to HAGA.

122.    HAGA filed a police report and a mail fraud complaint, on 12-30-2000 due to the fact HAGA is still receiving mail for RPI.

123.    The current address for RPI, as shown by the Florida State Department of Corporations is, RT 1, Box 2002, White Springs, FL 32096-9620.  The Current registered agent for RPI is also shown to be Charles E. Harder.  (See exhibit 98).

124.    ACCLAIM and FERRIS, as investors in ELU and RPI have filed formal complaints with the FBI, Florida State Department of Banking and Finance, State of Colorado Division of Securities and the SEC.

125.    Until April 3, 2001, HARDER continually promised to repay ACCLAIM and

15

FERRIS their loans and invstments in ELU/RPI from the sale of assets in PNI/ACORN/ELU/RPI for the investments HARDER fraudulently induced ACCLAIM and FERRIS to make in PNI/ACORN/ELU/RPI.

126.    On April 3, 2001, HARDER, in writing to ACCLAIM and FERRIS, states that he will now only repay the money ACCLAIM and FERRIS invested in ELU (and not at a profit as previously promised) and refuses to disclose any SEC required information to ACCLAIM and/or FERRIS which they insist must be disclosed prior to going forward which HARDER refuses to do. (See exhibits 99-101).

<u>**COUNT I**</u>

127.    Paragraphs 1-126 are incorporated herein and re-alleged as if separately stated.

128.    When HARDER approached HAGA and/or ACCLAIM in writing, to purchase air time on PRN HARDER had a duty to speak the truth regarding UBN and HAGA's UBN affiliates.

129.    HARDER, in fact, knowingly and intentionally made false statements of material fact, in writing, to HAGA and/or ACCLAIM regarding UBN and HAGA'S UBN affiliates in that UBN was not shutting down and HAGA'S UBN affiliates would not come onboard PRN.

130.    ACCLAIM justifiably relied upon HARDER'S, knowingly and intentionally made false statements of material fact, in writing, to HAGA and/or ACCLAIM regarding UBN and HAGA's UBN affiliates becoming part of PRN, in accepting HARDER'S offer to purchase air-time for HAGA and did not discover until 2-9-2000 when reading HARDER'S 12-9-1999 e-mail to his wife Dianne HARDER and Perreault  that UBN was not shutting down nor were HAGA'S UBN affiliates joining PRN.

131.    ACCLAIM, as a proximate result of HARDER'S knowingly and intentionally made

false statements of material fact, in writing, to HAGA and/or ACCLAIM regarding UBN and

HAGA's UBN affiliates becoming part of PRN on which ACCLAIM relied upon for its decision to

purchase air-time for HAGA and/or ACCLAIM on PRN, was damaged.

132.    ACCLAIM suffered actual loss, harm and damage in the amount of $48,000 ($6,000

per month ACCLAIM paid PNI/ACORN for the months of April 1999 through December, 1999).

(See exhibit 102).

WHEREFORE, ACCLAIM requests that Judgment be granted against Defendant HARDER

in the actual amount of $48,000, together with prejudgment interest as provided by law, punitive

damages for fraud in the inducement and for the loss of HAGA'S UBN affiliates in the amount of

$1,000,000, reasonable attorney fees and that ACCLAIM receive such other relief as this Court

deems proper and just under the circumstances, including payment of costs and expenses incurred

in the filing of this suit.

## COUNT II

133.    Paragraphs 1-132 are incorporated herein and re-alleged as if separately stated.

134.    When HARDER approached HAGA and/or ACCLAIM, in writing, to purchase air

time on PRN, HARDER, as an officer/agent and/or major shareholder of PNI/ACORN/PRN, had

a duty to speak the truth regarding UBN and  HAGA's UBN affiliates.

135.    HARDER, as an officer/agent and major shareholder of PNI/ACORN/PRN in fact,

knowingly, tortiously, and intentionally used the entities of PNI/ACORN/PRN to cleverly hide his

false statements of material fact, in writing, to HAGA and/or ACCLAIM regarding UBN and

HAGA'S UBN affiliates in that UBN was not shutting down and HAGA'S UBN affiliates would not

come onboard PRN.

17

136.   ACCLAIM in justifiably relied upon HARDER as an officer/agent/major shareholder of PNI/ACORN/PRN, in accepting HARDER'S offer to HAGA and/or ACCLAIM to purchase air-time for HAGA and/or ACCLAIM from April 1999 through December 1999 and did not discover until 2-9-1999 when reading HARDER'S 12-9-1999 e-mail to his wife Dianne HARDER and Perreault) that UBN was not shutting down nor were HAGA'S UBN affiliates joining PRN.

137.   ACCLAIM, as a proximate result of HARDER'S knowingly tortiously and intentionally made and cleverly and tortiously concealed false statements of material fact, as an officer/agent of PNI/ACORN/PRN, in writing, to HAGA and/or ACCLAIM regarding UBN and HAGA's UBN affiliates becoming part of PRN on which ACCLAIM relied upon for its decision to purchase air-time for HAGA on PRN, was damaged.

138.   ACCLAIM suffered actual loss, harm and damage in the amount of $48,000 ($6,000 per month ACCLAIM paid ACORN for the months of April 1999 through December, 1999). (See exhibit 99).

WHEREFORE, ACCLAIM requests that, since HARDER at all times material as a owner/officer/agent/shareholder of PNI/ACORN/PRN and tortiously utilized these corporations as alter ego's to perpetuate a fraud on ACCLAIM that this *Court Pierce the Corporate Veil* and Judgment be granted, jointly and severally, against Defendants HARDER/PNI/ACORN/PRN in the actual amount of $48,000 for fraud in the inducement, together with prejudgment interest as provided by law, punitive damages for fraud in the inducement and for fraud in the loss of HAGA'S UBN affiliates in the amount of $1,000,000, reasonable attorney fees and that ACCLAIM receive such other relief as this Court deems proper and just under the circumstances, including payment of costs and expenses incurred in the filing of this suit.

18

## COUNT III

139.   Paragraphs 1-138 are incorporated herein and re-alleged as if separately stated.

140.   From April, 1999 to December 1, 1999, HARDER, as owner/agent/officer of PNI/ACORN/PRN, continually posted on PNI/ACORN/PRN websites, www.prn1.com and www.acornradio.com, PRN radio affiliates allegedly carrying HAGA's radio program for which ACCLAIM paid ACORN $6,000 per month for the months of April, 1999 through November, 1999.

141.   HARDER, knowingly tortiously and intentionally made false statements of material fact, in writing, regarding HAGA'S PRN affiliates on www.prn1.com and www.acornradio.com regarding HAGA'S alleged PRN affiliates.

142.   ACCLAIM justifiably relied on these false statements of material fact. which HARDER cleverly utilized PNI/ACORN/PRN to conceal from ACCLAIM until 2-9-99 when reading HARDER's 12-9-1999 e-mail to his wife Dianne HARDER and Perreault, wherein HARDER admitted the PRN affiliate list was "bogus."

143.   As a result, ACCLAIM suffered actual damages in the amount of $48,000. ACCLAIM paid ACORN $6,000 per month for the months of April, 1999 through December, 1999

WHEREFORE, ACCLAIM requests that Judgment be granted, jointly and severally, against Defendants HARDER/PNI/ACORN/PRN in the actual amount of $48,000, together with prejudgment interest as provided by law, punitive damages for fraud in the amount of $1,000,000, reasonable attorney fees and that ACCLAIM receive such other relief as this Court deems proper and just under the circumstances, including payment of costs and expenses incurred in the filing of this suit.

## COUNT IV

19

144.   Paragraphs 1-143 are incorporated herein and re-alleged as if separately stated.

145.   When HARDER approached ACCLAIM to invest $12,500 in ELU, HARDER had a duty to speak the truth regarding ELU.

146.   HARDER, in fact, knowingly intentionally and tortiously made false statements of material fact to ACCLAIM to induce acclaim to invest in ELU.

147.   ACCLAIM, justifiably relied upon HARDER'S knowingly, intentionally and tortiously made false statements of fact regarding ELU in investing $12,500 in ELU.

148.   ACCLAIM, as a proximate result of HARDER'S knowingly, intentionally and tortiously made false statements of material fact regarding ELU which ACCLAIM relied upon for its decision to invest in ELU, was damaged.

149.   ACCLAIM suffered actual loss, harm and damage in the amount of $12,500.

WHEREFORE, ACCLAIM requests that Judgment be granted against Defendant HARDER in the actual amount of $12,500, together with prejudgment interest as provided by law, punitive damages for fraud in the inducement and then concealment in the amount of $1,000,000, reasonable attorney fees and that ACCLAIM receive such other relief as this Court deems proper and just under the circumstances, including payment of costs and expenses incurred in the filing of this suit.

## COUNT V

144.   Paragraphs 1-143 are incorporated herein and re-alleged as if separately stated.

145.   When HARDER and approached FERRIS to invest $12,500 in ELU, HARDER had a duty to speak the truth regarding ELU.

146.   HARDER, in fact, knowingly, tortiously and intentionally made false statements of material fact to FERRIS to induce FERRIS to invest in ELU.

20

147.    FERRIS, justifiably relied upon HARDER'S knowingly, tortiously and intentionally made false statements of fact regarding ELU in investing $12,500 in ELU.

148.    FERRIS, as a proximate result of HARDER'S knowingly, tortiously and intentionally made false statements of material fact regarding ELU which FERRIS relied upon for his decision to invest in ELU, was damaged.

149.    FERRIS suffered actual loss, harm and damage in the amount of $12,500.

WHEREFORE, FERRIS requests that Judgment be granted against Defendant HARDER in the actual amount of $12,500, together with prejudgment interest as provided by law, punitive damages for fraud in the inducement and the concealment in the amount of $1,000,000, reasonable attorney fees and that FERRIS receive such other relief as this Court deems proper and just under the circumstances, including payment of costs and expenses incurred in the filing of this suit.

<u>**COUNT VI**</u>

150.    Paragraphs 1-149 are incorporated herein and re-alleged as if separately stated.

151.    When HARDER and approached ACCLAIM to loan money to and to invest in RPI, HARDER had a duty to speak the truth regarding RPI.

152.    HARDER, knowingly and intentionally made false statements of material fact to ACCLAIM to induce acclaim to loan money to and to invest in RPI

153.    ACCLAIM, justifiably relied upon HARDER'S knowingly and intentionally made false statements of fact regarding RPI in loaning $25,000 to RPI and investing an additional $25.00 in RPI.

154.    ACCLAIM, as a proximate result of HARDER'S knowingly and intentionally made false statements of material fact, about RPI which ACCLAIM relied upon for its decision to loan

money to and to invest in RPI was damaged.

155.    ACCLAIM suffered actual loss, harm and damage in the amount of $25,025.

WHEREFORE, ACCLAIM requests that Judgment be granted against Defendant HARDER

in the actual amount of $25,025, together with prejudgment interest as provided by law, punitive

damages for fraud in the inducement and tortious concealment in the amount of $1,000,000,

reasonable attorney fees and that ACCLAIM receive such other relief as this Court deems proper and

just under the circumstances, including payment of costs and expenses incurred in the filing of this suit.

## COUNT VII

156.    Paragraphs 1-155 are incorporated herein and re-alleged as if separately stated.

157.    When HARDER approached FERRIS to loan money to and to invest in RPI,

HARDER had a duty to speak the truth regarding RPI.

158.    HARDER, in fact, knowingly and intentionally made false statements of material fact

to FERRIS to induce FERRIS to loan money to and to invest in RPI.

159.    FERRIS, justifiably relied upon HARDER'S knowingly and intentionally made false

statements of fact regarding RPI in loaning $25,000 to RPI and and investing $25.00 in RPI.

160.    FERRIS, as a proximate result of HARDER'S knowingly and intentionally made false

statements of material fact, about RPI which FERRIS relied upon for his decision to loan money to

and to in RPI was damaged.

161.    FERRIS suffered actual loss, harm and damage in the amount of $25,025.

WHEREFORE, FERRIS requests that Judgment be granted against Defendant HARDER in

the actual amount of $25,000, together with prejudgment interest as provided by law, punitive

damages for fraud in the inducement and tortious concealment in the amount of $1,000,000,

reasonable attorney fees and that FERRIS receive such other relief as this Court deems proper and just under the circumstances, including payment of costs and expenses incurred in the filing of this suit.

## COUNT VIII

162.   Paragraphs 1-161 are incorporated herein and re-alleged as if separately stated.

163    At all times material, up to April 3, 2001, HARDER promised, verbally and in writing, to repay ACCLAIM and FERRIS their loans to and investments in ELU/RPI from the sale of assets in PNI/ACORN/ELU/RPI/PRN which HARDER fraudulently induced ACCLAIM and FERRIS to make in RPI and ELU.

164.   On April 3, 2001, HARDER in writing, now refuses to repay ACCLAIM or FERRIS despite the fact HARDER, at all times material has promised to repay, with a profit, ACCLAIM and FERRIS.

165.   The fact HARDER, at all times material, promised verbally and writing, to repay ACCLAIM and FERRIS, from the sale of assets in PNI/ACORN/ELU/RPI for the investments/loans FERRIS and ACCLAIM made in RPI and ELU shows that HARDER never intended to repay ACCLAIM or FERRIS and, in fact *intended to deceive* ACCLAIM and FERRIS in hopes that ACCLAIM and FERRIS would not bring legal action against HARDER, PNI/ACORN/ELU/RPI to recover the investments/loans HARDER promised to repay.

WHEREFORE, ACCLAIM and FERRIS requests that Judgment be granted against Defendant HARDER in the actual amount of $75,050, together with prejudgment interest as provided by law, punitive damages for fraud and deceit in the amount of $1,000,000, reasonable attorney fees and that ACCLAIM and FERRIS receive such other relief as this Court deems proper

23

and just under the circumstances, including payment of costs and expenses incurred in the filing of this suit.

## COUNT IX

166. Paragraphs 1-165 are incorporated herein and re-alleged as if separately stated.

167. HARDER, unilaterally, illegally, fradulently and without notice to any RPI lender/investor utilized thousands of dollars of RPI funds to pay PNI/ACORN debts and employees.

168. HARDER, unilaterally, illegally, fradulently and without notice to any RPI investor utilized RPI funds to pay PNI/ACORN bills and employees to defraud investors in RPI and to put RPI funds beyond the lawful reach of RPI lenders/investors.

169. HARDER in using RPI funds to pay PNI/ACORN bills and employees, committed civil theft, conversion, fraudulent conveyance

170. ACCLAIM and FERRIS, as individuals who loaned money to and invested in RPI were defrauded by HARDER and were damaged.

WHEREFORE, ACCLAIM and FERRIS request this court enter judgment, jointly and severally, against HARDER/PNI/ACORN and in favor of ACCLAIM and FERRIS for actual damages together with prejudgment interest as provided by law, punitive damages for fraud, civil theft, unjust enrichment, fraudulent conversion, in the amount of $1,000,000, reasonable attorney fees and that ACCLAIM and FERRIS receive such other relief as this Court deems proper and just under the circumstances, including payment of costs and expenses incurred in the filing of this suit.

## COUNT X

171. Paragraphs 1-170 are incorporated herein and re-alleged as if separately stated.

24

172.    HARDER, illegally, fradulently and without notice to any RPI lender/investor utilized thousands of dollars of RPI funds to make major electrical improvements and install a heating system at his PNI/ACORN/PRN radio studio owned HARDER'S daughter Darlene in which HARDER (verbally?) leased a small space for RPI..

173.    HARDER, illegally, fradulently and without notice to any RPI lender/investor unilaterally utilized RPI funds to pay for improvements to his PNI/ACORN/PRN studio housed in a building owned by his daughter, to defraud lenders/investors in RPI and to put RPI funds beyond the lawful reach of RPI lenders/investors.

174.    HARDER illegally, fradulently and without notice to any RPI lender/investor in using RPI funds to unilaterally make improvements at PNI/ACORN/PRN studio, intentionally and deceitfully committed civil theft, conversion, fraudulent conveyance.

175.    ACCLAIM and FERRIS, as individuals who loaned money to and invested in RPI were intentionally and deceitfully defrauded by HARDER, who was unjustly enriched, and were damaged.

WHEREFORE, ACCLAIM and FERRIS request this court enter judgment, jointly and severally, against HARDER/PNI/ACORN/PRN and in favor of ACCLAIM and FERRIS for actual damages together with prejudgment interest as provided by law, punitive damages for fraud, civil theft, tortious deceit, conversion and unjust enrichment in the amount of $1,000,000, reasonable attorney fees and that ACCLAIM and FERRIS receive such other relief as this Court deems proper and just under the circumstances, including payment of costs and expenses incurred in filing of this suit.

## COUNT XI

176.    Paragraphs 1-175 are incorporated herein and re-alleged as if separately stated.

177.    HARDER illegally, fradulently and without notice to any RPI lender/investor utilized thousands of dollars of RPI funds to pay to pay the expenses of Ed Shiflett (an employee/officer of PNI/ACORN) which HARDER on at least two occasions stated in writing were being paid by ACORN.

178.    HARDER illegally, fradulently and without notice to any RPI lender/investor utilized RPI funds to pay Shiflett to defraud investors in RPI, unjustly enrich PNI/ACORN and to put RPI funds beyond the lawful reach of RPI lenders/investors.

179.    HARDER in using RPI funds to pay Shiflett, and employee/officer of PNI/ACORN, intentionally and deceitfully committed civil theft, conversion, fraudulent conveyance.

180.    ACCLAIM and FERRIS, as individuals who loaned money to and invested in RPI were tortiously and intentionally defrauded by HARDER, PNI/ACORN and were damaged.

WHEREFORE, ACCLAIM and FERRIS request this court enter judgment, jointly and severally, against HARDER/PNI/ACORN and in favor of ACCLAIM and FERRIS for actual damages together with prejudgment interest as provided by law, punitive damages for fraud, civil theft, unjust enrichment and tortious deceit, conversion in the amount of $1,000,000, reasonable attorney fees and that ACCLAIM and FERRIS receive such other relief as this Court deems proper and just under the circumstances, including payment of costs and expenses incurred in the filing of this suit.

## COUNT XI

181.    Paragraphs 1-180 are incorporated herein and re-alleged as if separately stated.

182.    At all times material HARDER wielded and wields almost total control over his corporations PNI/ACORN/ELU/RPI.

26

183.   HARDER freely transfers cash from any entity that had/has it whenever he wanted/wants to do so.

184   HARDER utilizes utilized PNI/ACORN/ELU as instrumentalities which he used and or uses as part of an ongoing design or scheme to defraud ACCLAIM and FERRIS as investors and creditors of RPI and investors in ELU and HAGA as a contributor to PNI.

185.   PNI/ACORN/ELU are basically indistinct in operation and recognition in that HARDER uses PNI/ACORN/PRN websites to promote ELU, uses PNI to advertise the sale of ACORN assets, has used and/or uses funds solicited for a specific purpose through PNI (the purchase of the Telford Hotel) solicited through PNI to fund ACORN, allowing this Court to "pierce the corporate veil" and for these assets to be utilized to repay RPI creditors/investors ACCLAIM AND FERRIS and ELU investors ACCLAIM and FERRIS and HAGA as a contributor of PNI.

WHEREFORE, ACCLAIM, FERRIS and HAGA request this court "pierce the corporate veil" of PNI/ACORN/ELU/RPI, against HARDER and in favor of ACCLAIM, FERRIS and HAGA for actual damages together with prejudgment interest as provided by law, punitive damages for fraud, civil theft, tortious deceit, unjust enrichment and conversion in the amount of $1,000,000, reasonable attorney fees and that ACCLAIM, FERRIS, HAGA receive such other relief, as this Court deems proper and just under the circumstances, including payment of costs and expenses incurred in the filing of this suit.

## COUNT XII

186.   Paragraphs 1-185 are incorporated herein and re-alleged as if separately stated.

187.   HARDER/PNI/ACORN/ELU, in fradulently, deceitfully intentionally and continuously supressing the truth of ELU to investors in ELU (ACCLAIM AND FERRIS) violated

27

and violates Regulation D of the Securities Act of 1933 which contains anti-fraud provisions and manditory reporting requirements.

188.    HARDER/ELU/PNI/ACORN also knowingly violated Colorado law when soliciting investments of ACCLAIM and FERRIS in ELU.

189.    HARDER/ELU/PNI/ACORN has never provided any reports or any kind concerning ELU to either ACCLAIM or FERRIS, other than his letter of April 3, 2001 refusing to disclose the "alleged" purchaser of ELU which will/would allow ACCLAIM and Ferris to make an informed consent and sell their shares in ELU to an independent entity not later proven to be HARDER/ELU/PNI/ACORN.

190.    Such omissions, were/are willful and knowingly in violation of Federal Securities laws and the laws of the State of Colorado.

WHEREFORE, ACCLAIM and FERRIS request this court "pierce the corporate veil" of PNI/ACORN/ELU/RPI, against HARDER, and in favor of ACCLAIM and FERRIS for actual damages together with prejudgment interest as provided by law, punitive damages for fraud, intentional, ongoing and tortious violation of federal securities laws, civil theft, unjust enrichment and conversion in the amount of $1,000,000, reasonable attorney fees and that ACCLAIM and FERRIS receive such other relief as this Court deems proper and just under the circumstances, including payment of costs and expenses incurred in the filing of this suit.

## COUNT XIII

191.    Paragraphs 1-190 are incorporated herein are re-alleged as if separately stated.

192.    In January, 2000, HAGA, "out of an abundance of caution" resigned as President of RPI.

28

193.   HARDER has acknowledged, in writing HAGA's resignation as president from RPI.

194.   Commencing on February 28, 2000 (which HAGA discovered in MARCH, 2000) and continuing to date, HARDER commenced the publication to RPI creditors as well as governmental agencies with whom HARDER had opened tax accounts, etc., of false and defamatory, malicious and libelous postcards and letters of and concerning HAGA, which postcards and letters stated, among other things that RPI had moved and that all bills, tax demands, etc should be sent to Mr. Mike Haga, President, RPI, PO Box 3918, Grand Junction, CO 81505.

195.   HARDER'S letter/postcard campaign against HAGA was/is a systematic campaign of defamation by the Defendant HARDER against the Plaintiff HAGA, long after HARDER admits in writing that HAGA had severed (if there were ever any) all legal relations HAGA had with HARDER/RPI.

196.   True and correct copies of a few of the letters/postcards containing the defamatory statements made against HAGA, in COLORADO, and published by HARDER to third persons are attached hereto as Exhibits 96-98.

197    The representations of HARDER to third persons regarding HAGA were false and untrue and were published with reckless and wanton and willful disregard of whether they were false or untrue.

198    Examples of the statements of HARDER to the persons identified in the documents attached as Exhibits 96-98  constitute libel per se.

199.   As a direct and proximate result of the above-referenced false and defamatory publications--among many others--and the acts of HARDER in connection therewith, HAGA has been forced to spend thousands of dollars on legal fees, held up to public contempt, ridicule, disgrase

29

and prejudice, has suffered great mental pain and anguish, and has been irreparably injured in his good name, business reputation and social standing, and has lost the esteem and respect of his friends, acquaintences, business associates, and of the public generally.

WHEREFORE, HAGA requests that Judgment be granted against HARDER in an actual amount of $17,000 in attorney fees HAGA has been forced to spend to date to protect his reputation, together with prejudgment interest as provided by law, punitive damages of $1,000,000, reasonable attorney fees, and that the Plaintiff receive such other relief as the Court deems proper and just under the circumstances, including payment of costs and  expenses incurred in filing this suit.

## COUNT XIV

200.    Paragraphs 1-199 are incorporated herein are re-alleged as if separately stated.

201.    In 1988, HAGA was medically diagnosed with Sacroidosis/Neurosarcoidosis, a chronic and progressively degenerative disease which slowly destroys the major organs of the body.

202.    While there is no known cure for Sarcoidosis/Neurosarcoidosis, stress enhances the adverse medical effects of the disease.

203.    At all times material, HARDER was aware of HAGA's chronic medical condition and the adverse effects stress could create in relation to the Plaintiff's medical condition.

204.    On May 5, 2000, HAGA, after personally receiving (as part of HARDER's systematic, false, defamatory, malicious and libelous postcard and letter campaign) a certified letter from Charles Smith Reality, addressed to Mr. Mike Haga, President, RPI, etc, demanding payment of $7,884.27 for a lease HARDER personally signed for RPI,  HAGA experienced such extreme stress that he ended up in the hospital with pulmonary emboli and is now required to be on blood thinners and oxygen perhaps for life.

30

205.   HARDER'S conduct has amounted to nothing less than intentional infliction of emotional duress in that HARDER'S actions have been outrageous, goes beyond all bounds of decency, and odious and utterly intolerable in a civilized society.

206.   As a direct and proximate result of HARDER's tortiously and intentional actions, HAGA has suffered severe emotional and physical duress and has been damaged.

207.   HARDER could easily have foreseen the outcome his intentional and outrageous actions would have upon the HAGA'S health.

WHEREFORE, HAGA requests that Judgment be granted against HARDER in an amount that is fair and reasonable, together with prejudgment interest as provided by law, punitive damages in the amount of $1,000,000 reasonable attorney fees, and that the HAGA receive such other relief as the Court deems proper and just under the circumstances, including actual damages of over $17,000 in attorney fees HAGA has to date been forced to spend to defend himself and protect his reputation, payment of costs and  expenses incurred in filing this suit.

## COUNT XV

208.   Paragraphs 1-221 are incorporated herein are re-alleged as if separately stated.

209.   HARDER, tortiously and intentionally breached his duty of good faith and fair dealing which he owed to HAGA, damaging HAGA in the matter described above.

210.   The tortious acts of HARDER were accompanied by fraud, oppression and a willful and wanton disregard for the rights of HAGA, justifying an award of punitive damages.

WHEREFORE, HAGA requests that Judgment be granted against HARDER in an amount that is fair and reasonable, together with prejudgment interest as provided by law, punitive damages, reasonable attorney fees, and that the Plaintiff receive such other relief as the Court deems proper

and just under the circumstances, including payment of costs and expenses incurred in filing this suit.

## COUNT XVI

211     Paragraphs 1-210 are incorporated herein are re-alleged as if separately stated.

212.    HARDER, utilizing his position as officer/owner of PNI/ACORN/ELU tortiously and intentionally breached their duty of good faith and fair dealing which he owed to ACCLAIM, FERRIS and HAGA, damaging ACCLAIM, FERRIS and HAGA in the matter described above.

213.    HARDER continues to solicit funds nationwide through PNI/ACORN/ELU and to utilize PNI/ACORN/ELU as a mechanism to shelter assets as a part of an elaborate and ongoing scheme to defraud ACCLAIM, FERRIS and HAGA. (See exhibit for the Fall./winter 2000/01 Chuck Harder update fundraiser recently sent by HARDER to HAGA in Colorado)

214.    The tortious acts of HARDER utilizing his position as officer/owner of PNI/ACORN/ELU were accompanied by fraud, oppression and a willful and wanton disregard for the rights of ACCLAIM, FERRIS and HAGA, justifying an award of punitive damages.

WHEREFORE, ACCLAIM, FERRIS and HAGA request that this Court "reverse pierce the corporate veil" and that Judgment be granted against HARDER/PNI/ACORN/ELU and in favor of ACCLAIM, FERRIS and HAGA in an amount that is fair and reasonable, together with prejudgment interest as provided by law, punitive damages, reasonable attorney fees, and that the Plaintiffs receive such other relief as the Court deems proper and just under the circumstances, including payment of costs and expenses incurred in filing this suit.

In all counts, Plaintiffs further request this Court enter a restraining order prohibiting CHARLES E. HARDER from disposing, transferring or selling any personal assets or any assets in PNI/ACORN/ELU until this matter is fully resolved in this Court.

32

Plaintiffs further request a trial by jury on all issues so triable.

Respectfully submitted,

Acclaim Publishing Co., Inc.
by, David L. Brothers, President
820 23 Road
Grand Junction, CO 81505
(970) 256-7359

Alan Ferris, Plaintiff
840 23 Road
Grand Junction, CO 81505
(970) 250-3553

Michael Haga, Plaintiff
820 23 Road
Grand Junction, CO 81505
(970) 256-7359

33

## CERTIFICATE OF SERVICE

I HEREBY CERTIFY that a true and correct copy of the **AMENDED COMPLAINT,** Civil action # 01-S-356, has been furnished via UPS to Robert Persante, 4625 East Bay Drive, Suite 223, Clearwater, FL 33764, this _____6_____ of April, 2001.

Michael Haga<br>
820 23 Road<br>
Grand Junction, CO 81505

34

UNITED STATES DISTRICT COURT
IN THE MIDDLE DISTRICT OF FLORIDA
TAMPA DIVISION

CHARLES E. HARDER,
    Plaintiff,

vs.

                                  Case No. 8:00-CV-270-T-26E
                                  JURY TRIAL DEMANDED

MICHAEL HAGA,
    Defendant.
_____/

## NOTICE OF RELATED CASE

COMES NOW the plaintiff, CHARLES E. HARDER, by and through his undersigned

counsel, and notifies this Court of a related case filed by the defendant in this action, Michael

Haga, against the plaintiff, Charles E. Harder:  UNITED STATES DISTRICT COURT FOR

THE DISTRICT OF COLORADO - MICHAEL HAGA, Plaintiff vs. CHARLES E. HARDER,

Defendant, Civil Action File No. 01-S-356.

                                  Respectfully submitted,

                                  _____

                                  Robert Persante, Esq.
                                  For: Persante & McCormack, P.A.
                                  4625 East Bay Drive, Suite 223
                                  Clearwater, FL 33764
                                  (727) 531-5530
                                  FBN: 376698 SPN: 01080596
                                  Attorneys for Plaintiff

## CERTIFICATE OF SERVICE

    I HEREBY CERTIFY that a true and correct copy of the foregoing has been furnished by U.S.
Mail to: **Michael Haga**, 820 23 Road, Grand Junction, Colorado 81505, this _____ 18th day of
April, 2001.

                                    _____
                                    Robert Persante

Exhibit C

United States District Court
for the
District of Colorado

Civil Action File No. __01-S-356__
JURY TRIAL DEMANDED

ACCLAIM PUBLISHING COMPANY, INC.
ALAN FERRIS,
MICHAEL HAGA

      Plaintiffs,

v.

CHARLES E. HARDER,
PEOPLES NETWORK, INC., a Florida Corporation,
AMERICAN COMMUNITY ORIENTED RADIO NETWORK, INC.,
a Florida Corporation,
ENERGY LIBERTY UNLIMITED, INC., a Florida Corporation,
RADIO PRESS INTERNATIONAL, INC., a Florida Corporation,
PEOPLES RADIO NETWORK, a subsidiary of Peoples Network, Inc., and/or American
Community Oriented Radio Network,

      Defendants.

## AFFIDAVIT OF DAVID L. BROTHERS

STATE OF COLORADO
COUNTY OF MESA

      Before me the undersigned authority, personally appeared DAVID L. BROTHERS, and after first

being duly sworn, did depose and state as follows.

      1.      I am a life-long resident of the State of Colorado, over the age of 18 years and have personal

knowledge of the facts contained herein.

      2.      I have read the affidavit of CHARLES E. HARDER, dated May 14, 2001 in this Case.

DEFENDANT HARDER'S REPLY TO PLAINTIFF HAGA'S RESPONSE TO HARDER'S MOTION TO

DISMISS, dated May 17, 2001; DEFENDANT'S MOTION TO DISMISS FOR IMPROPER VENUE AND

1

Exhibit D

FORUM NON-CONVENIENS, dated May 17, 2001; DEFENDANT'S MEMORANDUM OF LAW IN

SUPPORT OF MOTION TO DISMISS, dated May 17, 2001; and DEFENDANT'S MOTION TO DISMISS

COUNTS XII, XV, XVI OF PLAINTIFF'S AMENDED COMPLAINT, dated May 17, 2001, and feel that

I must respond to the many false statements contained therein.

3.     I am the President and sole owner of Acclaim Publishing Company, Inc., a Colorado

corporation which I incorporated in Colorado in 1992. *Tom Lacroix, Esq., 700 Rood Avenue, Grand*

*Junction, CO, is in the process of entering an appearance for Acclaim Publishing Co., Inc., thus reinstating*

*the claims of my company in this case.*

4.     From 1992, to date I have had, **in Colorado**, an ongoing *substantial* and ongoing business

relationship with Mr. Charles E. Harder, and his Florida corporations American Community Oriented Radio

Network, Inc, Peoples Network, Inc., Peoples Radio Network.

5.     Since 1992, Mr. Harder through PRN/PNI/ACORN has purchased, wholesale, from me in

Colorado, through my Colorado Corporation, Acclaim Publishing, CO., Inc. over $30,000 in books published

by Acclaim in the State of Colorado for resale through his Peoples Radio Network, and Peoples Network, Inc.,

and American Community Oriented Radio Network.

From 1992 to 1996, Mr. Harder periodically called Mike Haga in Colorado to appear as a

guest on Mr. Harder's daily nationwide talk show (carried on well over 100 radio stations) where Mr. Haga

and Mr. Harder would discuss four books Mr. Haga had written from 1992 to 1995 as the guest interviews

would result in orders for Mr. Haga's books through Mr. Harder's order center for PRN/PNI/ACORN.

It should be noted here that Mr. Haga, who had been a financial Administrator for Columbia

HCA (the nations largest hospital organization) for a decade, became disabled in 1995 as a result of

Sarcoidosis/Neurosarcoidosis, first diagnosed in 1987--a rare and slowly debilitating disease akin to MS.

I have been friends with Mike Haga for a very long time as I have been in health care all of

my adult life am an RN,BSN and ran the operating room at Presbyterian St. Lukes in Denver, Co, during the

2

time Mike was a Financial Administrator for Columbia HCA. P/SL is owned by Columbia HCA. My publishing Company also published Mike's four books which sold very well from 1992 to 1995.

In 1995, I became Mike Haga's caretaker as the result of his chronic progressive disease process.

It should be noted that Mike continues to try to write books, but to date has not been able to complete a new book--though he continues to try and believes one day he will.

6.       In March 1999, *Mr. Harder, due to his successful relationship with my company, Acclaim Publishing, Co., Inc. personally solicited Mike Haga and myself in Colorado* to purchase $6,000 per month air-time on his American Community Oriented Radio Network, Inc. (ACORN). Peoples Radio Network (PRN) Peoples Network, Inc.(PNI), which is carried live via the Internet in Colorado. through Satellite in Colorado and on several radio stations in Colorado as well as shortwave in Colorado.

Mr. Harder went on to state that because of having interviewed Mike on his own program, he knew Mike had the voice to become a great talk show host and Harder sweetened the pot by telling me the ACORN/PNI/PRN order center would continue to order Mikes books at wholesale from me, stock them in the order center and promote them heavily on other ACORN/PRN/PRN programs as well.

7.       Chuck Harder, Mike Haga and I discussed whether Mike physically felt he could host a radio program and Mike, who desperately wants to be what he feels is productive again and still believes he will one day wake up and be completely well said he knew he could.  After several discussions with Mr. Harder, I agreed, to purchase the air-time and Mr. Harder then sent to me a list of 35 ACORN/PRN/PNI radio stations nationwide that were to carry the one hour per day radio talk show Mike would host.  Mr. Harder also maintained this same list on his websites www.chuckharder.com and www.forthepeople.org.

7.       From April 1, 1999 to December, 1999 I purchased over $48.000 of Air-time on American Community Oriented Radio Network, Inc, (ACORN), PNI/PRN by writing checks on my Colorado bank account for Acclaim Publishing Company, Inc, which Mr. Harder subsequently cashed in Florida..

3

8.      In late July, 1999, Mr. Charles E. Harder called and proceeded to *personally solicited Mike Haga, myself and Alan Ferris*, a good friend and neighbor who was visiting Mike when Harder called, to invest in to invest in Harder's public corporation known as Energy Liberty Unlimited, Inc. (ELU).

9.      Mr. Charles E. Harder told the three of us the SEC was in the final process of registering ELU stock for public trading and that Mr. Harder had a financial consultant, Ross Secunda of Hanevan Financial, who would be working with Capstone a market-maker for ELU, stock, and that Mr. Harder would be transferring the assets of PNI/PRN/ACORN to ELU to make it very attractive to future stockholders.

Ferris, who was fascinated with Haga's daily radio program told Harder he was personally interested in investing as well, as it sounded like a gold mine, which Harder totally agreed with.  It is interesting that Mr. Harder has the ability to make one feel as if Harder is doing you a favor by letting you in become a part of his radio empire, and he certainly has the track record, 14 years of nationwide broadcasting, etc.

10.     By the end of the phone conversation, both Ferris and myself agreed that once we saw the prospectus we would each be interested in purchasing 12,500 shares each at a pre-offering price of $1.00 per share.  Mr. Harder agreed to mail to me and to Mr. Ferris, the ELU prospectus.  Harder also sent to me the appraised valuation of the assets of PNI/PRN/ACORN showing a then current valuation of $4,350,000 that would increase to $6,000,000.

11.     By the end of the phone call, Mr. Harder thanked Alan and myself and said Mark Warner, then President of ELU would after we had the prospectus contact each of us with instructions on where to wire transfer our investments in ELU.

12.     On August 3, 1999, pursuant to written instructions from Mr. Harder and Mark

4

Warner, I wired $12,500 from my Colorado bank account for Acclaim Publishing to First Federal Savings Bank of Florida for my investment in ELU.

13.   On or about August 15, 1999, I received, through the mail in Colorado, a stock certificate for 12,500 shares of ELU stock in the name of Acclaim Publishing, Inc.

14.   Mr. Harder signed the certificate as Chairman.

15.   On or about October 3, 1999, Mr. Charles E. Harder, called Mike to discuss his radio program and during that call Harder asked if Alan Ferris could join us (which he did) as Harder had some really important news to share.  When Alan arrived, Harder personally solicited us to loan money to and to invest in Radio Press International, Inc, (RPI) which he said was to be a nationwide radio news service he was creating to replace UPI news and that RPI News would become a part of ELU thus tremendously enhancing the value of our ELU stock.

16.   Mr. Harder told us he was personally investing in RPI, had already raised capital to fund RPI for at least one year of operation, that he had already hired the top anchors for the former UPI news, was finishing the RPI Business Plan, and the articles of incorporation for RPI, and that all 125 PNI/PRN/ACORN nationwide radio stations would immediately carry RPI news when it commenced operation in November, 1999 thus assuring that RPI would operate in the black from day one.  Ferris and I told Harder that once we had seen his Business Plan (which he said he was completing), we would consider it.

17.   Mr. Harder faxed copy of his Articles of Incorporation for RPI, dated October 8, 1999.

18.   On October 16, 1999, Mr. Harder faxed to me in Colorado a copy of his RPI Business Plan which stated he has 2 national sales reps for RPI, will not commence operations until there is

5

$150,000 IN THE BANK, that ACORN is profitable, that MR. Perreault, Mr. Harder's Florida CPA will maintain the RPI books and that Harder will monitor the RPI bank account.

19.     There are SIX pages to the RPI Business Plan, not five as Mr. Harder maintains. The SIXTH page is the RADIO PRESS INTERNATIONAL PRIVATE PLACEMENT INVESTOR AGREEMENT (a true and correct copy is attached hereto and incorporated herein).

20.     Though there is a forum selection clause on page 5 of the RPI Business Plan, naming Florida as the place of jurisdiction, I told Mr. Harder I would not invest in RPI if this were the case and he said don't worry about it, it's just a formality.  He said, "just don't sign the Investor Agreement." That's what we agreed to.  And I did not sign the Investor agreement which would have formed the contract to be bound by the laws of Florida.  In any event, since the whole Business Plan was, in my opinion, fraudulent, the law is clear that the Investor agreement would not be binding even if I had signed it because of the fraud.  (A true and correct copy of the RPI Investor Agreement--which I did not sign--is attached hereto and incorporated herein).  At the bottom of the Investor Agreement it says "**Charles E. Harder, Chairman and acting President**."

21.     As a result of Mr. Charles E. Harder's personal solicitation, phone calls to me in Colorado, faxing and subsequently mailing to me in Colorado his Radio Press International, Inc., Business Plan accompanied by his "global plan to put ACORN/PRN/PNI/RPI into ELU" I loaned $25,000 to Radio Press International, Inc. and agreed to purchase 250,000 shares of stock in RPI for an additional $25.00.

22.     Pursuant to written instructions from Mr. Harder. On October 21, 1999, I personally wired $5,000 to Mr. Harder from my bank in Colorado and authorized Mr. Harder to charge my Acclaim Publishing Company, Inc., American Express Corporate card $20,799.00.

6

23. Mr. Harder faxed to me a copy of the RPI Corporate resolution for deposit accounts showing Mr. Harder and his CPA Doug Perreault as being the only signers on the RPI Business account at First Federal Savings Bank of Florida.

24. Mr. Harder had also personally asked Mike Haga, who Mr. Harder knew was permanently disabled, as each of them discussed it during phone calls when I was present, if he would like to be the President of RPI.

25. I was present with Mike Haga on the day he called Mr. Harder and said he would be honored to be the president, but could not travel to Florida or actually assume any duties as President until his health permitted. Mr. Harder said that was fine and that Mr. Harder would continue in his role of acting President as well as remaining chairman of RPI, until such time as Mr. Haga's health permitted him to actually assume the role of President of RPI.

26. By late December 1999, I began having many concerns about ACORN/PRN/PNI as I was receiving only minimal response from approximately 6 radio stations from the air-time I was purchasing on ACORN despite the fact I was offering free items to listeners. At about this same time I learned from Kay Reetz, a long-time HARDER employee that Harder was using RPI funds to pay ACORN bills and to pay ACORN employees, among other things.

27. Mike Haga called Mr. Harder and said, "Hey Chuck, if I am going to be the President of this thing, I need to see the books. Mr. Harder was hesitant, but finally agreed.

28. On December 29, 1999, Mr. Harder, in writing had Mr. Perreault send the RPI books to HAGA at 820 23 Road, Grand Junction, CO 81505.

29. In early January 2000, I also (inadvertently?) received a copy of an e-mail Harder had sent 12-6-1999 to his wife Dianne and Perreault where Harder states that he knew he was bankrupt

7

when he thought of and then created RPI. This was material misrepresentation of fact which Harder knowingly suppressed from me.

30.    In early January Mike Haga received the RPI books and together we verified from cancelled checks signed by Mr. Perreault that Mr. Harder was indeed using RPI funds to pay ACORN bills and employees and to make improvements to the ACORN studio housed in a building owned by Harder's daughter Darlene Stewart (who is also the registered agent of ACORN). That Mr. Harder had never invested in RPI and did not at any time ever have the required $150,000 IN THE bank to commence operations for RPI as required in his RPI Business Plan. And that there were no national ad reps onboard for RPI and that the PNI/PRN/ACORN radio stations were not carrying the RPI news.

31. Copies of the bills and checks were made, the books were bundled up and returned to Harder who admitted, in writing that he received them and returned them to Perreault.

32.    Mr. Harder then began making written promises on 1-2-2000, 1-13-2000, 1-23-2000, to repay, with a profit, RPI and ELU investors from the sale of the assets of ACORN/PNI/PRN/ELU.

33.    On January 21, 2000, Mr. Harder sent a fax asking Mike Haga to contact Mr. Bob Persante, legal counsel for PNI/PRN/ACORN/ELU stating that harder's plan was"to recover your investment, etc."

34.    On January 22 or 23, 2000 Mike Haga called Mr. Persante and while I was present, listening on the speakerphone, Mr. Persante laughed and said: "I thought it had been too quiet down there." (Referring to Harder). Mr. Persante then went on to talk with Mr. Haga telling him that he (Persante) would make sure the "situation" was resolved correctly as he had represented Harder and his various companies for years and that Harder "often put the cart ahead of the horse leaving me

8

(Persante) to clean up the mess afterwards."

35.    Mr. Haga had a couple of other telephone conversations with Persante, while i was present and began opening up to Persante who continually assured Haga everything would be taken care of.

36.    In one conversation, Haga stated to Persante that he was permanently disabled with Sarcoidosis a progressive disease affecting his heart and lungs and also in his central nervous system and then faxed to Persante a letter which Haga said he planned to file civil and criminal charges against Harder if the matter was not resolved as Persante promised.

37.    On January 31, 2000 Mr. Persante sent a letter to Haga telling Haga that Persante was not comfortable working directly with Haga due to his neurologic problems with Sarcoidosis and told Haga to get a local attorney to work with Persante to "resolve" the issues.

38.    Haga went to Tom Lacroix, Esq. and made an appointment for 2-8-2000.

39.    I told Haga to let Lacroix know Haga had the authority to speak for me as well as I could not make the meeting.

40.    Haga met Lacroix on 2-8-2000 and left documentation with Lacroix.

41.    On February 15, Lacroix drafted a 3 day demand letter to Persante.

42.    On February 15, 2000, Haga was served with papers naming him as a defendant in a lawsuit Persante filed in Florida against Haga, alleging Haga defamed Harder when Haga sent (to Persante) a letter stating Haga planned to file civil and criminal charges against Harder for fraud.

43.    When he was served with Harder's lawsuit, Haga called Persante asking him why he did this and Persante said (over the speakerphone) "we knew you were going to do something so we thought we would head you off and make sure it would be almost impossible for anyone to sue

9

Harder outside the State of Florida."

44.    I was appalled and continue to be appalled at the misstatements, and outright lies made by not only Harder but Mr. Persante and refuse to discuss anything with Mr. Persante as I don't want to find myself being a target as well.  An example of the deceptive statements by Mr. Harder and Mr. Persante can be seen in the fact in the Florida case for Defamation of character Harder filed against Haga, in Harder's affidavit to the Court Harder states that Haga was the co-incorporator of RPI, in Harder's affidavit to this Court, along with Mr. Persante's DEFENDANT'S MEMORANDUM OF LAW IN SUPPORT OF MOTION TO DISMISS, both state that Mike Haga was the President of RPI, immediately assumed his duties as President and ran the day to day operations of RPI.  As I have stated in this affidavit, I am Mike Haga's caretaker, he lives in my home and from 1995 until July 2000 I was with him virtually 24 hours per day and I can state, for a fact, Haga was never the co-incorporator of RPI and certainly never ran the day-to-day operations of RPI as he was physically and much of the time mentally unable to do so.  This nonsense has to stop.  Attorneys are officers of the Court and are sworn to uphold professional standards and to represent the truth.

45.    It has been decades since I have been in Florida and it is outrageous that Mr. Harder now challenges the jurisdiction of the Colorado Court in this matter as Harder approached me in Colorado, I wired all loans and investments from Colorado, have filed complaints with the FBI in Colorado, the Colorado Department of Securities, the SEC, etc.

46.    I also personally know that Mike Haga never controlled the day-to-day operations of RPI as Mr. Harder alleges in his affidavit to this Court, as I am not only a Registered Nurse, since 1995 I have been Mike Haga's caretaker as well.  I know for a fact, Haga never signed any contract

10

for RPI, hired anyone for RPI, never visited the RPI operations center in Florida--though Harder diligently tried to get him to, as his health would not permit it at any time. I also know for a fact Haga never controlled or handled the RPI books other than examining and returning them immediately to Mr. Harder. I know for a fact only Harder and Perreault were ever the signers on the RPI bank account. I also can attest to the fact that after Haga examined the RPI books he told Harder he would have nothing to do with RPI and followed it up with a resignation letter on January 17, 2000 to Harder stating that although he was the named President in the Business Plan he had done nothing and wanted to go on record "out of an abundance of caution" to make it clear he resigned. Thank God He did! I also never received and stock certificate of any type for RPI stock.

47.    It has been even more appalling that ***in March 2000***, Haga began receiving bills for RPI, ***at my post office box for Acclaim Publishing***, addressed to: Mr. Mike Haga, President, Radio Press International, Inc., P.O. Box 3918, Grand Junction, CO 81505 (wrong zip code as well). In some of these bills were postcards and letters from Mr. Harder telling creditors to send the bills to Haga as President, to this post office box because "RPI had moved." This has not only been an outright lie, it has had a very serious impact on Haga's health as stress enhances the negative effects of Sarcoidosis--and Harder is well aware of this. The only way I can figure out how Harder got ahold of my Post Office box for Acclaim Publishing is that he took it off one of the $6,000.00 monthly checks I was sending to ACORN for air-time.

48.    This whole matter belongs in Colorado.

49.    I want nothing to do with Mr. Persante and will not talk with him and feel the only way to have a truthful examination of the facts is for there to be unbiased and truthful counsel as well.

11

50.     Mr. Persante told this Court of having my deposition taken if the Florida matter and has represented to this Court that is the only reason he sent me a notice of Cross Deposition in this case, which he later withdrew.

51.     For the record, I was never given notice of having my deposition taken in the Florida case and never gave a deposition in that case and am appalled that Mr. Persante continually represents the contrary.

52.     For the record, on April 2, 2001, I received a letter from Mr. Harder dated March 28, 2001 regarding being bought out of ELU. (A true and correct copy is attached hereto).

53.     Both myself and Alan Ferris responded to Mr. Harder, sending him a letter on April 2, 2001 requesting full disclosure on the buy-out of ELU. (A true and correct copy is attached hereto).

54.     On April 7, 2001, Both myself and Alan Ferris received a response from Mr. Harder (dated April 3, 2001) regarding ELU, with a demand to either sell our ELU shares or buy-out Mr. Harder. (A true and correct copy of this letter is attached hereto and incorporated herein).

55.     On May 5, 2001 I received a letter from Mr. Harder regarding ELU whit the threat of legal action against me. (A true and correct copy is attached hereto).

56.     Mr. Persante has made it clear that once he is successful in dismissing the Colorado action, he will file suit against me in Florida regarding ELU to obtain a settlement against me. This is nonsense indicative of why I want nothing to do with Mr. Persante.

57.     I feel badly that Mr. Harder finds his physical condition such that it makes it hard for him to travel. However, being "morbidly obese" is a choice, the same as I believe his physical problems are as all one has to do is go out to Mr. Harder's website (www.chuckharder.com) and read,

12

in Harder's own words how he became wheelchair bound. In his own words, he states that he fell, broke dislocated a knee and possibly broke a leg. Instead of going to the emergency room, Harder chose to blame his insurance carrier for not giving him a referral to a specialist, but instead went to bed and stayed there until his injuries healed wrong and then personally paid for his body brace, wheelchair, etc. Now Harder claims to be the voice for the 54 million disabled Americans. One wonders how his actions against Haga (a truly disabled man) could be helping a disabled American.

58.     Finally, in having research done with the Florida Department of State, Department of Corporations, I have learned that Mr. Harder has, over the years, incorporated 11 Corporations in the State of Florida and that almost all of them have been involuntarily dissolved by the State--the same as RPI and ELU and that there have been numerous lawsuits filed by Mr. Harder against former investors. (True and correct copies of the Florida Department of State, Division of Corporations, Coporations Online) are attached hereto and incorporated herein.

It is also outrageous that on Harder's website he continues to do business under ELU despite the fact Florida Dissolved the corporation on 9-22-2000. Harder even has the nerve to have a customer counter for ELU which has gone from 0 to almost 5,000 since 9-22-2000 as he refers to it on his daily radio broadcast. On several occasions, I have spoken with Mr. Barry Williams of the Florida State Department of Banking and Finance about this (as well as filing a formal written complaint which is under investigation) and Mr. Williams assures me they know all about this and though it may take several years, action will be taken.

59.     Mr. Persante states, in documents filed with this Court, that he has never had any knowledge of the financial aspects of any of Harder's companies, and I find this hard to believe as Mr. Persante was the registered agent for Sun Broadcasting, Inc/Sun Radio Network Corporation,

13

another corporation the state of Florida involuntariarly dissolved on 11-09-1990. Yet on Harder's website he proudly states he was the founder of Sun Radio Network.

FURTHER, THE AFFIANT SAYETH NAUGHT

DAVID L. BROTHERS

Sworn to and subscribed before me this 24th day of May, 2001 by DAVID L. BROTHERS.

Maurine Schumann
printed, stamped or typed name of notary

✓ personally known to me

__produced_____ as identification

14

## Radio Press International
## Private Placement Investor Agreement

Radio Press International, Inc. (A Florida for-profit corporation) hereby offers stock to the following person(s) to be classed as a sophisticated investor who is purchasing from an unregistered private placement.

_____ shares of stock @ 00.10 per share total:_____

to be issued to: _____

_____

_____

Signed: _____

Investor

with the understanding that there is a risk of losing the entire investment. This investment is guided by the laws of the State of Florida. Further the above investor warrants that he or she has read the business plan and has been cautioned of all risks of making this investment and there is no guarantee success or return of the investment.

Signed by:


Charles E. Harder
Chairman and acting President

United States District Court
for the
District of Colorado

_____

Civil Action File No.___01-S-356_____

JURY TRIAL DEMANDED

ACCLAIM PUBLISHING COMPANY, INC.
ALAN FERRIS,
MICHAEL HAGA

      Plaintiffs,

v.

CHARLES E. HARDER,
PEOPLES NETWORK, INC., a Florida Corporation,
AMERICAN COMMUNITY ORIENTED RADIO NETWORK, INC.,
a Florida Corporation,
ENERGY LIBERTY UNLIMITED, INC., a Florida Corporation,
RADIO PRESS INTERNATIONAL, INC., a Florida Corporation,
PEOPLES RADIO NETWORK, a subsidiary of Peoples Network, Inc., and/or American
Community Oriented Radio Network,

      Defendants.

_____

## AFFIDAVIT OF ALAN FERRIS

STATE OF COLORADO
COUNTY OF MESA

      Before me the undersigned authority, personally appeared Alan Ferris, and after first being

duly sworn, did depose and state as follows.

      1.     I am a life-long resident of the State of Colorado, over the age of 18 years and have

personal knowledge of the facts contained herein.

      2.     I have read the affidavit of CHARLES E. HARDER, dated May 14, 2001 in this Case,

and feel that I must respond to the many misstatements contained therein.

1

Exhibit E

3.    In July, 1999, I was visiting Mike Haga and David Brothers at David's home at 820 23 Road, Grand Junction, CO.   While I was visiting Mr. Charles E. Harder called and began discussing his public company Energy Liberty Unlimited (ELU).   During the conversation, which Mr. Brothers had on speakerphone,  Mr. Harder solicited Brothers and Haga to invest in ELU.   I said I was also interested in investing as well, as I had been fascinated by Mike Haga's radio program carried on Harder's nationwide radio network.   I gave Mr. Harder my phone number and address for him to send an ELU prospectus to.   Mr. Harder then sent to me the ELU through the US Mail.

4.    During the original phone call, Mr. Charles E. Harder assured me the SEC was in the final process of registering ELU stock for public trading and that Mr. Harder had a financial consultant, Ross Secunda of Hanevan Financial, who would be working with Capstone a market-maker for ELU, stock, and that Mr. Harder would be transferring the assets of PNI/PRN/ACORN to ELU to make it very attractive to future stockholders.

10.    Mr. Harder sent to me the appraised valuation of the assets of PNI/PRN/ACORN showing a current valuation of $4,350,000.

11.    I agreed with Mr. Harder to purchase 12,500 shares of ELU stock for $1.00 per share. Mr. Harder thanked me and said Mark Warner, then President of ELU would contact me with instructions on where to wire transfer my investment in ELU.

12.    On August 12, 1999, pursuant to written instructions from Mr. Harder and Mark Warner, I wired $12,500 from my A.G. Edwards Investment Account in Grand Junction, CO, to First Federal Savings Bank of Florida for my investment in ELU.

13.    On or about August 15, 1999, I received, through the mail in Colorado, a stock certificate for 12,500 shares of ELU stock in the name of  Alan Ferris.

2

14.     Mr. Harder signed the certificate as Chairman.

15.     On or about October 4, 1999, Mr. Brothers walked over to my house and told me Harder was on the phone and wanted to speak to both of us. I went to Brothers home where Mr. Charles E. Harder, *personally solicited*, me in Colorado to loan money to and to invest in Radio Press International, Inc, (RPI) which he said was to be a radio news service he was creating to replace UPI news and that RPI News would become a part of ELU thus tremendously enhancing the value of my ELU stock.

16.     Mr. Harder told me he was personally investing in RPI, had already raised capital to fund RPI for at least one year of operation, that he had already hired the top anchors for the former UPI news, was finishing the RPI Business Plan, and the articles of incorporation for RPI, and that all 125 PNI/PRN/ACORN nationwide radio stations would immediately carry RPI news when it commenced operation in November, 1999 thus assuring that RPI would operate in the black from day one.

17.     Mr. Harder faxed a copy of his Articles of Incorporation for RPI, dated October 8, 1999.

18.     On October 16, 1999, Mr. Harder faxed to me in Colorado a copy of his RPI Business Plan which stated he has 2 national sales reps, will not commence operations until there is $150,000 IN THE BANK, that ACORN is profitable, that MR. Perreault, Mr. Harder's Florida CPA will maintain the RPI books and that Harder will monitor the RPI bank account.

19.     There are SIX pages to the RPI Business Plan, not five as Mr. Harder maintains. The SIXTH page is the RADIO PRESS INTERNATIONAL PRIVATE PLACEMENT INVESTOR AGREEMENT (a true and correct copy is attached hereto and incorporated herein).

3

20.     Though there is a forum selection clause on page 5 of the RPI Business Plan, naming Florida as the place of jurisdiction, both Brothers and I, in another phone call, told Mr. Harder we would not invest in RPI if this were the case and he said don't worry about it, it's just a formality. Just don't sign the Investor Agreement, he said.  That's what we agreed to.  And I did not sign the Investor agreement which would have formed the contract to be bound by the laws of Florida.  In any event, since the whole Business Plan was, in my opinion, fraudulent, the law is clear that the Investor agreement would not be binding even if I had signed it because of the fraud.  (A true and correct copy of the RPI Investor Agreement--which I did not sign--is attached hereto and incorporated herein).   On the Investor Agreement form it states CHARLES E. HARDER, CHAIRMAN AND ACTING PRESIDENT.

21.     As a result of Mr. Charles E. Harder's personal solicitation, as well as his sending the RPI Business Plan to me via fax to me in Colorado, mailing to me in Colorado his Radio Press International, Inc., Business Plan accompanied by his "global plan to put RPI into ELU" I loaned $25,000 to Radio Press International, Inc. and agreed to purchase 250,000 shares of stock in RPI for an additional $25.00.

22.     Pursuant to written instructions from Mr. Harder,  On December 20, 1999, I personally wired $25,025 to Mr. Harder from my A.G. Edwards Investment Account in Grand Junction, Colorado to First Federal Savings Bank in Florida, for RPI, as designated by Mr. Harder.

23.     Mr. Harder faxed to me a copy of the RPI Corporate resolution for deposit accounts showing Mr. Harder and his CPA Doug Perreault as being the only signers on the RPI Business account at First Federal Savings Bank of Florida.

24.     In the original phone call where Harder solicited me to invest in RPI, Mr. Harder

4

personally asked Mike Haga, who Mr. Harder knew was permanently disabled, if he would like to be the President of RPI.

25.    During that phone call, Mr. Haga said he would be honored to be the president, but could not travel to Florida or actually assume any duties as President until his health permitted.  Mr. Harder said that was fine and that Mr. Harder would assume the role of acting President as well as remaining chairman of RPI, until such time as Mr. Haga's health permitted him to actually assume the role of President of RPI.

26.    In early January, 2000 Mike Haga told me that he had learned that Harder, among other things, was using RPI funds to pay ACORN bills and to pay ACORN employees, etc.

27.    Mike Haga demanded that Mr. Harder send the RPI books so we could verify the truthfulness of the information.

28.    On December 29, 1999, Mr. Harder had Mr. Perreault send the RPI books to HAGA.

29.    In early January 2000, David Brothers gave me a copy of an e-mail he and Mike Haga somehow received that Harder had sent on 12-6-1999 to his wife Dianne and Perreault where Harder states that he knew he was bankrupt when he created RPI.  This was a material misrepresentation of fact which Harder knowingly suppressed from me.

30.    In early January Mike Haga received the RPI books and together we verified from cancelled checks signed by Mr. Perreault that Mr. Harder was indeed using RPI funds to pay ACORN bills and employees and to make improvements to the ACORN studio housed in a building owned by Harder's daughter Darlene Stewart (who is also the registered agent of ACORN).  That Mr. Harder had never invested in RPI and did not at any time ever have the required $150,000 IN THE bank to commence operations for RPI as required in his RPI Business Plan.  And that there were no

5

national ad reps onboard for RPI and that the PNI/PRN/ACORN radio stations were not carrying the RPI news.

31. Copies of the bills and checks were made, the books were bundled up and returned to Harder who admitted, in writing that he received them and returned them to Perreault.

32.    Mr. Harder then began making written promises on 1-2-2000, 1-13-2000, 1-23-2000, to repay RPI and ELU investors from the sale of the assets of ACORN/PNI/PRN/ELU.

33.    On January 21, 2000, Mr. Harder sent a fax asking Mike Haga to contact Mr. Bob Persante, legal counsel for PNI/PRN/ACORN/ELU stating that harder's plan was "to recover your investment, etc."

34.    On January 22, 2000 Mike Haga called Mr. Persante and while David Brothers and I were present (because we wanted to know what was going on), listening on the speakerphone, Mr. Persante said: "I thought it had been too quiet down there."  Mr. Persante then went on to talk with Mr. Haga telling him that he (Persante) would make sure the "situation" was resolved correctly as he had known Harder for years and that Harder "often put the cart ahead of the horse leaving me (Persante) to clean up the mess afterwards."

35.    Mr. Haga began opening up to Persante and had several subsequent telephone discussions which I was present at and listened to on the speakerphone, with Persante who continually assured Haga everything would be taken care of.  I believed Haga had an attorney client relationship with Persante, at this juncture.

36.    In one conversation, Haga stated to Persante that he was permanently disabled with Sarcoidosis a progressive disease affecting his heart and lungs and also in his central nervous system and then faxed to Persante a letter which Haga said he planned to file civil and criminal charges

6

against Harder if the matter was not resolved as Persante promised.

37.    On January 31, 2000 Mr. Persante sent a letter to Haga telling Haga that Persante was not comfortable working directly with Haga due to his neurologic problems with Sarcoidosis and told Haga to get a local attorney to work with Persante to "resolve" the issues.

38.    Haga went to Tom Lacroix, esq. and made an appointment for 2-8-2000.

39.    I told Haga to let Lacroix know Haga had the authority to speak for me as well as I could not make the meeting.

40.    Haga met Lacroix on 2-8-2000 and left documentation with Lacroix.

41.    On February 15, Lacroix drafted a 3 day demand letter to Persante.

42.    On February 15, 2000, Haga was served with papers naming him as a defendant in a lawsuit Persante filed in Florida against Haga, alleging defamation of Harder's character by Haga.

43.    I was present when Haga called Persante asking him why he did this and Persante said (over the speakerphone) "we knew you were going to do something so we thought we would head you off and make sure it would be almost impossible for anyone to sue Harder outside the State of Florida." In a subsequent telephone conversation between Haga and Persante, which I was present at and listened to on the speakerphone, Haga told Persante he was upset that Harder used the donation Haga sent to PNI (after receiving in Colorado via the US mail a PNI fund-raising solicitation to help purchase the Telford Hotel in White Springs, FL--to fund operations of ACORN instead--which Harder discusses in his 12-9-99 e-mail to his wife and CPA Doug Perreault) saying "However, I'm getting calls on the air from folks who are getting the package and they are responsive. They have hope that we will get the Telford [Hotel] back. In their mind it is THEIR clubhouse. I figured processing all those checks could keep the order center going after December

15 and it looks like I'm right....." Persante responded to Haga saying: "So What!" "So what!" Persante is counsel for PNI.

44.     I was appalled and continue to be appalled at the mistatements, and outright lies made by not only Harder but Mr. Persante and refuse to discuss anything with Mr. Persante as I don't want to find myself being a target as well.

45.     It is outrageous that Mr. Harder now challenges the jurisdiction of the Colorado Court in this matter as Harder personally approached me in Colorado, I wired all loans and investments from Colorado, have filed complaints with the FBI in Colorado, the Colorado Department of Securities, the SEC, etc.

46.     I also personally know that Mike Haga never controlled the day-to-day operations of RPI as Mr. Harder alleges in his affidavit to this Court. I know for a fact, Haga never signed any contract for RPI, hired anyone for RPI, never visited the RPI operations center in Florida--though Harder diligently tried to get him to, as his health would not permit it at any time. I also know for a fact Haga never controlled or handled the RPI books other than examining and returning them immediately to Mr. Harder. I know for a fact only Harder and Perreault were ever the signers on the RPI bank account. I also can attest to the fact that after Haga examined the RPI books he told Harder he would have nothing to do with RPI and followed it up with a resignation letter on January 17, 2000 to Harder stating that although he was the named President in the Business Plan he had done nothing and wanted to go on record "out of an abundance of caution" to make it clear he resigned. I also have never received a stock certificate for the shares in RPI I purchased.

47.     I have witnessed the detrimental health effects Mr. Haga has suffered when, in March 2000, Haga began receiving bills, at David Brothers post office box for Acclaim Publishing, for RPI

8

addressed Mr. Mike Haga, President, Radio Press International, Inc., P.O. Box 3918, Grand Junction, CO 81505 (wrong zip code as well). In some of these bills were postcards and letters from Mr. Harder telling creditors to send the bills this post office box because "RPI had moved." This has not only been an outright lie, I have watched as Haga's health has gone downhill--with him ending up in the hospital in May last year as stress enhances the negative effects of Sarcoidosis--and Harder is well aware of this.

48.    This whole matter belongs in Colorado.

49.    I also want nothing to do with Mr. Persante and will not talk with him and feel the only way to have a truthful examination of the facts is for there to be unbiased and truthful counsel as well.

50.    Mr. Persante continually writes of having my deposition taken if the Florida matter and has represented to this Court that is the only reason he sent me a notice of Cross Deposition in this case, which he later withdrew.

51.    For the record, I was never given notice of having my deposition taken in the Florida case and never gave a deposition in that case and am appalled that Mr. Persante continually represents the contrary.

52.    For the record, on April 2, 2001, I received a letter from Mr. Harder dated March 28, 2001 regarding being bought out of ELU. (A true and correct copy is attached hereto).

53.    Both myself and David Brothers responded to Mr. Harder, sending him a letter on April 2, 2001 requesting full disclosure on the buy-out of ELU. (A true and correct copy is attached hereto).

54.    On April 7, 2001, Both myself and David Brothers received a response from Mr.

9

Harder (dated April 3, 2001) regarding ELU, with a demand to either sell our ELU shares or buy-out Mr. Harder.  (A true and correct copy of this letter is attached hereto and incorporated herein).

55.   On May 5, 2001 I received a letter from Mr. Harder regarding ELU whit the threat of legal action against me. (A true and correct copy is attached hereto).

56.   Mr. Persante has made it clear that once he is successful in dismissing the Colorado action. he will file suit against me in Florida to obtain a settlement against me.  This is nonsense indicative of why I want nothing to do with Mr. Persante and feel he should be disqualified as counsel in this Case so we can get at the truth instead of this continual paper chase which is costing time and money.

57.   I have tried on two occasions to talk with Mr. Persante to let him know that I planned to file a motion to have him disqualified in this case and each time he was unavailable am in the middle of planting season and don't have the time to continue try to talk with him and will not talk with him without either Haga or Brothers being present as I don't want my words to be twisted into what I believe Persante will use as grounds for a lawsuit against me as it seems there is a pattern here.

58.   David Brothers and I have done a lot of research on the Internet through the Florida Department of State, Division of Corporations, Corporations online and have learned that Mr. Harder has incorporated at least 11 corporations over the years and it seems that most of these companies have been involuntarily dissolved by the State.  Brothers has attached true and correct Copies to his affidavit and it is most troubling.

59.   I am appalled that Mr. Harder continues, to date, to do business through ELU, even though Florida dissolved it on 9-22-2000 and that he promotes it on his website:

www.chuckharder.com where there is a customer visit counter which one year ago stood at zero and today is near 5,000. Products and services are offered. Amazing.

60.    I filed a formal complaint with the State of Florida, Department of Banking and Finance regarding this and I know that Mr. Brothers has spoken several times with Mr. Barry Williams at this office and was told a formal investigation is underway and that it will take a long time but that action will be taken.

FURTHER, THE AFFIANT SAYETH NAUGHT

ALAN FERRIS

Sworn to and subscribed before me this 26th day of May, 2001 by ALAN FERRIS.

Aubrey J. Carlos
printed, stamped or typed name of notary

__personally known to me


My Commission Expires 3/11/2002

ⓧproduced drivers license as identification

11

United States District Court
for the
District of Colorado

Civil Action File No.___01-S-356_____
JURY TRIAL DEMANDED

ACCLAIM PUBLISHING COMPANY, INC.
ALAN FERRIS,
MICHAEL HAGA

       Plaintiffs,

v.

CHARLES E. HARDER,
PEOPLES NETWORK, INC., a Florida Corporation,
AMERICAN COMMUNITY ORIENTED RADIO NETWORK, INC.,
a Florida Corporation,
ENERGY LIBERTY UNLIMITED, INC., a Florida Corporation,
RADIO PRESS INTERNATIONAL, INC., a Florida Corporation,
PEOPLES RADIO NETWORK, a subsidiary of Peoples Network, Inc., and/or American
Community Oriented Radio Network,

       Defendants.

## AFFIDAVIT OF MICHAEL HAGA

STATE OF COLORADO
COUNTY OF MESA

       Before me the undersigned authority, personally appeared DAVID L. BROTHERS, and after first

being duly sworn, did depose and state as follows:

       1.     I am a life-long resident of the State of Colorado, over the age of 18 years and have personal

knowledge of the facts contained herein.

       2.     I have read the affidavit of CHARLES E. HARDER, dated May 14, 2001 in this Case,

DEFENDANT HARDER'S REPLY TO PLAINTIFF HAGA'S RESPONSE TO HARDER'S MOTION TO

DISMISS, dated May 17, 2001; DEFENDANT'S MOTION TO DISMISS FOR IMPROPER VENUE AND

1

*Exhibit F*

FORUM NON-CONVENIENS, dated May 17, 2001; DEFENDANT'S MEMORANDUM OF LAW IN

SUPPORT OF MOTION TO DISMISS, dated May 17, 2001; and DEFENDANT'S MOTION TO DISMISS

COUNTS XII, XV, XVI OF PLAINTIFF'S AMENDED COMPLAINT, dated May 17. 2001, and feel that

I must respond to the many false statements contained therein.

3.      Mr. Harder personally solicited me in Colorado to be the President of RPI at the same time

he personally solicited Colorado Investors in RPI (See affidavits of David Brothers and Alan Ferris).

4.      I was named as the President of RPI in Mr. Harder's RPI Business Plan only.

5.      There was never an election of officers nor a meeting of shareholders for RPI.

6.      Mr. Harder was aware, from day one, of my chronic and progressive physical and neurological

disability--Sarcoidosis/Neurosarcoidosis and agreed to be the acting President of RPI until I could assume the

duties of President--which never occurred.

7.      I never ran the day-to-day operations of Radio Press International, Inc. (RPI).

8.      I don't even know the names of the employees Mr. Harder hired to work for RPI.

9.      I was never on the RPI bank account, never signed a contract committing RPI funds for

anything.

10.     I did demand to see the RPI books in late December, 1999, after Kay Reetz called me to tell

me Harder was using RPI funds to pay for ACORN bills, etc.

11.     Mr. Harder told Mr. Perreault, in writing, on December 29, 1999 to Send the RPI Books to

the house where I reside at 820 23 Road, Grand Junction, CO 81505.

12.     Together with David Brothers and Alan Ferris (investors in RPI) we examined the books and

made copies of ACORN bills paid for with RPI funds via checks signed by Mr. Perreault.

13.     The books were returned to Mr. Harder who acknowledged receipt in writing on January 25,

2000 also stating that Harder returned them to Mr. Perreault.

14.     I did have several telephone discussions with Mr. Persante and felt he was representing me

2

and that we had an attorney client relationship, after Mr. Harder had me call him on January 22, 2000.

15.     I had forgotten that Mr. Brothers and Mr. Ferris were present when I called Mr. Persante and that the call was on a speakerphone.  See affidavits of Mr. Brothers and Alan Ferris.

16.     During that first phone call, Mr. Persante told me that he would "resolve" the situation and not to worry as Persante had worked for and represented Harder and his companies for years and that Harder often put the cart ahead of the horse leaving Persante to clean up the mess afterwards.

17.     When I told Mr. Persante of my chronic medical condition, he followed up with a letter on January 31, 2000 telling me he was not comfortable working with me with my medical condition and that he would work only with an attorney and told me to get one.

18.     I scheduled a meeting with Tom Lacroix and on 2-8-2000 took all the documentation to Mr. Lacroix, along with the written promises of Mr. Harder to repay the investors. Mr. Brothers and Mr. Ferris were unable to attend the meeting but gave Lacroix authorization for me to speak for them--although the documentation says it all.

19.     On 2-15-2000, Mr. Lacroix sent a 3 day demand letter to Mr. Persante asking Persante to contact Lacroix.

20.     On 2-15-2000 I was served with a lawsuit Harder and Persante filed in Florida on 2-10-2000 against me in which Harder alleges I defamed his character when I threatened to file criminal and civil actions against Harder for a fraudulent business plan in RPI.

I feel it was nothing more than bad faith on Mr. Persante's part to file a lawsuit against me in Florida during the very time I felt he was working with me to resolve a situation which Mr. Harder, in writing promised to do--repay the investors.

21.     After reading the affidavits of Mr. Brothers and Mr. Ferris, I remember Mr. Persante telling me why he filed the Florida lawsuit against me--to get jurisdiction in Florida and to prevent

3

the investors from pursuing Harder in Colorado.

22.     Jamie Fired, the Florida attorney I had to borrow money to hire to represent me in the Florida matter, also told me that Persante told her "We knew that Haga was going to do something, so we thought we better head him off."

23.     I have requested an affidavit from Mrs. Fried who will not give one, but will so testify to this if called to do so.

24.     I have never done any business in the State of Florida (see affidavit of David Brothers)

25.     I did voluntarily host a daily radio program on Mr. Harders Peoples Radio Network, American Community Oriented Radio Network, Peoples Network, Inc. However, the network called me in Colorado for each program.

26.     There were days when I could not host the program due to health reasons.

27.     I have never received any income from Acclaim Publishing. I own no stock or any other interest in Acclaim Publishing. Acclaim Publishing did publish 4 books of mine from 1992 to 1995 when I became disabled. I have never received any royalties from Acclaim Publishing-- though I had always hoped to and would have had Acclaim not paid out excessive costs, like the $6,000 per month Mr. Harder charged a\Acclaim for my broadcast.

28.     I am totally disabled and have been since 1995, when Social Security found me to be so disabled, though I long to be productive again.

29.     Mr. Brothers and Mr. Ferris have filed suit in Colorado, alleging fraud on the part of Mr. Harder who personally solicited them, in Colorado to invest in two of his Florida corporations, Energy Liberty Unlimited, and Radio Press International. (See affidavits of Mr. Brothers and Mr.

4

Ferris).

30.     I also filed suit in Colorado against Mr. Harder who began a systematic mail fraud campaign against me by sending postcards and letters to RPI creditors telling them to send all the bills to me in Colorado at a post office box belonging to Acclaim Publishing (See affidavit of David Brothers).

31.     Mr. Harder commenced his postcard and letter campaign in March, 2000--even though Harder admits in his Florida lawsuit against me that I resigned as President of RPI in January, 2000.

32.     In the Florida lawsuit, Mr. Harder states (in his affidavit) that I was the co-incorporator of RPI which is an absolute lie.

33.     In Mr. Harder's response to the Colorado lawsuit both Mr. Harder and his attorney Mr. Persante now claim I ran the day to day operations of RPI which is an outright lie.  Nowhere does Mr. Persante nor Mr. Harder now claim I was the co-incorporator of RPI.  It is amazing how their stories have changed.

34.     Mr. Persante now claims that my claims in Colorado were compulsory counterclaims in the Florida proceeding as they arose out of the same occurrence or transaction.  This is nonsense.  Again, Mr. Harder admits in his Florida pleadings, I resigned as President in January, 2000.  That severed whatever legal connection I would have had to RPI and Harder's mail fraud campaign is a totally separate occurrence, transaction which Mr Harder commenced much later, when I had no legal relationship whatsoever to RPI.

35.     Mr. Persante and Mr. Harder now claim that I controlled the books for RPI.  More nonsense.  The only connection whatsoever I had with the RPI books was when I demanded to see

5

them and Mr. Harder and Mr. Perreault sent them to me at my residence on December 29, 1999.

After documenting (for investors) Mr. Harder's and Mr. Perreault's improper use of RPI funds to pay

ACORN bills, etc., they were returned to Mr. Harder who admitted receipt in writing and returned

them to Mr.Perreault.

36.     I am unable to travel for more than short distances.  On Friday, May 18, 2001, I met

with my primary care physician, Dr. Horowitz who, after a complete examination (though I see him

very frequently) wrote the attached letter stating that air travel is out of the question and that even

short trips are medically risky.  (see a true and correct copy--the Florida Court has the original of Dr.

Horowitz's letter of May 18, 2001 which is attached hereto and incorporated herein.

37.     I do admit that I have memory problems which are severe at times is there is swelling

of the brain which MRI's document as needed.  However, in the Florida case, I filed a motion for the

appointment of a Guardian ad Litem which the Florida court rejected finding I was competent

enough to draft the motion so I am competent.

38.     Mr. Persante had no problem with the ruling of the Florida Court but now raises the

question of my competency with the Colorado Court.  More nonsense.  I am drafting this affidavit

and feel perfectly competent to do so.  If, at any point I feel I cannot represent myself, I will have a

guardian appointed to so represent me.

39.     It appears that Mr. Harder is no stranger to creating corporations and then leaving

them and investors, and Mr. Persante to clean up the mess.  (See affidavit of David Brothers with

attachments).

40.     I believe Mr. Persante cleans up the messes by first endearing himself (as he did to

me) to people Mr. Harder has gotten involved in his corporations, getting them to open up to him

and then finding a reason to file suit against them to place them on the defensive, creating so much legal mumbo-jumbo in the process that they give up and Harder wins. It will not happen this time, not if my health will hold together long enough to get the truth out.

41.     I hold no ill will toward Mr. Harder, though I am upset that there is this whole other side to him that radio listeners of his FOR THE PEOPLE nationwide daily broadcast never see. I am upset that Mr. Harder would take money from people for donations to specific causes, like the purchase of the Telford Hotel (which was to become the headquarters of RPI/PRN/PNI/ACORN/ELU) and then in writing, as he did on 12-9-99 tell his wife and his CPA (who was also handling the books for RPI and wrote RPI checks to pay ACORN bills) that he knew that processing all those (donations) checks would keep the order center operating.

42.     I sent a $100.00 donation to help purchase the Telford Hotel pursuant to the PNI non-profit fundraiser solicitation I received in Colorado only to learn it was used to keep the for-profit ACORN order center operating. That's not right.

43.     Mr. Persante's response when I told him of this was: "So What! So What!" (See affidavit of Alan Ferris).

44.     I feel badly that Mr. Harder now claims to be disabled because he is morbidly obese and wheelchair bound due to leg injuries he suffered in a fall. However, Harder freely admits on his website that the injuries healed wrong because he did not get proper medical attention. Being overweight and not seeking medical attention--were and are choices. Many of us who are truly disabled do not have the luxury of that CHOICE.

45.     By the time trial rolls around, Mr. Harder could lose weight and have his leg fixed--again, it is CHOICE. I don't have the luxury of that choice, nor do most of the 54 million disabled

Americans Harder now claims to be the voice for on his daily nationwide radio broadcast and his websites. I have also asked Mr. Persante, in discovery, to provide documentation showing that someone other than Mr. Harder has declared him to be disabled. I have yet to receive a response. I also find it ironic that Mr. Harder, personally decided to have his leather body brace built at, he said to me, his own expense along with purchasing his wheelchair, etc. Insurance companies ordinarily pay for these things, if there is a need.

46.     It is also critically important that on May 1, 2001, the Florida Court, in Harder's action against me for defamation,  issued an ORDER REFERRING CASE TO MEDIATION stating: "Because of limited judicial resources available to try civil cases and given the nature of this proceeding which suggests that mediation........." The court then ordered the case to mediation. (A true and correct copy of the ORDER is attached hereto and incorporated herein).

47.     Interestingly enough, Mr. Persante never references this order in his paper barrage in the Colorado Court. On the contrary Persante continually tries to get the Colorado case dismissed or transferred to Florida despite the fact the Colorado investors have nothing to do with the Florida litigation.

48.     Mr Persante also harps to the Colorado Court about trying to cross-depose the Colorado investors when he was to allegedly depose them in the Florida matter. But when you read the affidavits of Brothers and Ferris, they never received notice of having their depositions taken in the Florida matter and have never been deposed. More nonsense.

49.     I am filing a Motion to Dismiss or Transfer venue to the Colorado Court where the investor claims reside. This is where it belongs, especially in light of the Florida Court ordering mediation. I have no choice. My doctor prohibits travel as it could possibly take my life, not to

8

mention the fact that I am at one Dr's office or another almost 2 days of every week.  Again, Mr. Harder has a choice.

50.    I am also, like Brothers and Ferris asking that Mr. Persante be disqualified as Colorado counsel for Mr. Harder so the truth in this matter can be achieved without the ongoing mistatements and continual paper barrage.

51.    Now that I have read the affidavits of Brothers and Ferris, I am also going to be asking the Florida Court to award me attorney fees as Mr. Persante admitted to them he filed the matter in bad faith and Jamie Fried will, if needed, corrobborate this fact.

FURTHER, THE AFFIANT SAYETH NAUGHT

_Michael W. Haga_
MICHAEL W. HAGA

Sworn to and subscribed before me this 24th day of May, 2001 by MICHAEL W. HAGA.

_Aubrey J. Carlos_
_Aubrey J. Carlos_
printed, stamped or typed name of notary

__personally known to me

X produced _drivers license_ as identification

NOTARY PUBLIC
AUBREY J. CARLOS
STATE OF COLORADO

My Commission Expires 3/11/2002

9

## Radio Press International
## Private Placement Investor Agreement

Radio Press International, Inc. (A Florida for-profit corporation) hereby offers stock to the following person(s) to be classed as a sophisticated investor who is purchasing from an unregistered private placement.

_____ shares of stock @ 00.10 per share total:_____  -

to be issued to: _____

_____

_____

Signed: _____

       Investor      .

with the understanding that there is a risk of losing the entire investment. This investment is guided by the laws of the State of Florida. Further the above investor warrants that he or she has read the business plan and has been cautioned of all risks of making this investment and there is no guarantee success or return of the investment.

Signed by:

Charles E. Harder
Chairman and acting President

EXhibit  B